## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER L. CRANE, DAVID A. ENGLE, ANASTASIA MARIE CARROLL, RICARDO DIAZ, LORENZO GARZA, FELIX LUCIANO, TRE REBSTOCK, FERNANDO SILVA, SAMUEL MARTIN, JAMES D. DOEBLER, and THE STATE OF MISSISSIPPI, by and through GOVERNOR PHIL BRYANT** | ) ) ) ) ) ) ) ) ) ) | |
| | ) | **Civil Action No. 3:12-cv-03247-O** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| | ) | **AMENDED COMPLAINT** |
| **JANET NAPOLITANO, in her official capacity as Secretary of Homeland Security, JOHN MORTON, in his official capacity as Director of Immigration and Customs Enforcement, and ALEJANDRO MAYORKAS, in his official capacity as Director of United States Citizenship and Immigration Services** | ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

### INTRODUCTION

1.      Plaintiffs are law enforcement officers of United States Immigration and Customs Enforcement ("ICE"), as well as the State of Mississippi by and through Governor Phil Bryant, pursuant to Miss. Code Ann. §§ 7-1-5(n) and 7-1-33.

2.      On June 15, 2012, Defendant Secretary of Homeland Security Janet Napolitano issued a Directive entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (hereinafter "the Directive"). The Directive, attached to

this Complaint as Appendix A, instructs ICE officers to refrain from placing certain aliens who are unlawfully present in the United States ("illegal aliens") into removal proceedings, and to take actions to facilitate the granting of deferred action to aliens who are unlawfully present in the United States.  The Directive also directs DHS personnel to grant employment authorization to certain beneficiaries of the Directive.

3.     The requirements that an unlawfully present alien must assert to be granted the privileges described in the Directive are that the alien:

• came to the United States under the age of sixteen;

• has continuously resided in the United States for a least five years preceding June 15, 2012, and was present in the United States on June 15, 2012;

• is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

• has not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and does not otherwise pose a threat to national security or public safety; and

• is not above the age of thirty.

4.     The Directive commands ICE officers to violate federal law, as detailed below, commands ICE officers to violate their oaths to uphold and support federal law, violates the Administrative Procedure Act, unconstitutionally usurps and encroaches upon the legislative powers of Congress, as defined in Article I of the United States Constitution, and violates the obligation of the executive branch to faithfully execute the law, as required by Article II, Section 3, of the United States Constitution.

2

5.      Plaintiffs bring this civil action to seek injunctive relief preventing the implementation of this unlawful and unconstitutional Directive.

6.      This lawsuit seeks to prevent law enforcement officer Plaintiffs from being forced to either violate federal law if they comply with the unlawful Directive or risk adverse employment action if they disobey the unlawful orders of the DHS Secretary.

7.      This lawsuit also seeks to protect the State of Mississippi from the fiscal burden imposed upon the State by illegal aliens who would otherwise be placed in removal proceedings and removed from the United States, but for the implementation of the unlawful Directive.

8.      This lawsuit also seeks to preserve the balance of legislative and executive powers established by the United States Constitution.

## THE PARTIES

**Plaintiffs**

9.      Plaintiff Christopher L. Crane is an ICE Deportation Officer.  He serves in Enforcement and Removal Operations at the Salt Lake City Field Office at 2975 Decker Lake Drive, Stop A, in West Valley City, Utah.  He is also the President of the ICE Agents and Officers Union, AFGE Council #118.  As an ICE Deportation Officer, Crane is authorized by law to, *inter alia*, arrest aliens for administrative immigration violations or for any criminal offense against the United States and execute administrative and criminal arrest warrants.

10.     Plaintiff David A. Engle is an ICE Immigration Enforcement Agent.  He serves in Enforcement and Removal Operations at the Dallas Field Office at 8101 N. Stemmons Freeway, in Dallas, Texas.  As an ICE Immigration Enforcement Agent, Engle is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and execute administrative arrest warrants for aliens.

11.     Plaintiff Anastasia Marie Carroll is an ICE Immigration Enforcement Agent.  She serves in Enforcement and Removal Operations at the El Paso Field Office at 1545 Hawkins Boulevard, in El Paso, Texas.  As an ICE Immigration Enforcement Agent, Carroll is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and execute administrative arrest warrants for aliens.

12.     Plaintiff Ricardo Diaz is an ICE Immigration Enforcement Agent.  He serves in Enforcement and Removal Operations at the El Paso Field Office at 1545 Hawkins Boulevard, in El Paso, Texas.  As an ICE Immigration Enforcement Agent, Diaz is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and execute administrative arrest warrants for aliens.

13.     Plaintiff Lorenzo Garza is an ICE Immigration Enforcement Agent.  He serves in Enforcement and Removal Operations at the Port Isabel Detention Center at 27791 Buena Vista Boulevard, in Los Fresnos, Texas.  As an ICE Immigration Enforcement Agent, Garza is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and execute administrative arrest warrants for aliens.

14.     Plaintiff Felix Luciano is an ICE Immigration Enforcement Agent.  He serves in Enforcement and Removal Operations at the San Diego Field Office at 880 Front Street, Suite B-2232, in San Diego, California.  As an ICE Immigration Enforcement Agent, Luciano is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and execute administrative arrest warrants for aliens.

15.     Plaintiff Tre Rebstock is an ICE Immigration Enforcement Agent.  He serves in Enforcement and Removal Operations at the Houston Field Office at 7405 C-1 Highway 75 South, in Huntsville, Texas.  As an ICE Immigration Enforcement Agent, Rebstock is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and execute administrative arrest warrants for aliens.

16.     Plaintiff Fernando Silva is an ICE Immigration Enforcement Agent.  He serves in Enforcement and Removal Operations at the El Paso Field Office at 1545 Hawkins Boulevard, in El Paso, Texas.  As an ICE Immigration Enforcement Agent, Silva is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and issue administrative arrest warrants for aliens.

17.     Plaintiff Samuel Martin is an ICE Immigration Enforcement Agent.  He serves in Enforcement and Removal Operations in the El Paso Field Office at 8915 Montana Avenue, in El Paso, Texas.  As an ICE Immigration Enforcement Agent, Martin is authorized to, *inter alia*, arrest aliens for immigration violations, arrest any person for felonies regulating the admission or removal of aliens, and execute administrative arrest warrants for aliens.

18.     Plaintiff James D. Doebler is an ICE Deportation Officer.  He serves in Enforcement and Removal Operations in the Dover Sub-Office at 1305 McD Drive, in Dover, Delaware.  As an ICE Deportation Officer, Doebler is authorized by law to, *inter alia*, arrest aliens for administrative immigration violations or for any criminal offense against the United States and execute administrative and criminal arrest warrants.

19.     Each ICE plaintiff is authorized to execute the laws of the United States pursuant to statutory authority and delegated authority under regulations of the Department of Homeland Security.

20.     Illegal immigration imposes a wide variety of significant fiscal costs on Plaintiff the State of Mississippi and its taxpayers, including but not limited to:  costs associated with educating illegal aliens in the State's K-12 school system; costs related to uncompensated healthcare provided by state agencies, hospitals, and clinics; law enforcement costs associated with arresting, prosecuting, and incarcerating illegal aliens in the State's criminal justice system; and lost tax revenues and economic losses related to illegal aliens who work "off the books" and thereby avoid paying state taxes and/or who send "remittances" to relatives in foreign countries, diverting dollars that otherwise would remain in the State's economy and generate additional state tax revenues.

21.     Governor Phil Bryant brings this suit on behalf of the State of Mississippi pursuant to Miss. Code Ann. §§ 7-1-5(n) and 7-1-33.

**Defendants**

22.     Defendant Janet Napolitano is the Secretary of Homeland Security and the head of the United States Department of Homeland Security ("DHS") and in her official capacity is responsible for the enforcement of federal immigration laws, 6 U.S.C. § 112, 8 U.S.C. § 1101, et seq., pursuant to 8 U.S.C. § 1103(a)(2).

23.     Defendant John Morton is the Director of United States Immigration and Customs Enforcement (ICE) and in his official capacity is responsible for administering all operations of ICE.  Defendant Morton is not authorized to promulgate regulations implementing the Immigration and Nationality Act.

24.     Defendant Alejandro Mayorkas is the Director of United States Citizenship and Immigration Services (USCIS) and in his official capacity is responsible for administering all

operations of USCIS.  Defendant Mayorkas is not authorized to promulgate regulations implementing the Immigration and Nationality Act.

25.     Defendant Napolitano issued the Directive on June 15, 2012, and is the executive branch official responsible for its implementation by and through her inferior officers and other employees of DHS.  Defendant Napolitano is the official authorized to promulgate regulations implementing the Immigration and Nationality Act in the Department of Homeland Security.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiffs' claims under the Constitution and laws of the United States.  This Court is authorized to grant Plaintiffs' requests for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the majority of the Plaintiffs named in this complaint reside and work in the State of Texas.  Plaintiff Engle resides and works in the Northern District of Texas.

## THE DIRECTIVE AND RELATED EVENTS

28.     On June 17, 2011, Defendant Morton issued a Memorandum entitled "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (the "Morton Memorandum").

29.     On June 15, 2012, Defendant Napolitano issued the Directive.

30.     In July 2012, DHS issued the "ERO Supplemental Guidance:  Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children" which directs Plaintiffs and other DHS personnel to implement the terms of the Directive.

31.     In early August 2012, DHS issued a document of more than 90 pages explaining how applicants for the benefits of the Directive would be processed by DHS, entitled "National Standard Operating Procedures (SOP):  Deferred Action for Childhood Arrivals (DACA) (Form I-821D and Form I-765)."

32.     On August 15, 2012, DHS began full implementation of the Directive, including receiving applications and distributing the benefits of deferred action and employment authorization.

33.     The orders in the field that have been given to Plaintiffs by their supervisors are that an alien only needs to *claim* that he is covered by the Directive in order to be released and offered the benefits of the Directive.  ICE agents are prohibited from demanding that an alien provide proof that he meets the Directive's criteria.

34.     On August 16, 2012, DHS published a Federal Register Notice soliciting public comments on the Directive.  The Notice offered for review and comment no actual rules that will be promulgated.  Instead, it only solicited comments on the questions to be posed on the form that DHS has developed to accept applications for benefits under the Directive.  DHS categorized the notice as an "information collection" exercise.

35.     According to official estimates provided on August 16, 2012, by the U.S. Citizenship and Immigration Service, pursuant to the Paperwork Reduction Act, the number of aliens unlawfully present in the United States who qualify for the benefits offered by the Directive is estimated to be 1.76 million.  Source:  U.S. Citizenship and Immigration Services, *Agency Information Collection Activities: Consideration of Deferred Action for Childhood Arrivals, Form I–821D, New Information Collection; Emergency Submission to the Office of Management and Budget; Comment Request*,  77 Fed. Reg. 49451 (Aug. 16, 2012) (1,041,300

estimated total number of responses for new Consideration of Deferred Action for Childhood

Arrivals, Form I-821D, USCIS); U.S. Citizenship and Immigration Services, *Agency Information*

*Collection Activities: Application for Employment Authorization, Form I–765, Revision of a*

*Currently Approved Information Collection; Emergency Submission to the Office of*

*Management and Budget; Comment Request*, 77 Fed. Reg. 49453 (Aug. 16, 2012) (estimated

1,761,300 responses related to Application for Employment Authorization Document, Form I–

765, USCIS; 1,385,292 responses related to Biometrics; 1,047,357 responses related to

Application for Employment Authorization Document Worksheet, Form I–765WS, USCIS; and

1,761,300 responses to required Passport-Style Photographs).

36.     According to DHS, the number of aliens unlawfully present in the United States is

estimated to be 11.5 million.  Michael Hoefer, Nancy Rytina, and Bryan Baker, "Estimates of the

Unauthorized Immigrant Population Residing in the United States: January 2011" (March 2012),

available at http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf.

## FEDERAL STATUTORY BACKGROUND

37.     In 1996, Congress sought to significantly reduce executive discretion in the

enforcement of federal immigration laws: "[I]mmigration law enforcement is as high a priority

as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in

the United States undetected and unapprehended."  H.R. Rep. 104-725 (1996), at 383.

38.     Enacted in 1996, 8 U.S.C. § 1225(a)(1) provides that "an alien present in the

United States who has not been admitted … shall be deemed for purposes of this chapter an

applicant for admission."

39.     8 U.S.C. § 1225(a)(3) provides that all applicants for admission "shall be

inspected by immigration officers."

40.      8 U.S.C. § 1225(b)(2)(A) mandates that "if the examining immigration officer determines that an alien seeking admission is not *clearly and beyond a doubt* entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." (emphasis added).

41.      Deferred action is not specifically authorized anywhere in federal law. Historically, deferred action has been utilized sparsely for small numbers of aliens in discrete distress pending statutory or foreign policy-mandated regulatory changes.  No group of aliens has been granted deferred action in the past 15 years that approaches a fraction of the size of the class of aliens subject to the Directive.

42.      Regulations describe deferred action only in the application sense as authorizing employment upon *application* in 8 C.F.R. § 274a.12(c)(14), or application for social security benefits, 8 C.F.R. § 1.3(a)(4)(vi).  Accordingly, "deferred action" is a substantive government *benefit*.

43.      Federal regulations do not authorize the Secretary to grant deferred action wholesale to a large number of illegal aliens.

44.      Eligibility for a substantive immigration benefit may not be conferred as a matter of prosecutorial discretion, but only by regulations promulgated under authority delegated by Congress, consistent with the terms of the law authorizing the regulations.

45.      By definition, "prosecutorial discretion" cannot be used to confer a substantive benefit.

46.      USCIS is not a law enforcement agency and has no "prosecutorial" authority.  As such, USCIS cannot exercise "prosecutorial discretion."

**HARM**

47.    ICE Plaintiffs have each sworn an oath to support and defend the Constitution of the United States and the laws of the United States.

48.    ICE Plaintiffs believe that if they follow the Directive, they will be violating their oath of office, as well as violating several laws of the United States.

49.    ICE Plaintiffs reasonably fear, based upon official communications to them, their knowledge of communications to Plaintiff Doebler, Plaintiff Martin, and Plaintiff Crane from their superiors, past events, and public sources, that if they follow the requirements of federal law, contrary to the "Directive," and arrest an alien or issue an alien an Notice to Appear (NTA) in removal proceedings, they will be disciplined or suffer other adverse employment consequences.

50.    Plaintiff James D. Doebler arrested an alien who was unlawfully present in the United States and issued the alien an NTA, contrary to the general directions of his supervisors that he should decline to issue NTAs to certain illegal aliens.  Plaintiff Doebler was issued a Notice of Proposed Suspension.  Plaintiff Doebler is facing a three-day suspension for arresting and processing the alien for a hearing rather than exercising the "prosecutorial discretion" commanded by his supervisors.  Plaintiff Doebler requested a written directive ordering him not to issue the NTA.  His supervisors have refused to give him a written directive and would not sign any paperwork authorizing the use of "prosecutorial discretion."

51.    Plaintiff Doebler reasonably fears, based on his past experience, that if he follows the requirements of federal law, contrary to the "Directive," and arrests an alien or issues the alien an NTA, he will be disciplined again.  He reasonably fears that a second disciplinary action will result in the loss of his job.

11

52.     On July 17, 2012, Plaintiff Samuel Martin, along with another immigration enforcement agent, picked up an illegal alien from the El Paso County Jail.  While the agents were trying to place the alien in the vehicle, the alien attempted to escape, and resisted and assaulted Plaintiff Martin and his colleague.  The agents regained custody of the alien and transported him to the El Paso Criminal Alien Program office for processing.  Plaintiff Martin's supervisors ordered him to release the alien without any charges being filed against the alien and ordered Plaintiff Martin not to issue an NTA.  The agents who were present protested the release of the alien; but they were told "it was a management decision, based on the President's new immigration policies."  No supervisor ever asked the agents if they were injured or if they needed assistance.  It is the understanding of Plaintiff Martin, reflected in his signed statement concerning the incident, that his supervisors gave him these orders based on the Directive.

53.     On January 25, 2012, Plaintiff Christopher L. Crane, in his capacity as President of the ICE Agents and Officers Union, filed a Demand to Bargain with Defendants, expressing significant concerns with the Morton Memorandum, including that the actions that ICE agents would have to take or not take under it were contrary to federal law.  The Demand to Bargain included the proposal that: "No employee will be subject to disciplinary or adverse action for refusing to obey an unlawful order."

54.     On April 5, 2012, Plaintiff Christopher L. Crane, in his capacity as President of the ICE Agents and Officers Union, submitted Additional Proposals, reiterating that officers should not be subject to discipline or adverse action for refusing to obey an unlawful order.  Plaintiff Crane also filed an Information Request at that time.

55.     On August 20, 2012, nearly eight months after the January 25, 2012, Demand to Bargain, Defendant Morton sent a letter to the ICE Agents and Officers Union merely indicating

that Defendant Morton "may" formally respond to the January 25, 2012, Demand to Bargain and the April 5, 2012, Additional Proposals at an unspecified time in the future.  In the past, when confronted with a Demand to Bargain letter, Defendants have ultimately refused to bargain at all and have refused to make any changes to their policies.

56.     As of the filing of this complaint, Defendants have not changed ICE policies in any way in response to Plaintiff Crane's January 25, 2012, Demand to Bargain and April 5, 2012, Additional Proposals.

57.     ICE Plaintiffs reasonably expect that the filing of a similar Demand to Bargain in order to protest the Directive would be treated in a similarly non-responsive manner, and that it would not result in any response or alteration of the Directive policy.

58.     Because ICE Plaintiffs are now being ordered to implement the Directive, they have an immediate and urgent need for relief.   They are being ordered to violate federal law and are facing discipline or adverse employment action if they follow federal law.

59.     Defendants Napolitano and Morton are obligated, under the terms of their signed agreement with the ICE Agents and Officers Union, to issue an "Article 9A Notice of Proposed Change" prior to the alteration of agency policies.  The purpose of such a Notice is to allow ICE agents and officers to provide input regarding proposed agency policies.  No such Notice was issued prior to the June 15, 2012, Directive or its August 15, 2012, implementation date.

60.     Plaintiff the State of Mississippi will be compelled to bear the foreseeable fiscal costs of the illegal aliens residing in Mississippi who are not placed in removal proceedings, who are granted deferred action, or who are otherwise permitted to remain in the State of Mississippi, as a direct consequence of the Directive.

61.     Mississippi Governor Phil Bryant formerly served as the State Auditor of Mississippi.  In that capacity, on February 21, 2006, he issued a report entitled "The Impact of Illegal Immigration on Mississippi:  Costs and Population Trends" (OSA Report).  A copy of the OSA Report is attached to this Amended Complaint.

62.     The OSA Report concluded that the *net* fiscal impact of illegal aliens in the State of Mississippi was at least $25 million per year.  The OSA Report took into consideration the tax contributions made to the State by illegal aliens.

63.     The OSA Report was based on an estimate that the number of illegal aliens in Mississippi in 2006 was 49,000.  This represented a midpoint among various estimates available at the time.  Upon information and belief, the State's current illegal alien population remains that high, if not higher.

64.     Prior to the issuance of the Directive, a significant number of illegal aliens aged 30 and younger were removed from the State of Mississippi by the federal government each year.

65.     The implementation of the Directive will allow a significant number of illegal aliens aged 30 and younger, who would otherwise have been removed, to remain in the State of Mississippi.

66.     The illegal alien beneficiaries of the Directive that remain in the State of Mississippi will impose a net fiscal cost on the State that is foreseeable, estimable, and significant.  The sources of that fiscal cost are described in the OSA Report.  They include, *inter alia*: costs associated with educating illegal aliens in the State's K-12 school system; costs related to uncompensated healthcare provided by state agencies, hospitals, and clinics; law enforcement costs associated with arresting, prosecuting, and incarcerating illegal aliens in the

State's criminal justice system; and lost tax revenues and economic losses related to illegal aliens who work "off the books" and thereby avoid paying state taxes and/or who send "remittances" to relatives in foreign countries, diverting dollars that otherwise would remain in the State's economy and generate additional state tax revenues.

**FIRST CAUSE OF ACTION**
**THE DIRECTIVE EXPRESSLY VIOLATES FEDERAL STATUTES**
**REQUIRING THE INITIATION OF REMOVALS**

67. Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

68. 8 U.S.C. § 1225(a)(1) requires that "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission." This designation triggers 8 U.S.C. § 1225(a)(3), which requires that all applicants for admission "shall be inspected by immigration officers." This in turn triggers 8 U.S.C. § 1225(b)(2)(A), which mandates that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." The proceedings under 8 U.S.C. § 1229a are removal proceedings in United States immigration courts.

69. The Directive orders ICE Plaintiffs to violate the above-listed provisions of federal law by declining to place certain aliens into removal proceedings, when federal law clearly requires Plaintiffs to place such aliens into removal proceedings.

70. The Morton Memorandum, as implemented by Defendants, asserts "prosecutorial discretion… [not] to issue, reissue, serve, file, or cancel a Notice to Appear (NTA)," in direct contradiction of 8 U.S.C. § 1225(b)(2)(A) in cases in which that statute applies.

71.     Because Congress has expressly limited the discretion of Defendants to not initiate removal proceedings, any "prosecutorial discretion" that Defendants exercise must be consistent with 8 U.S.C. § 1225 and can only occur after an alien has been placed into removal proceedings as required by 8 U.S.C. § 1225, or under a provision of federal law expressly authorizing such "prosecutorial discretion."

72.     Defendant Napolitano's authority under 8 USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize her to order her subordinate officers or employees to violate the requirements of federal law expressed in 8 U.S.C. § 1225.

73.     Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

**SECOND CAUSE OF ACTION**
**THE DIRECTIVE VIOLATES FEDERAL LAW BY CONFERRING A NON-STATUTORY FORM OF BENEFIT, DEFERRED ACTION, TO MORE THAN 1.7 MILLION ALIENS, RATHER THAN A FORM OF RELIEF OR BENEFIT THAT FEDERAL LAW PERMITS ON SUCH A LARGE SCALE**

74.     Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

75.     "Deferred action" is a benefit that is not authorized in federal statute and is only authorized to a limited extent and for limited purposes in federal regulations.

76.     No federal regulation authorizes the granting of the benefit of deferred action to aliens who are in the position of the more than 1.7 million beneficiaries of the Directive.

77.     No federal regulation authorizes the conferral of the benefit of deferred action to an entire category of unlawfully present aliens numbering in excess of 1.7 million persons.

78.     If an executive agency's practice contradicts the express terms of federal law, that practice is *ultra vires* and unlawful.

79.     Defendant Napolitano's authority under 8 USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize her to order her subordinate officers or employees to violate the requirements of federal law expressed in 8 U.S.C. § 1225.

80.     Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

**THIRD CAUSE OF ACTION**
**THE DIRECTIVE VIOLATES FEDERAL LAW BY CONFERRING THE**
**LEGAL BENEFIT OF EMPLOYMENT AUTHORIZATION WITHOUT**
**ANY STATUTORY BASIS AND UNDER THE FALSE PRETENSE OF**
**"PROSECUTORIAL DISCRETION"**

81.     Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

82.     The Directive purports to use "prosecutorial discretion" to grant the benefit of employment authorization to unlawfully present aliens.

83.     Employment authorization is a benefit under federal regulations that is "granted" to beneficiary aliens.  8 C.F.R. § 274a.12(c)(14).

84.     Federal law specifies the circumstances under which aliens may be granted the benefit of employment authorization.

85.     The Morton Memorandum on pp. 2-3 lists twelve ways in which "prosecutorial discretion" may purportedly be exercised in immigration law, but nowhere mentions the conferral of the benefit of employment authorization.

86.     "Prosecutorial discretion," insofar as it is permitted by federal immigration law, is by definition the exercise of discretion not to remove; it is not the conferral of a benefit.

87.     To the limited extent that any "prosecutorial discretion" is permitted by federal immigration law, such discretion allows ICE to seek the cancellation or withholding of a

17

removal.  The exercise of "prosecutorial discretion" does not permit any DHS employee or officer to grant unlawfully present aliens the benefit of employment authorization in the manner attempted by the Directive.

88.     U.S. Citizenship and Immigration Services is not a law enforcement agency.

89.     A non-law-enforcement agency cannot exercise prosecutorial discretion.

90.     Defendant Napolitano's authority under 8 USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize her to order her subordinate officers or employees to confer a substantive benefit on aliens that is not authorized by federal law.

91.     Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

### FOURTH CAUSE OF ACTION
### THE DIRECTIVE VIOLATES THE CONSTITUTIONAL ALLOCATION
### OF LEGISLATIVE POWER TO CONGRESS

92.     Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

93.     Article I, section 1, of the United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

94.     The Development, Relief, and Education for Alien Minors Act (DREAM Act), in various forms, has been proposed in Congress at least 24 times.  It was introduced in the following bills:  S. 1291, 107th Cong. §§ 2, 3 (2001); S. 1545, 108th Cong. (2003); S. 2863, 108th Cong. §§ 1801-1813 (2004); S. 2075, 109th Cong. (2005); H.R. 5131, 109th Cong. (2006); S. 2611, 109th Cong. §§ 621–632 (2006); H.R. 1275, 110th Cong. (2007); H.R. 1645, 110th Cong. §§ 621-632 (2007); S. 774, 110th Cong. (2007); S. 1348, 110th Cong. §§ 621–632 (2007)

(as amended by S.A. 1150 §§ 612–619); S. 1639, 110th Cong. §§ 612-620 (2007); S. 2205, 110th Cong. (2007); H.R. 1751, 111th Cong. (2009); S. 729, 111th Cong. (2009); H.R. 5281, 111th Cong. §§ 5-16 (2010); H.R. 6497, 111th Cong. (2010); S. 3827, 111th Cong. (2010); S. 3932, 111th Cong. §§ 531-542 (2010); S. 3962, 111th Cong. (2010); S. 3963, 111th Cong. (2010); S. 3992, 111th Cong. (2010); H.R. 1842, 112th Cong. (2011); S. 952, 112th Cong. (2011); S. 1258, 112th Cong. §§ 141-149 (2011); H.R. 5869, 112th Cong. (2012).

95.     The principal provisions of the DREAM Act, as reiterated in the two dozen DREAM Act bills introduced in Congress, are that it establishes a class of unlawfully present aliens who may apply for cancellation of removal and either temporary or conditional lawful residence, and then may adjust to lawful permanent resident status or have the conditions removed.  The class is generally defined as those aliens who arrived in the United States as minors, have been physically present in the United States for a period of years (typically five years) prior to enactment, have not been convicted of a felony or two or more misdemeanors and do not pose a threat to national security or public safety, have earned a high school diploma or a general education development certificate in the United States, and are below a certain age (typically early to mid-thirties) on the date of enactment.  Qualifying aliens whose removal is cancelled and who are granted temporary or conditional residence then must be admitted to, or earn a certain number of credits in, an institution of higher education or serve honorably in the U.S. Armed Forces for a certain period in order to adjust to lawful permanent resident status or have the conditions on their status removed.

96.     The DREAM Act has never been passed by both houses of Congress and signed into law by the President.

97.     The fact that the DREAM Act has been proposed in Congress two dozen times, and has been voted on by the United States House of Representatives and by the United States Senate, indicates Congress's understanding that federal legislation is required in order to achieve these objectives.

98.     The Directive attempts to confer continued presence in the United States, as well as employment authorization, to all aliens meeting the criteria specified in the Directive.

99.     The unlawfully present aliens who are given benefits by the Directive are substantially the same aliens that would have been given benefits by the DREAM Act, had it passed both Houses of Congress and been signed into law by the President.

100.     The conferral of legal rights and privileges to a large class of persons meeting certain criteria is a legislative act.

101.     The application of "deferred action" to approximately 15% of aliens who are in the United States without authorization is not an exercise of executive branch discretion permitted by the Constitution. The application of "deferred action" to approximately 15% of aliens who are in the United States without authorization is a legislative act of amnesty, the granting of a legislative benefit, and an act otherwise exceeding the Secretary's authority as a principal executive officer under the Constitution. It therefore usurps the legislative authority conferred by the Constitution exclusively on Congress.

102.     Because the Directive is a legislative act that Defendants have implemented through executive action, it is in violation of Article I, section 1, of the United States Constitution.

103.     Defendant Napolitano's authority under 8 USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize her to exercise legislative powers through the issuance of directives.

104.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## FIFTH CAUSE OF ACTION
## THE DIRECTIVE VIOLATES THE ARTICLE II, SECTION 3, CONSTITUTIONAL OBLIGATION OF THE EXECUTIVE TO TAKE CARE THAT THE LAWS ARE FAITHFULLY EXECUTED

105.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

106.    Article II, section 3, of the United States Constitution requires that the President, by and through his executive branch officials, including Defendants, "shall take Care that the Laws be faithfully executed."

107.    The application of "deferred action" to approximately 15% of aliens who are in the United States without authorization is not consistent with the executive's duty to take care that the laws be faithfully executed.  In effect, the Directive orders that the immigration laws of the United States shall not be executed against a class of more than 1.7 million aliens.

108.    Defendant Napolitano's authority under 8  USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize her to order her subordinate officers or employees to decline to enforce federal immigration laws against a class of more than 1.7 million aliens.

109.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## SIXTH CAUSE OF ACTION
## THE DIRECTIVE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT THROUGH CONFERRAL OF A BENEFIT WITHOUT REGULATORY IMPLEMENTATION

110.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

111.    The Administrative Procedure Act requires that agencies implementing Congressional statutes in whole or in part through an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy do so through a rulemaking.   A rulemaking under the Administrative Procedure Act is defined as the agency process for formulating, amending, or repealing a rule through notice and comment procedures under the Administrative Procedure Act, 5 U.S.C. § 553. The Immigration and Nationality Act delegates authority to the Secretary of Homeland Security and the Attorney General to implement its provisions through regulations.  The Secretary has not promulgated any regulation that establishes the criteria for eligibility for relief from removal from the United States or the granting of employment authorization.  The Directive identifies a large class of individuals by specific eligibility criteria against whom the immigration laws of the United States requiring their removal shall not be executed and who are made eligible for specific benefits.

112.    Establishing a class of eligibility by criteria for exception from removal from the United States and affirmative eligibility for benefits is quintessentially a "rule" under the Administrative Procedure Act, 5 U.S.C. § 551(4).  The Secretary has not issued a notice of proposed rulemaking or promulgated a final rule in conformity with the Administrative Procedure Act.  The Directive is not a rule under the Administrative Procedure Act.

113.    The Directive is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and without observance of procedure required by the Administrative Procedure Act.

114.    Defendant Napolitano's issuance of a Federal Register Notice on August 16, 2012, as part of a so-called "information collection" exercise in no way satisfies the publication and comment requirements for rulemaking under the Administrative Procedure Act.

22

115.    Defendant Napolitano's authority under 8  USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize her to order her subordinate officers or employees to circumvent the terms of the Administrative Procedure Act by simply issuing "directives" or "orders" that confer substantive legal benefits and privileges, and significantly transform the enforcement of federal immigration law.

116.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

A.    Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the Directive is unlawful and in violation of Article I of the Constitution of the United States as a usurpation of legislative authority, and vacate the Directive;

B.    Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the Directive is unlawful and in violation of Article II of the Constitution of the United States as in excess of executive authority and vacate the Directive;

C.    Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the Directive and relevant provisions of the Morton Memorandum are unlawful and in violation of 8 U.S.C. § 1225(b)(2)(A) and vacate the Directive and relevant provisions of the Morton Memorandum;

D.    Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(C) that the Directive is unlawful and in violation of the Immigration and Nationality Act as in excess of delegated authority and vacate the Directive;

E.      Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(D) that the Directive is unlawful and in violation of the Administrative Procedure Act as a rule promulgated without conforming to the procedure described therein and vacate the Directive;

F.      Temporarily restrain, preliminarily enjoin, and permanently enjoin Defendants and their subordinate officers, employees, and agents from implementing or enforcing the Directive, or taking any adverse action against Plaintiffs pursuant to the Directive or for not following the Directive;

G.      Direct Defendants to pay all costs associated with this lawsuit; and

H.      Grant such other and further relief as this Court deems equitable, just, and proper.

Dated:  October 10, 2012          By:  s/ Kris W. Kobach

KRIS W. KOBACH
Kansas Bar No. 17280 (*pro hac vice* applic. pending)
Kobach Law, LLC
4701 N. 130th St.
Kansas City, Kansas 66109
Telephone:  913-638-5567
kkobach@gmail.com


P. MICHAEL JUNG
Texas Bar No. 11054600
Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: 214-651-4300
michael.jung@strasburger.com


*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Amended Complaint has been served on the defendants by mailing copies thereof to: Hon. Janet Napolitano, Secretary of Homeland Security, Department of Homeland Security, Washington, D.C. 20528; and Hon. John Morton, Director, Immigration and Customs Enforcement, 500 12th Street, S.W., Washington, D.C. 20536; both on this 10th day of October, 2012.

/s P. Michael Jung
P. MICHAEL JUNG