**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER L. CRANE, DAVID A. ENGLE, ANASTASIA MARIE CARROLL, RICARDO DIAZ, LORENZO GARZA, FELIX LUCIANO, TRE REBSTOCK, FERNANDO SILVA, SAMUEL MARTIN, JAMES D. DOEBLER, and THE STATE OF MISSISSIPPI, by and through GOVERNOR PHIL BRYANT** | ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| | ) | **Civil Action No. 3:12-cv-03247-O** |
| **v.** | ) ) | |
| | ) | |
| **JANET NAPOLITANO, in her official capacity as Secretary of Homeland Security, JOHN MORTON, in his official capacity as Director of Immigration and Customs Enforcement, and ALEJANDRO MAYORKAS, in his official capacity as Director of United States Citizenship and Immigration Services** | ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

_____

**BRIEF IN SUPPORT OF PLAINTIFFS' APPLICATION**
**FOR PRELIMINARY INJUNCTIVE RELIEF**

_____

P. MICHAEL JUNG
Texas Bar No. 11054600

Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: 214-651-4300

KRIS W. KOBACH
Kansas Bar No. 17280 (admitted *pro hac vice*)

Kobach Law, LLC
4701 N. 130th St.
Kansas City, Kansas 66109
Telephone:  913-638-5567

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorities ......................................................................................................... iii

Preliminary Statement ...................................................................................................... 1

Statement of Facts ............................................................................................................ 1

Summary of Argument ..................................................................................................... 1

Standards for Injunctive Relief ........................................................................................ 2

Argument and Authorities................................................................................................. 3

    **I.**    **THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**................................................................................................3

        **A.**    **The Directive Violates Federal Statutes Requiring the Initiation of Removals.**................................................................3

        **B.**    **"Prosecutorial Discretion" Cannot Be Used to Confer a Benefit.** ..............................................................................7

        **C.**    **The Directive is an Unconstitutional Exercise of Legislative Power by the Executive Branch.**..............................................9

        **D.**    **The Directive Violates the Constitutional Obligation to Faithfully Execute the Law.** ...............................................13

        **E.**    **The Directive Violates the Administrative Procedure Act.**.................15

        **F.**    **The Directive Is Not Entitled to *Chevron* Deference.**...........................21

    **II.**    **THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS THE COURT ISSUES A PRELIMINARY INJUNCTION.** ...........22

    **III.**    **THE INJURY TO THE PLAINTIFFS GREATLY OUTWEIGHS ANY PURPORTED INJURY TO THE DEFENDANTS OR THE AGENCIES THAT THEY ADMINISTER.**.......................................................23

    **IV.**    **INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.**..............................23

Request for Relief ........................................................................................................... 25

Certificate of Service ................................................................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Adams v. Richardson*,
480 F.2d 1159 (D.C. Cir. 1973) (*en banc*) ........................................................... 6

*Alaska Professional Hunters Assoc. v. FAA*,
177 F.3d 1030 (D.C. Cir. 1999) ........................................................................ 17

*Allied Marketing Group, Inc. v. CDL Mktg, Inc.*,
878 F.2d 806 (5th Cir. 1989) ............................................................................ 2

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ................................................................... 17, 19

*Arizona v. United States*,
132 S. Ct. 2492 (2012) (Scalia, J., dissenting) .................................................... 7

*Auer v. Robbins*,
519 U.S. 452 (1997) ....................................................................................... 21

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................................... 11

*Center for Auto Safety v. National Highway Traffic Safety Administration*,
452 F.3d 798 (D.C. Cir. 2006) .......................................................................... 19

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ....................................................................................... 21

*Communist Party of Indiana v. Whitcomb*,
414 U.S. 441 (1974) (Powell, J., concurring) .................................................... 14

*Compact Van Equipment Co. v. Leggett & Platt, Inc.*,
566 F.2d 9524 (5th Cir. 1978) ........................................................................... 3

*CSX Transportation, Inc. v. Surface Transportation Board*,
584 F.3d 1076 (D.C. Cir. 2009) ........................................................................ 19

*Dunlop v. Bachowski*,
421 U.S. 560 (1975) ................................................................................... 6, 25

*Electronic Privacy Information Center v. United States Department of Homeland Security*,
653 F.3d 1 (D.C. Cir. 2011) ............................................................................. 18

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
    762 F.2d 464 (5th Cir. 1985) ........................................................................ 22

*Evergreen Presbyterian Ministries, Inc. v. Hood,*
    235 F.3d 908 (5th Cir. 2000) ......................................................................... 3

*Fong Yue Ting v. United States,*
    149 U.S. 698 (1893) ................................................................................. 5, 14

*General Electric Co. v. EPA,*
    290 F.3d 377 (D.C. Cir. 2002) ..................................................................... 17

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ....................................................................................... 6

*Immigration & Naturalization Service v. Chadha,*
    462 U.S. 919 (1983) ......................................................................... 10, 11, 12

*Janvey v. Alguire,*
    628 F.3d 164 (5th Cir. 2010) ................................................................... 3, 11

*La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency,*
    608 F.3d 217 (5th Cir. 2010) ....................................................................... 18

*Lakedreams v. Taylor,*
    932 F.2d 1103 (5th Cir. 1991) ....................................................................... 2

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ....................................................................................... 5

*Martin v. Linen Systems for Hospitals, Inc.,*
    671 S.W.2d 706 (Tex. App. – Houston [1st Dist.] 1984, no writ) .................. 22

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618 (5th Cir. 1985) ......................................................................... 3

*Morales v. TWA,*
    504 U.S. 374 (1992) ..................................................................................... 22

*Morrison v. Olson,*
    487 U.S. 654 (1988) ..................................................................................... 11

*Morton v. Ruiz,*
    415 U.S. 199 (1974) ......................................................................... 16, 17, 18

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile
    Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................................... 21

*Placid Oil Co. v. United States Dep't of the Interior,*
    491 F. Supp. 895 (N.D. Tex. 1980) ................................................................. 3

*Reno v. American-Arab Antidiscrimination Committee,*
    525 U.S. 471 (1999) ........................................................................................ 4

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ...................................................................................... 21

*Texas Medical Providers Performing Abortion Services v. Lakey,*
    667 F.3d 570 (5th Cir. 2012) ......................................................................... 3

*Texas v. EPA,*
    690 F.3d 670 (5th Cir. 2012) ....................................................................... 17

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ....................................................................... 18

*Travelhost, Inc. v. Modglin,*
    2012 U.S. Dist. LEXIS 78539 (N.D. Tex. June 6, 2012) ................................. 3

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ...................................................................................... 21

*United States v. Valenzuela-Bernal,*
    458 U.S. 858 (1982) ...................................................................................... 14

## Constitutional Provisions

Miss. Const. art. IV, § 115 ........................................................................................ 22

U.S. Const. art. I, § 1 ................................................................................................. 9

U.S. Const. art. II .............................................................................................. 12, 14

U.S. Const. art. II, § 3 ................................................................................... 13, 14, 15

U.S. Const. art. III ................................................................................................... 10

## Statutes

26 U.S.C. § 1(h) ...................................................................................................... 14

44 U.S.C. §§ 1501, *et seq.* ...................................................................................... 22

5 U.S.C. § 551(4) ....................................................................................................... 16

5 U.S.C. § 553 .......................................................................................................... 15

5 U.S.C. § 701(a)(2) ................................................................................................... 7

6 U.S.C. § 271(b) ....................................................................................................... 9

8 U.S.C. § 1103 ....................................................................................................... 19

8 U.S.C. § 1103(a)(5) ........................................................................................... 5, 19

8 U.S.C. § 1225 .......................................................................................................... 5

8 U.S.C. § 1225(a)(1) ............................................................................................ 4, 6

8 U.S.C. § 1225(a)(3) ............................................................................................ 4, 6

8 U.S.C. § 1225(b)(2)(A) ............................................................................... 4, 5, 6, 12

8 U.S.C. § 1229a .......................................................................................................... 4

8 U.S.C. § 1229b ..................................................................................................... 5, 8

8 U.S.C. § 1231(b)(3) .............................................................................................. 5, 8

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat.
    3009-546 ............................................................................................................... 4

**Legislative Materials**

Cong. Rec. S8179 (Sept. 4, 2002) (ltr. by Sens. Kennedy and Brownback) ................................. 9

H.R. 1275, 110th Cong. (2007) .................................................................................... 9

H.R. 1645, 110th Cong. §§ 621-32 (2007) ......................................................................... 9

H.R. 1751, 111th Cong. (2009) ................................................................................... 10

H.R. 1842, 112th Cong. (2011) ................................................................................... 10

H.R. 5131, 109th Cong. (2006) .................................................................................... 9

H.R. 5281, 111th Cong. §§ 5-16 (2010) .......................................................................... 10

H.R. 5869, 112th Cong. (2012) ................................................................................... 10

H.R. 6497, 111th Cong. (2010).................................................................................. 10

H.R. Rep. 104-725 (1996) (Conf. Rep.) ......................................................................... 4

S. 1258, 112th Cong. §§ 141-149 (2011)..................................................................... 10

S. 1291, 107th Cong. §§ 2, 3 (2001)............................................................................ 9

S. 1348, 110th Cong. §§ 621-32 (2007) (as amended by S.A. 1150 §§ 612-19)............ 9

S. 1545, 108th Cong. (2003)........................................................................................ 9

S. 1639, 110th Cong. §§ 612-20 (2007)....................................................................... 10

S. 2075, 109th Cong. (2005)........................................................................................ 9

S. 2205, 110th Cong. (2007)........................................................................................ 10

S. 2611, 109th Cong. §§ 621-32 (2006)....................................................................... 9

S. 2863, 108th Cong. §§ 1801-13 (2004)..................................................................... 9

S. 3827, 111th Cong. (2010)........................................................................................ 10

S. 3932, 111th Cong. §§ 531-42 (2010)....................................................................... 10

S. 3962, 111th Cong. (2010)........................................................................................ 10

S. 3963, 111th Cong. (2010)........................................................................................ 10

S. 3992, 111th Cong. (2010)........................................................................................ 10

S. 729, 111th Cong. (2009).......................................................................................... 10

S. 774, 110th Cong. (2007).......................................................................................... 9

S. 952, 112th Cong. (2011).......................................................................................... 10

**Administrative Materials**

8 C.F.R. § 274a.12(c)(14) ............................................................................................ 8

8 C.F.R. §§ 274a.12(a)(1)-(16) .................................................................................... 8

*Adjustment of Immigration and Naturalization Benefit Application and Petition
    Fee Schedule, Final Rule*, 72 Fed. Reg. 29,851 (May 30, 2007)...................... 20

*Adjustment of Immigration and Naturalization Benefit Application and Petition
Fee Schedule, Proposed Rule*, 72 Fed. Reg. 4889 (Feb. 1, 2007) .................................... 20

Department of Homeland Security, *Provisional Unlawful Presence Waivers of
Inadmissibility for Certain Immediate Relatives*, 77 Fed. Reg. 19,902
(April 2, 2012) (proposed rule) ........................................................................................ 17

*U.S. Citizenship and Immigration Services Fee Schedule, Final Rule*, 75 Fed.
Reg. 58,962 (Sept. 24, 2010) ........................................................................................... 20

*U.S. Citizenship and Immigration Services Fee Schedule, Proposed Rule*, 75 Fed.
Reg. 33,448 (June 11, 2010) ............................................................................................ 20

U.S. Citizenship and Immigration Services, *Agency Information Collection
Activities: Application for Employment Authorization, Form I-765,
Revision of a Currently Approved Information Collection; Emergency
Submission to the Office of Management and Budget; Comment Request*,
77 Fed. Reg. 49453 (Aug. 16, 2012) ................................................................................. 8

## Rules of Court

Fed. R. Evid. 201(b) ............................................................................................................. 12, 20

## Secondary Sources

Jack Martin & Eric A. Ruark, Fed'n for Am. Immigration Reform, *The Fiscal
Burden of Illegal Immigration on United States Taxpayers* (2010)
(available at
www.fairus.org/site/DocServer/USCostStudy_2010.pdf?docID=4921) .......................... 24

Michael Hoefer, Nancy Rytina, and Bryan Baker, "Estimates of the Unauthorized
Immigrant Population Residing in the United States: January 2011"
(March 2012) (available at
www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf) ..................... 11

Remarks by the President to the National Council of La Raza, Washington D.C.
(July 25, 2011), available at www.whitehouse.gov/the-press-
office/2011/07/25/remarks-president-national-council-la-raza ....................................... 13

Ronald Dworkin, *The Model of Rules*, 35 U. Chi. L. Rev 14 (1967) ............................................ 6

www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20F
orms%20Data/Static_files/2012-
1116%20DACA%20Monthly%20Report.pdf ................................................................. 20

## PRELIMINARY STATEMENT

Plaintiffs Christopher L. Crane, David A. Engle, Anastasia Marie Carroll, Ricardo Diaz, Lorenzo Garza, Felix Luciano, Tre Rebstock, Fernando Silva, Samuel Martin, James D. Doebler (collectively the "ICE Agent Plaintiffs"), and the State of Mississippi, by and through Governor Phil Bryant, file this Brief in Support of Plaintiffs' Application for Preliminary Injunctive Relief. The application seeks to enjoin the defendants from implementing and enforcing the June 15, 2012, directive issued by Defendant Secretary of Homeland Security Janet Napolitano entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" ("the Directive") and related provisions of the June 17, 2011, Memorandum issued by Defendant Immigration and Customs Enforcement (ICE) Director John Morton entitled "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (the "Morton Memorandum"), until this Court adjudicates the lawfulness of the Directive and related provisions of the Morton Memorandum and renders a final judgment in this matter.

## STATEMENT OF FACTS

The facts supporting the application are set forth in detail in the Amended Complaint. To avoid repetition, the plaintiffs incorporate by reference the facts contained therein.

## SUMMARY OF ARGUMENT

Unless enjoined by this Court, the defendants will impose irreparable injury on the plaintiffs. The defendants (1) have adopted the Directive in violation of the Administrative Procedure Act by establishing a new form of relief from removal called Deferred Action for Childhood Arrivals, complete with eligibility specifications; (2) have begun to accept, process, and approve

applications for that relief; and (3) have instructed the ICE Agent Plaintiffs not to process any alien for removal from the United States if the alien claims to be eligible under the Directive. These actions prevent the ICE Agent Plaintiffs from complying with the express terms of the Immigration and Nationality Act (INA), which *require* them to initiate removal proceedings in specified cases. The defendants' actions place the ICE Agent Plaintiffs on the horns of a dilemma; they must either comply with federal law and face disciplinary actions, or ignore the requirements of federal law and participate in the administration of an illegal program. Moreover, Plaintiff State of Mississippi faces the calculable and already-mounting fiscal costs imposed upon the State each time an otherwise removable illegal alien residing in Mississippi is permitted to remain unlawfully present under the Directive.

## STANDARDS FOR INJUNCTIVE RELIEF

Courts consider four criteria in determining whether to grant a preliminary injunction: (1) the probability of success on the merits; (2) the threat of irreparable harm if the injunction does not issue; (3) the relative balance of harm to the parties; and (4) the public interest. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991); *Allied Marketing Group, Inc. v. CDL Mktg, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). Here, each factor favors the issuance of appropriate injunctive relief. The plaintiffs demonstrate through the attached affidavits and through this brief:

    (1)    that they have a substantial likelihood of prevailing on the merits of their claims after trial;

    (2)    a substantial threat that they will suffer irreparable injury if the preliminary injunction is not granted pending resolution of their claims at trial;

    (3)    that the substantial threat of irreparable injury outweighs any harm to defendants and their respective corporate subordinates, the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and United States Citizenship and Immigration Services (USCIS), from the granting of the preliminary injunction; and

(4)    granting the preliminary injunction pending trial will not disserve the public interest.

*See Travelhost, Inc. v. Modglin*, 2012 U.S. Dist. LEXIS 78539, *9-10 (N.D. Tex. June 6, 2012) (Fish, J.), *citing Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). The decision to grant or deny preliminary injunctive relief rests in the sound discretion of the district court. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## ARGUMENT AND AUTHORITIES

## I.    THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Although a movant must demonstrate that eventual success in the litigation is probable, *see Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 918-19 (5th Cir. 2000), the likelihood of success need not be established with absolute certainty. *Placid Oil Co. v. United States Dep't of the Interior*, 491 F. Supp. 895, 905 (N.D. Tex. 1980) ("It is not necessary for Plaintiffs to prove to an absolute certainty that they will prevail on the merits"). A "plaintiff must present a prima facie case but need not show that he is certain to win." *Janvey v. Alguire*, 628 F.3d 164, 175 (5th Cir. 2010). To obtain an injunction, the movant's likelihood of success must be more than negligible, *Compact Van Equipment Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978). For the reasons explained below, in this case it is likely that the Court will declare the Directive and related provisions of the Morton Memorandum to be contrary to federal law and in violation of the United States Constitution.

### A.    The Directive Violates Federal Statutes Requiring the Initiation of Removals.

In 1996, Congress acted to drastically limit the any discretion that ICE officers might otherwise have with respect to the initiation of removal proceedings. Frustrated with executive

-3-

non-enforcement of federal immigration laws, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546 (IIRIRA).  "[A]t the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."  *Reno v. American-Arab Antidiscrimination Committee*, 525 U.S. 471, 483-84 (1999).  Congress therefore acted to statutorily restrict the discretion available to the executive branch.  As a conference committee report in 1996 succinctly stated: "[I]mmigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended."  H.R. Rep. 104-725 (1996), at 383 (Conf. Rep.).  To achieve its objective of maximizing the removal efforts of the executive branch, Congress inserted several interlocking provision into the INA to *require* removal when immigration officers encounter illegal aliens.

8 U.S.C. § 1225(a)(1) requires that "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission."  This designation triggers 8 U.S.C. § 1225(a)(3), which requires that all applicants for admission "shall be inspected by immigration officers."  This in turn triggers 8 U.S.C. § 1225(b)(2)(A), which mandates that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  The proceedings under 8 U.S.C. § 1229a are removal proceedings in United States Immigration Courts.

The Directive orders the ICE Agent Plaintiffs to violate these provisions of federal law by declining to place certain aliens into removal proceedings, when federal law clearly requires them to place such aliens into removal proceedings.  The Morton Memorandum similarly asserts

"prosecutorial discretion … [not] to issue, reissue, serve, file, or cancel a Notice to Appear (NTA)," in direct contravention of 8 U.S.C. § 1225(b)(2)(A) in applicable cases.

Because Congress has expressly limited the defendants' discretion not to initiate removal proceedings, any "prosecutorial discretion" that they exercise must be consistent with 8 U.S.C. § 1225. Since that statute mandates the commencement of removal proceedings, such discretion can only be exercised *after* such proceedings have been initiated, as is the case with cancellation or withholding of removal. *See* 8 U.S.C. §§ 1229b, 1231(b)(3). An executive agency's policy preference about how to enforce (or, in this case, not enforce) an act of Congress cannot trump the power of Congress: a Court may not, "simply … accept an argument that the [agency] may … take action which it thinks will best effectuate a federal policy" because "[a]n agency may not confer power upon itself." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

It is Congress that determines which aliens are to be removed from the United States, even though it exercises that power through executive officers such as the defendants: "The power of Congress … to expel, like the power to exclude aliens, or any specified class of aliens, from the country, may be exercised through executive officers …." *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893). Defendant Napolitano's authority to enforce the immigration laws under 8 U.S.C. § 1103(a)(5) cannot possibly be construed to authorize her to order her subordinate employees to violate the requirements of federal law expressed in 8 U.S.C. § 1225.

The Supreme Court has recognized that Congress has the authority to statutorily restrict executive discretion in this manner: "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985). Through IIRIRA, Congress circumscribed the executive branch's discre-

tion *not* to pursue removal of illegal aliens.    The interlocking provisions of 8 U.S.C. §§ 1225(a)(1), 1225(a)(3), and 1225(b)(2)(A) provide clear statutory direction to DHS.  If an illegal alien is encountered by DHS, an inspection *must* occur, and if that illegal alien is not entitled to be admitted to the United States, he or she *must* be placed in removal proceedings.  Any subsequent relief, whether it be through asylum, cancellation of removal, or withdrawal of removal, must be authorized by federal statute.  Wholesale grants of "deferred action" are no longer possible after IIRIRA.

Unfettered discretion ceases to exist where federal law "not only requires the agency to enforce the Act, but also sets forth specific enforcement procedures." *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (*en banc*).  Here, as was true in the Labor-Management Reporting and Disclosure Act case of *Dunlop v. Bachowski*, 421 U.S. 560 (1975), Congress established clearly defined factors requiring the executive agency to take action to enforce federal law.  "The statute being administered [in *Dunlop*] quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power."  *Heckler*, 470 U.S. at 834. So, too, IIRIRA "quite clearly withdrew discretion from the agency."  The defendants cannot now by Directive exercise the discretion that Congress took away.  "Discretion, like the hole in a doughnut, does not exist except as an area left open by a surrounding belt of restriction." Ronald Dworkin, *The Model of Rules*, 35 U. Chi. L. Rev 14, 32 (1967).

The defendants will doubtless protest that the Directive and the Morton Memorandum enable them to prioritize their allocation of limited enforcement resources more efficiently than the "if you encounter an inadmissible alien, start removal proceedings" approach of IIRIRA.  They may or may not have a good policy argument.  But they no longer have the legal authority to set policy in that respect – Congress has done it for them.  If the defendants do not like the

way IIRIRA forces them to utilize their limited enforcement resources, they have two choices: (1) ask Congress for more resources, or (2) ask Congress to change the law. They cannot circumvent the requirements of federal law through executive fiat.

Moreover, Justice Scalia recently observed that the Directive cannot plausibly be justified as an effort to allocate scarce enforcement resources:

> After this case was argued and while it was under consideration, the Secretary of Homeland Security announced a program exempting from immigration enforcement some 1.4 million illegal immigrants under the age of 30. ... U.S. immigration officials have been directed to "defe[r] action" against such individual "for a period of two years, subject to renewal." The husbanding of scarce enforcement resources can hardly be the justification for this, since the considerable administrative cost of conducting as many as 1.4 million background checks, and ruling on the biennial requests for dispensation that the nonenforcement program envisions, will necessarily be *deducted* from immigration enforcement.

*Arizona v. United States*, 132 S. Ct. 2492, 2521 (2012) (Scalia, J., dissenting) (internal citations omitted; emphasis in original). Justice Scalia is exactly right. The Directive is a "nonenforcement" program that consumes, rather than conserves, enforcement resources.

The Directive and the Morton Memorandum violate the express terms of federal law. That in turn authorizes and obligates this Court to require the defendants to follow the law: "If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under [5 U.S.C.] § 701(a)(2), and courts may require that the agency follow that law ...." *Heckler*, 470 U.S. at 834-35.

### B.    "Prosecutorial Discretion" Cannot Be Used to Confer a Benefit.

As explained above, Congress has specifically removed any prosecutorial discretion with respect to the placement of certain aliens into removal proceedings. But assuming *arguendo* that such discretion did exist, it could not under any circumstances be used to confer a *benefit*. The

defendants are attempting to use prosecutorial discretion – which is, by definition, a decision not to prosecute (or remove) a specific individual for reasons that apply in that individual's particular case – in order to grant a benefit to an entire pre-defined category of illegal aliens numbering approximately 1.7 million.[1]  The defendants also enumerate the qualifications for receiving this benefit under the guise of "prosecutorial discretion."

The Directive purports to use "prosecutorial discretion" to grant the benefit of employment authorization to unlawfully present aliens.  But employment authorization is a benefit under federal regulations that is "granted" to beneficiary aliens.  8 C.F.R. § 274a.12(c)(14).  Federal regulations spell out the sixteen specific circumstances under which aliens may be granted the benefit of employment authorization.  8 C.F.R. §§ 274a.12(a)(1)-(16).  Nowhere do federal regulations or statutes state that employment authorization may be granted through the exercise of "prosecutorial discretion."  *See id*.  Indeed, the defendants themselves seem to acknowledge this fact:  the Morton Memorandum (at pp. 2-3) lists twelve ways in which "prosecutorial discretion" may purportedly be exercised in immigration law, but nowhere mentions the conferral of the *benefit* of employment authorization.

To the limited extent that any "prosecutorial discretion" is permitted by federal immigration law, such discretion allows ICE only to seek the cancellation or withholding of a removal.  8 U.S.C. §§ 1229b, 1231(b)(3).  Nowhere in federal law is any DHS employee or officer authorized to grant unlawfully present aliens the benefit of employment authorization through "prosecutorial discretion."

---

[1] The U.S. Citizenship and Immigration Service (USCIS) estimated on August 16, 2012, pursuant to the Paperwork Reduction Act, that 1,760,000 aliens unlawfully present in the United States who qualify for the benefits offered by the Directive.  U.S. Citizenship and Immigration Services, *Agency Information Collection Activities: Application for Employment Authorization, Form I-765, Revision of a Currently Approved Information Collection; Emergency Submission to the Office of Management and Budget; Comment Request*, 77 Fed. Reg. 49453 (Aug. 16, 2012).

Importantly, U.S. Citizenship and Immigration Services, the agency that confers the benefit of employment authorization, *is not a law enforcement agency*. *See* 6 U.S.C. § 271(b).[2]  By definition, a non-law-enforcement agency cannot exercise prosecutorial discretion.

The INA provides, in a number of discrete instances, that the Secretary "may" grant specific benefits to specific categories of aliens.  The INA establishes both the categories of aliens and the specific criteria for the Secretary to use in granting specific benefits.  It contains no catch-all delegation to the Secretary to grant benefits as she may choose, or to do so by fiat.  And no benefit may be conveyed through "prosecutorial discretion."

### C.   The Directive is an Unconstitutional Exercise of Legislative Power by the Executive Branch.

U.S. Const. art. I, § 1, provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  As explained below, the Directive is an exercise of legislative power by an executive agency and is an aggrandizement of the executive branch at the expense of the legislative branch. As such, it plainly violates the separation of powers.

The Development, Relief, and Education for Alien Minors Act (DREAM Act), in various forms, has been proposed in Congress at least 24 times.[3]  The Directive is a mirror image of the

---

[2]When DHS was created, Congress expressly sought to place all immigration law enforcement functions in ICE, while placing immigration services functions in USCIS.  "There must be a clearer separation of the enforcement and services functions to achieve great clarity of mission and thereby greater efficiency in the respective functions." Cong. Rec. S8179 (Sept. 4, 2002) (ltr. by Sens. Kennedy and Brownback).

[3]It was introduced in the following bills: S. 1291, 107th Cong. §§ 2, 3 (2001); S. 1545, 108th Cong. (2003); S. 2863, 108th Cong. §§ 1801-13 (2004); S. 2075, 109th Cong. (2005); H.R. 5131, 109th Cong. (2006); S. 2611, 109th Cong. §§ 621-32 (2006); H.R. 1275, 110th Cong. (2007); H.R. 1645, 110th Cong. §§ 621-32 (2007); S. 774, 110th Cong. (2007); S. 1348, 110th Cong. §§ 621-32 (2007) (as amended by S.A. 1150 §§ 612-19); S. 1639, 110th Cong. §§ 612-20 (2007); S. 2205, 110th Cong. (2007); H.R. 1751, 111th Cong. (2009); S. 729, 111th Cong. (2009); H.R. 5281, 111th Cong. §§ 5-16 (2010); H.R. 6497, 111th Cong. (2010); S. 3827, 111th Cong. (2010); S. 3932, 111th Cong. §§

(footnote continued on next page …)

DREAM Act, conferring non-removal and employment authorization upon substantially the same class of illegal aliens covered by the DREAM Act.[4]  The DREAM Act has never been passed by both houses of Congress and signed into law by the President.  But the fact that the Act has been proposed in Congress two dozen times, and has been voted on by the House of Representatives and Senate, indicates Congress's plain understanding that federal legislation is required in order to achieve these objectives.  Congress is correct in this understanding.

>     The constitutional separation of powers is fundamental to the Republic:

>     The Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

*Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 951 (1983).  Article III courts must enforce lines of demarcation between the three branches:

>     Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches.  …  As we stated in *Buckley v. Valeo*, 424 U.S. 1 (1976), the system of separated powers and checks and balances established in the Constitution was regarded by

---

(... footnote continued from previous page)

531-42 (2010); S. 3962, 111th Cong. (2010); S. 3963, 111th Cong. (2010); S. 3992, 111th Cong. (2010); H.R. 1842, 112th Cong. (2011); S. 952, 112th Cong. (2011); S. 1258, 112th Cong. §§ 141-149 (2011); H.R.  112th Cong. (2012).

[4]The principal provisions of the DREAM Act, as reiterated in the two dozen DREAM Act bills introduced in Congress, are that it establishes a class of unlawfully present aliens who may apply for cancellation of removal and either temporary or conditional lawful residence, and then may adjust to lawful permanent resident status or have the conditions removed.  The class is generally defined as those aliens who arrived in the United States as minors, have been physically present in the United States for a period of years (typically five years) prior to enactment, have not been convicted of a felony or two or more misdemeanors and do not pose a threat to national security or public safety, have earned a high school diploma or a general education development certificate in the United States, and are below a certain age (typically early to mid-thirties) on the date of enactment.  Qualifying aliens whose removal is cancelled and who are granted temporary or conditional residence then must be admitted to, or earn a certain number of credits in, an institution of higher education or serve honorably in the U.S. Armed Forces for a certain period in order to adjust to lawful permanent resident status or have the conditions on their status removed.

> the Framers as 'a self-executing safeguard against the encroachment or aggran-
> dizement of one branch at the expense of the other.' *Id*., at 122. We have not
> hesitated to invalidate provisions of law which violate this principle.

*Morrison v. Olson*, 487 U.S. 654, 693 (1988) (internal citations omitted). The Court recognizes two types of separation-of-powers violations: (1) an attempt by one branch to exercise the powers entrusted by the Constitution to another, and (2) unconstitutional aggrandizement of one branch at the expense of another. *Id.* at 693-95. The Directive represents both.

First, the Directive is legislative in nature. The Directive attempts to confer continued presence in the United States, as well as employment authorization, on all aliens meeting specified criteria. The conferral of legal rights and privileges to a large class of persons meeting certain criteria is a legislative act. The Supreme Court has defined an action as "essentially legislative in purpose and effect" if it "ha[s] the purpose and effect of altering the legal rights, duties and relations of persons." *Chadha*, 462 U.S. at 952. The Directive alters the rights and duties of a class of some 1.7 million persons by giving them the legal rights to remain present in the United States and to be employed in the United States. It is therefore legislative in nature.

The grounds for removal or dispensation from removal are set out in the Immigration and Nationality Act. Because the establishment of those grounds has "the purpose and effect of altering the legal rights, duties and relations of persons," it is a legislative act. *Chadha*, 462 U.S. at 952. The granting of "deferred action" and employment authorization to approximately fifteen percent of the aliens who are unlawfully present in the United States[5] is not an exercise of execu-

---

[5]As noted *supra* n.1, the estimated number of beneficiaries of the Directive is 1.7 million. DHS has estimated that 11.5 million aliens are unlawfully present in the United States. Michael Hoefer, Nancy Rytina, and Bryan Baker, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011" (March 2012) (available at www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf). This Court may take judicial notice of facts, and plaintiff need not prove such facts, if those facts are (1) generally known within the territorial

(footnote continued on next page …)

tive branch discretion permitted by the Constitution.  Rather, it is a legislative act of amnesty, the granting of a legislative benefit.  Only Congress has the authority to make such a large class of individuals eligible for employment authorization in the United States.

Although Secretary Napolitano possesses the authority to promulgate formal rules to fill in statutory gaps and resolve statutory ambiguities, that is a legislatively circumscribed exercise of executive power.  "[T]he Attorney General acts in his presumptively Art. II capacity when he administers the Immigration and Nationality Act."  *Chadha*, 462 U.S. at 953 n.16.  It is axiomatic that "administrative activity cannot reach beyond the limits of the statute that created it."  *Id*.  In the instant case, the Secretary not only lacks statutory authority to grant these benefits to 1.7 million illegal aliens, but is prohibited by federal law from doing so.  8 U.S.C. § 1225(b)(2)(A).  In sum, the Directive is the product of an executive officer attempting to use executive authority to effect change that is legislative in nature.  It therefore constitutes an attempt by one branch to exercise the powers of another.

Second, the Directive unconstitutionally aggrandizes the executive branch at the expense of Congress.  As noted above, Congress has repeatedly considered and rejected enactment of essentially the same provisions embodied by the Directive.  Rather than wait for Congress to adopt the executive branch's way of thinking regarding the proposed DREAM Act, the defendants usurped Congress's role and attempted to impose the same legislative change under the guise of "prosecutorial discretion."  It is noteworthy that in 2011, the President himself stated that, as the chief executive, he lacked the power to provide the benefits of the DREAM Act unilaterally

---

(... footnote continued from previous page)

jurisdiction of the court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).

without congressional action.  In his words, while it was "very tempting" to "bypass Congress and change the laws on my own," he could not do so because "that's not how our system works."[6]  The President's assessment of his constitutional authority was correct; the plaintiffs are likely to prevail on this cause of action.

### D.    The Directive Violates the Constitutional Obligation to Faithfully Execute the Law.

U.S. Const. art. II, § 3, requires that the President, by and through his executive branch officials, including the defendants, "shall take Care that the Laws be faithfully executed."  The application of "deferred action" to approximately fifteen percent of aliens who are in the United States without authorization is not consistent with the executive's duty to take care that the laws be faithfully executed.  In effect, the Directive orders that the immigration laws of the United States shall *not* be executed against a class of more than 1.7 million aliens.  Categorical non-enforcement of the law on this scale is impossible to reconcile with the wording of art. II, § 3.

The "take care" clause does not merely describe an executive prerogative; it "imposes on the President the *affirmative duty* to 'take Care that the Laws be faithfully executed.'"  *Com-*

---

[6]The full section of the President's speech was as follows:

THE PRESIDENT: … Now, I know some people want me to bypass Congress and change the laws on my own.  (Applause.)  And believe me, right now dealing with Congress –

AUDIENCE: Yes, you can!  Yes, you can!  Yes, you can!  Yes, you can!  Yes, you can!

THE PRESIDENT: Believe me – believe me, the idea of doing things on my own is very tempting.  (Laughter.)  I promise you.  Not just on immigration reform.  (Laughter.)  But that's not how our system works.

AUDIENCE MEMBER: Change it!

THE PRESIDENT: That's not how our democracy functions.  That's not how our Constitution is written ..

Remarks by the President to the National Council of La Raza, Washington D.C. (July 25, 2011), available at www.whitehouse.gov/the-press-office/2011/07/25/remarks-president-national-council-la-raza.

*munist Party of Indiana v. Whitcomb*, 414 U.S. 441, 452 (1974) (Powell, J., concurring) (emphasis added); *Fong Yue Ting*, 149 U.S. at 712. This affirmative duty extends to faithfully enforcing the immigration laws of the United States:

> The Constitution imposes on the President the duty to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3. One of the duties of the Executive Branch, and a vitally important one, is that of apprehending and obtaining the conviction of those who have violated criminal statutes of the United States. The prosecution of respondent [illegal alien] is of course one example of the Executive's effort to discharge that responsibility.

*United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982). The Directive is an extraordinary attempt to evade this duty imposed by the Constitution.

The defendants will doubtless claim that they cannot achieve 100% enforcement of federal immigration laws against all illegal aliens; therefore, the Directive is simply a decision not to enforce the law against "low priority" illegal aliens. While it is true that 100% enforcement of any law is virtually impossible, that reality does not free the Executive Branch from its Article II obligation to faithfully attempt to enforce the law. By *announcing beforehand that the law will not be enforced* against 1.7 million people, the defendants have done something entirely different than attempting to enforce the law faithfully but falling short of 100% enforcement. They have declared in advance that enforcement *will not occur* against a clearly defined class of law breakers. In so doing, they have effectively changed the law of the land. That is an extraordinary action that violates the high duty imposed by art. II, § 3.

To better understand what the defendants have done, consider an analogous scenario in tax law. Federal law currently requires all individual taxpayers to declare any income that they receive from capital gains and to pay taxes on those capital gains. *See* 26 U.S.C. § 1(h). Suppose that a future President, after failing to push through Congress a bill eliminating the taxation of capital gains, decides to take the following actions. He orders his Treasury Secretary to issue

-14-

a "directive" that "defers" indefinitely the prosecution of anyone who fails to pay federal income taxes on capital gains. The "directive" further orders the Internal Revenue Service and its agents to refrain from taking administrative actions to collect any taxes on capital gains. Instead, the IRS is ordered devote its limited enforcement resources to the collection of other taxes. The directive cloaks this lawless act in the language of executive discretion, saying that this national policy change merely guides the allocation of enforcement resources and will be implemented on a "case by case" basis. But of course it is nothing like executive discretion that the IRS might legitimately exercise not to take action against a particular taxpayer. Rather it is an abrogation of the executive's duty to faithfully execute the laws.

The same may be said of the Directive in the instant case. The defendants are achieving the Administration's objective of enacting the DREAM Act by simply not enforcing the law. Indeed there is no material distinction between the two examples. Because the defendants' actions abrogate the executive's duty under art. II, § 3, the plaintiffs are likely to prevail on this cause of action.

### E.    The Directive Violates the Administrative Procedure Act.

The Administrative Procedure Act (APA) requires that agencies implementing federal statutes in whole or in part do so through rulemaking. Rulemaking is defined under the APA as the agency process for formulating, amending, or repealing a rule through notice and comment procedures under the Administrative Procedure Act. 5 U.S.C. § 553.

The INA delegates authority to the Secretary of Homeland Security and the Attorney General to implement its provisions through the formal promulgation of rules pursuant to the APA. Using specific eligibility criteria, the Directive enumerates the qualifications of a large class of individuals who are made eligible for non-removal and the specific benefit of employ-

ment authorization.  Yet the Secretary has not promulgated any rule that establishes the criteria

for eligibility for relief from removal from the United States or the granting of employment au-

thorization as described in the Directive.

An administrative action that establishes criteria for exception from removal from the

United States and defines a class with affirmative eligibility for benefits is quintessentially a

"rule" under the Administrative Procedure Act.  5 U.S.C. § 551(4) ("'rule' means the whole or a

part of an agency statement of general or particular applicability and future effect designed to

implement, interpret, or prescribe law or policy").  The United States Supreme Court has made

clear that "on-off" or "yes-no" eligibility for benefits under a Congressional enactment must be

defined through formal rulemaking:

> The power of an administrative agency to administer a congressionally created
> and funded program necessarily requires the formulation of policy and the making
> of rules to fill any gap left, implicitly or explicitly, by Congress.  In the area of
> Indian affairs, the Executive has long been empowered to promulgate rules and
> policies, and the power has been given explicitly to the Secretary and his dele-
> gates at the BIA.  This agency power to make rules that affect substantial individ-
> ual rights and obligations carries with it the responsibility not only to remain con-
> sistent with the governing legislation, … but also to employ procedures that con-
> form to the law.  …  No matter how rational or consistent with congressional in-
> tent a particular decision might be, the determination of eligibility cannot be made
> on an ad hoc basis by the dispenser of the funds.
>
> The Administrative Procedure Act was adopted to provide, inter alia, that admin-
> istrative policies affecting individual rights and obligations be promulgated pur-
> suant to certain stated procedures so as to avoid the inherently arbitrary nature of
> unpublished ad hoc determinations.

*Morton v. Ruiz*, 415 U.S. 199, 231-32 (1974) (citations and footnotes omitted).  In this instance,

the Secretary has set out in the Directive a determination of future rights, privileges, and benefits.

In so doing, she has attempted to bury, outside of the APA, rulemaking decisions that have the

"inherently arbitrary nature of unpublished ad hoc determinations."  And as in *Morton*, "[t]he

Secretary has presented no reason why the requirements of the Administrative Procedure Act

could not or should not have been met." *Morton*, 415 U.S. at 235.

In the wake of *Morton*, whether an agency has unlawfully altered substantive rights through "guidance" has become one of the staples of administrative litigation. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("[W]hatever EPA may think of its Guidance generally, the elements of the Guidance petitioners challenge consist of the agency's settled position, a position it plans to follow in reviewing State-issued permits, a position it will insist State and local authorities comply with in setting the terms and conditions of permits issued to petitioners, a position EPA officials in the field are bound to apply"); *Alaska Professional Hunters Assoc. v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) ("Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played'"); *General Electric Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002) (guidance document purported to bind applicants for approval of a risk-based cleanup plan and appeared to bind the agency to accept applications, and was therefore a legislative rule).  In the instant case, the Directive is so far outside the bounds of permissible guidance that it mimics the arbitrary and capricious decision in *Morton*.

DHS is not free to vacillate between regulations, policy, and discretion at will.  *See Texas v. EPA*, 690 F.3d 670 (5th Cir. 2012).  Under prior Administrations, DHS, and the Department of Justice before it, consistently chose to formally promulgate regulations in order to establish or disestablish eligibility for immigration benefits.[7]  At no time did DHS or its predecessors suggest that they had the authority to make a massive policy change to grant immigration benefits to more than fifteen percent of all unlawfully present aliens.  Nor did they do so without promulgat-

---

[7]*See, e.g.*, Department of Homeland Security, *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives*, 77 Fed. Reg. 19,902 (April 2, 2012) (proposed rule).

ing a rule subject to advance notice and an opportunity for public comment and criticism.[8]

The issuance of Defendant Napolitano's "Directive" inherently requires rulemaking. The criteria imposed – that the applicant must have entered the United States under the age of "sixteen", have resided continuously in the United States for at least "five" years, and be under the age of "thirty" – are fundamentally arbitrary thresholds of eligibility. They are policy selections that define a terminus for deciding whether one is "in" or "out." They are not clarifications of existing statutes or regulations; they are instead new policies establishing new standards of eligibility for a massive class of individuals.

A central facet of the Administrative Procedure Act is the exposure of a proposed rule to public comment and criticism, which in turn provides the promulgating agency an opportunity to answer such criticism, make changes to the proposed rule, or even decline to publish a final rule in light of the criticism. By attempting to make this policy change through executive fiat, Defendant Napolitano avoided this public scrutiny. She could have exposed the Directive's "guidance" to public comment, had she formally proposed to adopt a rule. Had she done so, the plaintiffs would have had the opportunity to challenge the Secretary's authority before the agency through the process laid out in the APA. That process alone would have distinguished *Morton*; but instead the Defendant Napolitano chose another course. *Compare La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217 (5th Cir. 2010) (regulations promulgated distinguished *Morton v. Ruiz*), *with Texas v. United States*, 497 F.3d 491 (5th Cir. 2007) (Secretary of Interior procedures constituted invalid attempt to circumvent court ruling).

---

[8]This is not Defendant Napolitano's first attempt to unlawfully alter national policy by simply issuing a policy statement. *See*, *e.g.*, *Electronic Privacy Information Center v. United States Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) (application of advanced imaging technology instead of magnetometers in air passenger screening requires notice and comment rulemaking).

Here, the Secretary has deviated from the course laid out by the APA without explana-tion.  The Secretary has not issued a notice of proposed rulemaking or promulgated a final rule in conformity with the APA.[9]

Defendant Napolitano's authority under 8 U.S.C. § 1103(a)(5) does not authorize her to order her subordinate officers or employees to circumvent the terms of the APA by simply issu-ing "directives" or "orders" that confer substantive legal benefits and privileges, and significant-ly transform the enforcement of federal immigration law.  On the contrary, the INA specifies a long and detailed list of relief from removal and a long and detailed list of benefits that may be granted.  Nowhere does the Act delegate authority to the Secretary to grant "deferred action" on such terms as she may desire.  Her authority under 8 U.S.C. § 1103 extends simply to filling in the gaps and resolving ambiguities *within* the exceptions and dispensations from removal enu-merated by the Congress.

Moreover, in implementing the Directive, DHS has treated the Directive as if it were a rule.  The Directive enumerates definitive "criteria" and reads like an ukase of arbitrary numbers defining who is "in" and who is "out."  It decrees the steps that ICE "should" "immediately" take.  *See Appalachian Power Co. v. EPA, supra*; *see also Center for Auto Safety v. National Highway Traffic Safety Administration*, 452 F.3d 798 (D.C. Cir. 2006).  These, like all numerical benchmarks, are *inherently arbitrary*.  They may not be capriciously established or changed without advance notice and an opportunity for public comment.  *See*, *e.g. CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1081-82 (D.C. Cir. 2009) (on rehearing) (logical outgrowth doctrine limits scope of permissible change in numerical metrics), and cases

---

[9]Her issuance of a Federal Register Notice on August 16, 2012, as part of a so-called "information collection" exer-cise, in no way satisfies the publication and comment requirements for rulemaking under the APA.

cited therein.

USCIS, in implementing the Directive, has been accepting and approving massive numbers of applications for "Deferred Action for Childhood Arrival" applicants. It has publicly reported that, between August 15 and November 15, 2012, it:

a.    accepted for processing 298,834 requests for Deferred Action for Childhood Arrival;

b.    scheduled 273,203 biometric services appointments;

c.    held 124,572 requests for Deferred Action for Childhood Arrival under review; and

d.    approved 53,273 requests for Deferred Action for Childhood Arrival.[10]

USCIS has also been collecting fees from aliens seeking relief under the Directive, contrary to DHS's prior consistent position that such fees in the USCIS fee schedule must be promulgated through the procedures of the APA as rules.[11]  This collection of nearly $140,000,000 in fees[12] further reflects the fact that the Directive is a regulation in disguise.

Thus, DHS has now entirely changed its prior legal position that a change in fees requires the promulgation of a rule. It has done so without explanation. Unexplained inconsistency is a reason for holding an interpretation to be an arbitrary and capricious change from agency prac-

---

[10]www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/2012-1116%20DACA%20Monthly%20Report.pdf.  The Court should take judicial notice of this fact.  Fed. R. Evid. 201(b).

[11]*E.g., U.S. Citizenship and Immigration Services Fee Schedule, Final Rule*, 75 Fed. Reg. 58,962, 58,966 (Sept. 24, 2010); *U.S. Citizenship and Immigration Services Fee Schedule, Proposed Rule*, 75 Fed. Reg. 33,448 (June 11, 2010); *Adjustment of Immigration and Naturalization Benefit Application and Petition Fee Schedule, Final Rule*, 72 Fed. Reg. 29,851 (May 30, 2007); *Adjustment of Immigration and Naturalization Benefit Application and Petition Fee Schedule, Proposed Rule*, 72 Fed. Reg. 4889 (Feb. 1, 2007).

[12]USCIS announced that the fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, including biometric fee, would be $465.  Multiplying that fee by the 298,834 accepted applications yields $138,957,810.  The collection of this fee has not been authorized by Congress through any supplemental appropriation or reprogramming approval.  Nor has the expenditure of the funds collected been authorized.

tice under the Administrative Procedure Act.  *See Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 46-57 (1983).  As DHS has never proposed a rule or subjected that rule and its authority to public scrutiny, the Court cannot now give credence to any *post hoc* explanation of DHS's decisions to create a new form of relief from removal through "deferred action" and to change its fee schedule.

**F.     The Directive Is Not Entitled to *Chevron* Deference.**

Familiar standards in judicial review of final agency rules are inapplicable here because the Secretary has not promulgated even an interpretive rule.  An administrative *rule* may receive substantial deference if it interprets the issuing agency's own ambiguous regulation.  *Auer v. Robbins*, 519 U.S. 452, 461-63 (1997).  An interpretation of an ambiguous statute may also receive substantial deference if embodied in a *rule*.  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).

Deference in accordance with *Chevron*, however, is warranted only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  "If the agency's decision is a result of a sufficiently formal and deliberative process to warrant deference, the second step of *Chevron* requires the court to assess whether the agency's interpretation is 'based on a permissible construction of the statute.'"  *Mead*, 533 U.S. at 230 (*quoting Chevron*, 467 U.S. at 843).  Otherwise, the interpretation is "entitled to respect" only to the extent it has the "power to persuade."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

In the instant case, no formal rulemaking has occurred.  Thus, the Secretary's persuasive powers are limited to the four corners of the "Directive."   Nor can the Directive be treated as an

interpretive rule; it does not purport to be one, nor has it been promulgated under any of the procedures of the APA or the Federal Register Act, 44 U.S.C. §§ 1501, *et seq.*

## II.    THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS THE COURT ISSUES A PRELIMINARY INJUNCTION.

An injury is irreparable if it cannot be adequately compensated by an award of damages. *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472-73 (5th Cir. 1985). As an aspect of that rule, courts may enjoin government officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution." *Morales v. TWA,* 504 U.S. 374, 381 (1992).

Harm to the careers of ICE Agent Plaintiffs who seek only to follow federal law, caused by unjust disciplinary action up to and including termination, is harm of an irreparable nature. Just as, for example, dollar values cannot easily be assigned to a company's loss of clientele, goodwill, marketing techniques, or office stability, *Martin v. Linen Systems for Hospitals, Inc.*, 671 S.W.2d 706, 710 (Tex. App. – Houston [1st Dist.] 1984, no writ), neither can the harm to ICE Plaintiffs' reputations as law enforcement officers or the stigmatization of having been disciplined for resisting the illegal Directive be remedied by such damages as back pay for a suspension shorter than the threshold for administrative review under the Civil Service Reform Act.

The injury to Plaintiff State of Mississippi is equally irreparable. Even if damages equal to the net fiscal cost that the illegal alien beneficiaries of the Directive impose upon the State could be recovered from the defendants in the future, some aspects of the immediate fiscal injury could not be repaired. The State of Mississippi cannot incur debt exceeding one-and-a-half times the general revenue of one of the four preceding years. Miss. Const. art. IV, § 115. Consequently, any shortfall due to the cost imposed by illegal alien beneficiaries of the Directive must be

-22-

paid for by taxes raised in that fiscal year or by cuts to other programs in that fiscal year. So, for example, if the high cost to the state of incarcerating illegal alien offenders means that the state troopers cannot hire another officer that year, the fact that damages might recovered at some time in the future does not repair the damage to the state of having one fewer law enforcement officer protecting the state's residents.

## III.    THE INJURY TO THE PLAINTIFFS GREATLY OUTWEIGHS ANY PURPORTED INJURY TO THE DEFENDANTS OR THE AGENCIES THAT THEY ADMINISTER.

In contrast to the considerable, irreparable, and immediate harm that implementation of the Directive and related provisions of the Morton Memorandum will inflict upon the plaintiffs, the defendants can claim no injury that would result from enjoining their implementation.[13] Any purported injury would have already been evident prior the issuance of the Directive. And the defendants can assert no legitimate national interest in refusing to place illegal alien beneficiaries into removal proceedings, because Congress discounted any such interest when it enacted IIRI-RA in 1996.

## IV.    INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

The grant of injunctive relief in this matter would serve four significant public interests. First, there is an immense public interest in the enforcement of the immigration laws of the United States. The unlawful conferral of deferred action and employment authorization upon illegal aliens whom federal law requires be removed creates a legal ambiguities and confusion that will hamstring immigration enforcement for years to come. Illegal alien beneficiaries of the Di-

---

[13]While the defendants have apparently implemented the Directive to protect the interests of illegal alien beneficiaries to remain unlawfully present in the United States, such interests have no legal basis or legitimacy, and consequently injury to those interests is of no moment in the issuance of preliminary injunctive relief.

rective are assured that they possess a legal benefit that prevents their removal from the United States. Consequently, a reliance interest in those benefits arises. This reliance interest will impose a barrier to the enforcement of federal immigration laws as intended by Congress. At the time of this filing, there are now more than 53,000 aliens who have been granted illegitimate benefits under the Directive, and that number will climb daily until injunctive relief is granted.

Second, the implementation of the Directive poses a safety risk to all residents of the United States. As a direct result of the Directive, multiple illegal aliens arrested for (but not yet convicted of) serious crimes have been released by ICE and allowed to remain in the United States, rather than being placed into removal proceedings as was the case before the Directive. One of the ICE Agent Plaintiffs, Samuel Martin, has already been compelled to release four criminal aliens back into the community, including one who assaulted federal law enforcement officers. Martin Affidavit, attached, at ¶¶ 6-17; *see also* Crane Affidavit, attached, at ¶ 10.

Third, the Directive is costing the taxpayers of Mississippi, and by extension the taxpayers of all fifty states, a great deal of money. The net fiscal cost of illegal immigration, after any taxes paid by illegal aliens are deducted, is $99.2 billion annually.[14] In the state of Mississippi, according to the audit performed by Plaintiff Bryant in his former capacity as State Auditor, the net fiscal burden of illegal immigration is more than $25 million annually.[15] The Directive ensures that 15% of aliens responsible for those costs will not be removed each year. The practical effect of the Directive is even broader, due to the fact that ICE agents are not being permitted to

---

[14]Jack Martin & Eric A. Ruark, Fed'n for Am. Immigration Reform, *The Fiscal Burden of Illegal Immigration on United States Taxpayers* 79 (2010) (available at www.fairus.org/site/DocServer/USCostStudy_2010.pdf?docID=-4921).

[15]"The Impact of Illegal Immigration on Mississippi: Costs and Population Trends" (OSA Report, 2006), Appx. to Am. Complaint.

require illegal aliens to prove their asserted eligibility. Consequently, the vast majority of illegal aliens aged 30 and under (including those who do not meet the criteria of the Directive) are not being removed from the United States. *See* Crane Affidavit, attached, at ¶¶ 8-9.

Fourth, the defiance of federal law by the executive branch is by its very nature a matter of immense public interest. "If the Secretary were to declare that he no longer would enforce [a particular law" such a case "inevitably would be a matter of grave public concern." *Dunlop*, 421 U.S. at 574. If the defendants can successfully defy the express terms of federal law in this instance, one wonders what the next step will be.

## REQUEST FOR RELIEF

In light of the foregoing, the plaintiffs respectfully request that the Court (1) issue a preliminary injunction prohibiting the implementation of the Directive and related provisions of the Morton Memorandum pending entry of a final judgment in this case; and (2) grant the plaintiffs such other relief, at law or in equity, to which they may be entitled and which this Court deems just and proper.

In order to prevent the harms explained above, the plaintiffs seek a nationwide preliminary injunction pending resolution of this litigation. The ICE Agent Plaintiffs seek a nationwide injunction because they are assigned to different offices in different States across the United States. The State of Mississippi also must seek a nationwide injunction because the failure of DHS to place illegal aliens into removal proceedings does not stop or start at the borders of Mississippi. Illegal aliens cross state boundaries and impose costs on any State in which they chose to rest. The plaintiffs therefore request that this Court issue preliminary injunctive relief that is nationwide in scope.

Respectfully submitted,

/s Kris W. Kobach

P. MICHAEL JUNG
Texas Bar No. 11054600

KRIS W. KOBACH
Kansas Bar No. 17280 (admitted *pro hac vice*)

Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: 214-651-4300

Kobach Law, LLC
4701 N. 130th St.
Kansas City, Kansas 66109
Telephone:  913-638-5567

ATTORNEYS FOR PLAINTIFFS

DATED:  November 28, 2012

## CERTIFICATE OF SERVICE

I hereby certify that this Brief in Support of Plaintiffs' Application for Preliminary Injunctive Relief has been served on the defendants by electronic service through the Court's ECF system to Adam Kirschner, Esq., Attorney for Defendants, at Adam.Kirschner@usdoj.gov, on this 28th day of November, 2012.

/s Kris W. Kobach
KRIS W. KOBACH