IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER L. CRANE, DAVID A. ENGLE, ANASTASIA MARIE CARROLL, RICARDO DIAZ, LORENZO GARZA, FELIX LUCIANO, TRE REBSTOCK, FERNANDO SILVA, SAMUEL MARTIN, JAMES D. DOEBLER, and THE STATE OF MISSISSIPPI, by and through GOVERNOR PHIL BRYANT **Plaintiffs,** | ) ) ) ) ) ) ) ) ) ) ) | |
| v. | ) ) ) | Civil Action No. 3:12-cv-03247-O |
| JANET NAPOLITANO, in her official capacity as Secretary of Homeland Security, JOHN MORTON, in his official capacity as Director of Immigration and Customs Enforcement, and ALEJANDRO MAYORKAS, in his official capacity as Director of United States Citizenship and Immigration Services **Defendants.** | ) ) ) ) ) ) ) ) ) | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

---

KRIS W. KOBACH
Kansas Bar No. 17280 (admitted *pro hac vice*)
Kobach Law, LLC
4701 N. 130th St.
Kansas City, Kansas 66109
Telephone:  913-638-5567

P. MICHAEL JUNG
Texas Bar No. 11054600
Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: 214-651-4300

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Table of Contents ..................................................................................................................... i

Table of Authorities .............................................................................................................. iii

Argument .................................................................................................................................1

I.      THE CONSTITUTIONAL AND PRUDENTIAL REQUIREMENTS
OF STANDING. ...............................................................................................1

II.     THE ICE AGENT PLAINTIFFS POSSESS STANDING. ...............................2

     A.     The ICE Agent Plaintiffs Have Suffered Injury-in-Fact. ......................2

          1.     Being Compelled to Violate a Federal Statute Upon
Pain of Adverse Employment Action Constitutes
Injury-in-Fact. ...............................................................................2

          2.     The ICE Agent Plaintiffs Meet the Fifth Circuit's
Violation-of-Oath Standing Criteria. ............................................7

          3.     The Burden of Compliance Constitutes Injury-in-Fact. ..........12

          4.     The Amended Complaint Contains No Policy Argument
Whatsoever. .................................................................................14

     B.     The Plaintiffs Fall Within the Zone of Interest of 8 U.S.C.
§§ 1225(a)(3) and (b)(2)(A). ..................................................................15

     C.     The Procedures of the Civil Service Reform Act Are Irrelevant
to the Case at Bar. ..................................................................................15

III.    THE STATE OF MISSISSIPPI POSSESSES STANDING. ..........................16

     A.     The State's Fiscal Injury-in-Fact is Already Manifest. ......................16

     B.     The State's Injuries Are Redressable. ..................................................19

IV.    THE DEFENDANTS MISUNDERSTAND HOW EMPLOYMENT
AUTHORIZATION AFFECTS THIS CASE. ..................................................20

V.     IF THE PLAINTIFFS DO NOT HAVE STANDING, THEN NO ONE
HAS STANDING. ...........................................................................................24

VI.   VENUE IS PROPER IN THIS DISTRICT. ....................................................24

Conclusion .............................................................................................................................25

Certificate of Service ...................................................................................................................26

## TABLE OF AUTHORITIES

**Cases**

*A. J. Taft Coal Co. v. Barnhart*,
   291 F. Supp. 2d 1290, (N.D. Ala. 2003) ........................................................................ 25

*Allen v. Wright*,
   468 U.S. 737 (1984) ...................................................................................................... 3

*Am. Forest & Paper Ass'n v. United States EPA*,
   137 F.3d 291 (5th Cir. 1998) .................................................................................. 12, 13

*Arizona v. United States*,
   132 S. Ct. 2492 (2012) (Scalia, J., dissenting) ............................................................. 19

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
   397 U.S. 150 (1970) ..................................................................................................... 15

*Athanson v. Grasso*,
   411 F. Supp. 1153 (D. Conn. 1976) ............................................................................... 9

*Ayuda, Inc. v. Meese*,
   687 F. Supp. 650 (D.D.C. 1988) .................................................................................... 5

*Baker v. Carr*,
   369 U.S. 186 (1962) ....................................................................................................... 8

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................................... 1

*Board of Education v. Allen*,
   392 U.S. 236 (1968) .................................................................................................... 8, 9

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ..................................................................................................... 17

*Doe v. Bolton*,
   410 U.S. 179 (1973 ........................................................................................................ 5

*Donelon v. Louisiana Div. of Admin. Law*,
   522 F.3d 564 (5th Cir. 2008) ............................................................................. 3, 10, 11

*Drake v. Obama*,
   664 F.3d 774 (9th Cir. 2011) ............................................................................... 11, 12

*Elgin v. Dep't of the Treasury*,
    132 S. Ct. 2126 (2012) ................................................................. 16

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) ........................................................................ 4

*Exxon Corp. v. FTC*,
    588 F.2d 895 (3rd Cir. 1978) ....................................................... 25

*Fed'n for Am. Immigration Reform v. Reno*,
    93 F.3d 897 (D.C. Cir., 1996) ..................................................... 15

*Finch v. Mississippi State Medical Ass'n*,
    585 F.2d 765 (5th Cir. 1978) ......................................... 8, 9, 10, 11

*Flast v. Cohen*,
    392 U.S. 83 (1968) ...................................................................... 19

*Fleet Nat'l Bank v. Boyle*,
    2005 U.S. Dist. LEXIS 44036 (E.D. Pa. 2005) ............................ 18

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012) ....................................................... 18

*Gray v. Valley Park*,
    567 F.3d 976 (8th Cir. 2009) ....................................................... 13

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................... 20

*Independent Hous. Servs. v. Fillmore Ctr. Assocs.*,
    840 F. Supp. 1328 (N.D. Cal. 1993) ........................................... 18

*Inv. Co. Inst. v. Camp*,
    401 U.S. 617 (1971) .................................................................... 17

*Lance v. Coffman*,
    549 U.S. 437 (2009) ...................................................................... 3

*Lipscomb v. Wise*,
    643 F.2d 319 (5th Cir. 1981) ......................................................... 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................... 1, 2, 3, 4

*Marbury v. Madison*,
    5 U.S. 137 (1803) ....................................................................... 20

*Menard v. Saxbe*,
  498 F.2d 1017 (D.C. Cir. 1974) ........................................................................ 7

*Mobil Oil Corp. v. Att'y Gen.*,
  940 F.2d 73 (4th Cir. 1991) .............................................................................. 7

*Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of
  Jacksonville*,
  508 U.S. 656 (1993) .......................................................................................... 1

*Pelican Chapter, Associated Builders & Contrs. v. Edwards*,
  128 F.3d 910 (5th Cir. 1997) ............................................................................ 6

*Public Interest Research Group v. Powell Duffryn Terminals, Inc.*,
  913 F.2d 64 (3d Cir. 1990) .............................................................................. 18

*Raines v. Byrd*,
  521 U.S. 811 (1997) ........................................................................................ 24

*Sch. Dist. v. Sec'y of Dep't of Educ.*,
  584 F.3d 253 (6th Cir. 2009) .......................................................................... 17

*Sidney Coal Co. v. Massanari*,
  221 F. Supp. 2d 755 (E.D. Ky. 2002) , *app. dism'd*, 98 Fed. Appx. 378 (6th Cir.
  2004) ................................................................................................................ 25

*Smith v. Secretary of Navy*,
  659 F.2d 1113 (D.C. Cir. 1981) ........................................................................ 7

*St. Paul Area Chamber of Commerce v. Gaertner*,
  439 F.3d 481 (8th Cir. 2006) ............................................................................ 7

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) ...................................................................... 4, 17

*Time Warner Cable, Inc. v. Hudson*,
  667 F.3d 630 (5th Cir. 2012) ............................................................................ 4

*Truax v. Raich*,
  239 U.S. 33 (1915) .......................................................................................... 22

*United Food & Commercial Workers Int'l Union v. IBP, Inc.*,
  857 F.2d 422 (8th Cir. 1988) ............................................................................ 5

*United States Postal Serv. v. Nat'l Ass'n of Letter Carriers*,
  330 F.3d 747 (6th Cir. 2003) ............................................................................ 5

*United States v. Miami*,
    664 F.2d 435 (5th Cir. 1981) (*en banc*) .............................................................. 7

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State*,
    454 U.S. 464 (1982) ........................................................................................... 2

*Villas at Parkside Partners v. City of Farmers Branch*,
    701 F. Supp. 2d 835 (N.D. Tex. 2010), *aff'd*, 675 F.3d 802 (5th Cir. 2012, vacated
    on grant of reh'g *en banc*) ..................................................................... 12, 13

*Warth v. Seldin*,
    422 U.S. 490 (1975) .............................................................................. 2, 19, 24

## **Statutes**

18 U.S.C. § 1033 .................................................................................................. 10

28 U.S.C. § 1391(e)(1)(C) ................................................................................... 25

5 U.S.C. § 701(a)(2) .............................................................................................. 20

5 U.S.C. § 7121 .................................................................................................... 15

5 U.S.C. § 7512 .................................................................................................... 16

8 U.S.C. § 1225(a)(3) ..................................................................................... passim

8 U.S.C. § 1225(b)(2)(A) ............................................................................... passim

8 U.S.C. § 1229a .................................................................................................... 3

## **Legislative Materials**

Robert Rector, "The Fiscal Cost of Low-Skill Immigrants to State and Local Taxpayers,"
    Heritage Foundation Study (testimony before Subcomm. on Immigration, House
    Comm. on the Judiciary, May 17, 2007) (available at
    judiciary.house.gov/hearings/May2007/Rector070501.pdf) ........................... 23

## **Secondary Sources**

George J. Borjas, Jeffrey Grogger, & Gordon H. Hanson, *Immigration and African-*
    *American Employment Opportunities: The Response of Wages, Employment and*

*Incarceration to Labor Market Shocks*, Working Paper #12518, National Bureau of Economic Research, www.nber.org/papers/w12518.................................................... 24

Robert E. Rector and Christine Kim, *The Fiscal Cost of Low-Skill Immigrants to the U.S. Taxpayer* (May 22, 2007), Heritage Foundation Special Report #14 (available at www.heritage.org/Research/Immigration/sr14.cfm) ........................................................ 23

Stephen A. Camarota, *Welfare Use by Immigrant Households with Children: A Look at Cash, Medicaid, Housing, and Food Programs, Center for Immigration Studies Backgrounder* (Apr, 2011) (available at www.cis.org/articles/2011/immigrant-welfare-use-4-11.pdf)....................................................................................................... 17

www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/2012-1116%20DACA%20Monthly%20Report.pdf ........................ 17

## ARGUMENT

The plaintiffs respectfully urge this Court to deny defendants' motion to dismiss for lack of standing, or alternatively, for improper venue. As explained fully below, the motion to dismiss misunderstands the nature of the ICE Agent Plaintiffs' injuries-in-fact and mischaracterizes applicable Fifth Circuit law. The defendants' attack on the standing of the State of Mississippi is equally weak; a long line of authority supports the standing of a sovereign state that faces the concrete fiscal injury that is present in this matter. And finally, the defendants' venue argument falls with their standing argument.

## I.    THE CONSTITUTIONAL AND PRUDENTIAL REQUIREMENTS OF STANDING.

A party seeking to invoke a federal court's jurisdiction must meet the three constitutional requirements of standing. First, the party must demonstrate injury-in-fact, which means "an invasion of a legally protected interest." *Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993). The Supreme Court would later describe injury-in-fact as the invasion of a "judicially cognizable interest." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). The invasion of a judicially cognizable interest must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, there must be "a causal relationship between the injury and the challenged conduct." *Jacksonville*, 508 U.S. at 663. And third, there must exist "a likelihood that the injury will be redressed by a favorable decision." *Id.*

In addition to the constitutional requirements of standing, there are three prudential requirements for standing: (1) a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties;" (2) courts must not adjudicate "generalized grievances;" and (3) a plaintiff must fall within "the zone of interests" regulated or protected by the statute. *Valley Forge Chris-*

*tian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 474-75 (1982) (*citing Warth v. Seldin*, 422 U.S. 490, 499-500 (1975)).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice …." *Lujan*, 504 U.S. at 561. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.

## II.     THE ICE AGENT PLAINTIFFS POSSESS STANDING.

### A.     The ICE Agent Plaintiffs Have Suffered Injury-in-Fact.

The ICE Agent Plaintiffs in this case have suffered three distinct forms of injury-in-fact: (1) being compelled to violate a federal statute directed specifically at them, on pain of adverse employment action if they do not, (2) being compelled to violate their oaths of office, on pain of adverse employment action if they do not, and (3) the burden of compliance with the Directive. The defendants have addressed only the second of these injuries-in-fact. In any event, abundant case law supports all three of the ICE Agent Plaintiffs' asserted injuries-in-fact. Moreover, the defendants do not challenge the causation or redressability of these injuries-in-fact.

#### 1.     Being Compelled to Violate a Federal Statute Upon Pain of Adverse Employment Action Constitutes Injury-in-Fact.

The defendants fail to even address the principal basis of the ICE Agent Plaintiffs' standing. The standing of the ICE Agent Plaintiffs is based first and foremost on the fact that the statutory obligations of 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A) *fall directly upon them as ICE agents.* 8 U.S.C. § 1225(a)(3) states that all applicants for admission "shall be inspected *by immigration officers.*" *Id.* (emphasis added). 8 U.S.C. § 1225(b)(2)(A) mandates that "if the examining *immigration officer* determines that an alien seeking admission is not clearly and beyond a doubt

entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." *Id.* (emphasis added).  The Directive compels the ICE agents to violate statutes that expressly command them – specifically – to act.

This is not, then, as the defendants claim, a case where the plaintiffs are not "differentially situated from that of any ordinary citizen with a generalized grievance," Def. Memo. 9, and are "claiming only harm to [their] and every citizen's interest in [the] proper application of the Constitution and laws," *Lance v. Coffman*, 549 U.S. 437, 439 (2009) (*quoting Lujan*, 504 U.S. at 560-61).  On the contrary, the ICE Agent Plaintiffs are uniquely situated: they are the only persons directly commanded to do something by 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A).  At the same time, they are also directly commanded to do the opposite by the Directive; and they risk adverse employment action if they disobey.  No other class of persons in the country is so situated: the hypothetical "ordinary citizen" is not commanded to act by either the Directive or the statutes.

"[T]he plaintiff must establish a 'personal stake' in the dispute and that the injury is particularized to him."  *Donelon v. Louisiana Div. of Admin. Law*, 522 F.3d 564, 566 (5th Cir. 2008) (*quoting Allen v. Wright*, 468 U.S. 737, 819 (1984)).  The ICE Agent Plaintiffs have a concrete and particularized interest in obeying Congress's direct command to them and in avoiding adverse employment actions if they follow federal law and thereby disobey the Directive and Morton Memorandum, which are also directed at them specifically.

The Supreme Court declared in *Lujan* that a plaintiff clearly possesses standing under circumstances such as these:

> When the suit is one challenging the legality of government action or inaction …
> [and] *the plaintiff is himself an object of the action* (or forgone action) at issue …,
> there is ordinarily little question that the action or inaction has caused him injury,
> and that a judgment preventing or requiring the action will redress it.

*Lujan*, 504 U.S. at 561-62 (emphasis added); *see also Texas v. United States*, 497 F.3d 491, 498

(5th Cir. 2007). "'[T]he nature and extent of facts that must be averred (at the summary judgment stage) … in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.'" *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012) (*quoting Lujan*, 504 U.S. at 561). Here there is no question that the ICE Agent Plaintiffs are the object of the government action and consequently that the action has caused them injury.

An unusual feature of 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A) bears mention. Unlike the preponderance of federal immigration law, which commands the "Secretary" or the "Attorney General" to take particular steps or exercise particular authority, these statutory provisions command specific categories of executive branch *employees* to undertake the specified actions. Thus, the ICE agent plaintiffs are under an unusually strong obligation imposed by federal law upon them *directly*, not an obligation imposed upon the Secretary of DHS and delegated to them. This extraordinary aspect of the federal statute at the center of the ICE Agent Plaintiffs' claim strongly supports their assertion of injury-in-fact.

It is well-established that a plaintiff who placed in a position of having to violate the law possesses injury-in-fact. This is true, whether the violated law is the challenged regulation (the Directive) or another law that would be violated in the course of complying with the challenged regulation (here 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A)). The Supreme Court has repeatedly held that a plaintiff seeking to avoid conflict with the law possesses standing. In the landmark First Amendment case of *Epperson v. Arkansas*, 393 U.S. 97 (1968), involving a teacher's challenge to an Arkansas law prohibiting the use of textbooks teaching the theory of evolution, the teacher alleged that school administrators were compelling her to use such textbooks in the coming year and that doing so would place her in violation of the state law. Although the statute had never

been enforced, the Court found that she faced "at least a literal dilemma because she was supposed to use the new textbook … but to do so would be a criminal offense and subject her to dismissal." *Id*. at 100-02; *see also Doe v. Bolton*, 410 U.S. 179, 188 (1973). "Where plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest which is clearly proscribed by statute, courts have found standing to challenge the statute, even absent a specific threat of enforcement." *United Food & Commercial Workers Int'l Union v. IBP, Inc*., 857 F.2d 422, 428 (8th Cir. 1988). The same is true in the instant case, where the ICE Agent Plaintiffs seek to follow federal law and engage in a course of conduct proscribed by the Directive and the Morton Memorandum.

Injury-in-fact occurs when a plaintiff is forced to violate the law, regardless of whether the violated law is a criminal law or a civil law. In *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747 (6th Cir. 2003), the Sixth Circuit held that the plaintiff Postal Service had standing because it was being compelled to violate a statutory duty it had to its employees. "We are satisfied that to the extent the Postal Service claims the award *will force it to violate a federal statute*, it is asserting its own rights and has Article III standing." *Id*. at 750-51 (emphasis added). In a case with remarkable similarities to the instant one, *Ayuda, Inc. v. Meese*, 687 F. Supp. 650, 657 (D.D.C. 1988), plaintiff organizations challenged regulations promulgated by the Immigration and Naturalization Service (INS) because those regulations would compel the plaintiff organizations to violate the terms of federal law. The court held that the plaintiff organizations possessed standing. In so holding, Judge Sporkin noted: "I am deeply troubled by the INS' position that they have the contractual right to compel an organization to carry out a regulation that on its face violates the law – and that nevertheless, the organizations lack standing to challenge that interpretative regulation." *Id*. at 657. The defendants – successors to the INS –

take the same troubling position in this case.

All of the ICE Agent Plaintiffs are placed in the position of being compelled either to violate the express commands of federal law that are particularly directed at them, or to face suspension or other adverse employment action for refusing to violate those commands. Several ICE Agent Plaintiffs have already been forced to make this painful choice. *See* Martin Aff. ¶¶ 6-16; Doebler Aff. ¶¶ 2-9; Engle Aff. ¶¶ 8-15. And all of the ICE Agent Plaintiffs face the imminent threat that they must confront this choice of injuries when they next encounter a Directive-eligible illegal alien. Am. Compl. ¶ 49. The Fifth Circuit has recognized that a plaintiff facing such a "Hobson's choice" between two injuries-in-fact possesses standing. *Pelican Chapter, Associated Builders & Contrs. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997).

The injury on the opposite horn of the plaintiffs' dilemma is equally great. The ICE Agent Plaintiffs will be disciplined if they disobey the Directive or the Morton Memorandum and issue a Notice to Appear (NTA) as required by federal law. Plaintiff Doebler has *already* been subjected to disciplinary action for issuing an NTA to an illegal alien, contrary to the Morton Memorandum. Doebler Aff. ¶¶ 2-9. All of the ICE Agent Plaintiffs have the concrete and imminent fear that the same penalty will be imposed upon them if they comply with federal law and issue an NTA to an alien who is covered by the Directive or Morton Memorandum. *See*, *e.g.*, Doebler Aff. ¶¶ 10-11; Engle Aff. ¶ 20. The Plaintiffs have encountered numerous Directive-eligible and/or Morton-Memorandum-Eligible aliens, and their supervisors have made it clear that they will be disciplined if they disobey these directives and issue NTAs. Engle Aff. ¶ 20, Am. Compl. ¶¶ 49, 51. The threat is real, it is imminent, and in Plaintiff Doebler's case, the initiation of disciplinary action has already occurred. "[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S.

488, 496 (1974).  If they disobey these directives, the ICE Agent Plaintiffs will suffer injury in the form of disciplinary action and concomitant loss of income, seniority, and reputation.[1]

It is axiomatic that an adverse employment action, or the threat thereof, constitutes injury-in-fact.  *United States v. Miami*, 664 F.2d 435, 446 (5th Cir. 1981) (*en banc*) (plaintiffs in non-preferred category for promotion "have been threatened with the requisite 'injury-in-fact'"), *quoting Lipscomb v. Wise*, 643 F.2d 319, 320 (5th Cir. 1981); *Shanahan v. City of Chicago*, 82 F.3d 776 (7th Cir. 1996) ("[T]here can be little question that Shanahan's demotion from director back to his career position as a lieutenant in the CFD is an adequate injury-in-fact to meet the constitutional minimum of Article III standing").  Even an unfavorable evaluation by a supervisor constitutes sufficient injury-in-fact: "[T]he location of an unfavorable evaluation in appellant's personnel files, presently injuring his reputation and threatening him with denial of future benefits rightfully due him, plainly enabled him to satisfy both the constitutional and the statutory requirements of injury-in-fact."  *Smith v. Secretary of Navy*, 659 F.2d 1113 (D.C. Cir. 1981) (*citing Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C. Cir. 1974)).

## 2.    The ICE Agent Plaintiffs Meet the Fifth Circuit's Violation-of-Oath Standing Criteria.

The defendants spend nearly seven pages on the subject of violation-of-oath standing.  Def. Memo. 11-17.  None of that argument bears on the ICE Agent Plaintiffs' principal bases for standing – their being compelled to violate the command of federal law that bears directly upon

---

[1]The fact that some of the ICE Agent Plaintiffs have made the choice to follow the Memorandum and Directive while simultaneously bringing this lawsuit does not impugn their standing.  *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 488 (8th Cir. 2006) ("Our holding promotes good public policy by breeding respect for the law. Like the Fourth Circuit, we 'encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution'"), *citing Mobil Oil Corp. v. Att'y Gen.*, 940 F.2d 73, 75 (4th Cir. 1991).

them, *see* Section II.A.1, *supra*, and the burden of compliance with the Directive and Morton

Memorandum, *see* Section II.A.3, *infra*.  But in any event, the ICE Agent Plaintiffs can and do

independently base their standing on being forced to violate their oaths of office.  Specifically,

they claim that they face being suspended or expelled from their positions if they do not violate

their oaths of office by breaking 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A).  Am. Compl. ¶¶ 47, 48.

The defendants argue that the violation of an oath to uphold the law is never sufficient to

establish injury-in-fact.  Citing *Finch v. Mississippi State Medical Ass'n*, 585 F.2d 765 (5th Cir.

1978), they declare that "[t]he Fifth Circuit has categorically held that purportedly being required

to violate an oath is insufficient to establish standing without a showing that there would be some

*separate and concrete* adverse consequence that flows from violating the oath."  Def. Memo. 11

(emphasis in original).  That is not at all what *Finch* states.

To fully understand the context in which *Finch* was decided, one must begin with the Su-

preme Court holding that *Finch* was interpreting and applying – that of *Board of Education v.

Allen*, 392 U.S. 236 (1968).  *Allen* involved public school board members who believed that if

they complied with a New York state law requiring them to loan public school textbooks to pa-

rochial school students, they would violate their oaths of office to uphold the United States Con-

stitution (specifically the Establishment Clause of the First Amendment).  *Id*. at 238-41.  The Su-

preme Court held that the plaintiffs possessed standing, and in so doing, wrote the following:

> Appellants have taken an oath to support the United States Constitution.  Believ-
> ing § 701 to be unconstitutional, they are in the position of having to choose be-
> tween violating their oath and taking a step – refusal to comply with § 701 – that
> would be likely to bring their expulsion from office and also a reduction in state
> funds for their school districts.  There can be no doubt that appellants thus have a
> 'personal stake in the outcome' of this litigation.

*Id.* at 241 n.5 (*quoting Baker v. Carr*, 369 U.S. 186, 204 (1962)).  These words were pregnant

with implications for standing cases across the country.  If interpreted broadly, they would give

just about any government employee who had sworn an oath of office standing to challenge all sorts of rules, regulations, and statutes. If interpreted narrowly, they would provide only a small window for violation-of-oath standing.

The Fifth Circuit chose the latter path. The *Finch* Court, eschewing the broad approach favored by the Second Circuit, looked for a limiting factor in the words of the *Allen* Court and in subsequent court decisions. 585 F.2d at 773-74. The Court arrived at the following limiting factor: plaintiffs only possess standing for being compelled to violate their oaths of office if "plaintiffs were in danger of expulsion from office at the hands of the defendant if they did not obey the statute." *Id.* at 774 (citing discussion of *Allen* in *Athanson v. Grasso*, 411 F. Supp. 1153 (D. Conn. 1976)). Note that the "statute" is the challenged action of the defendants.

Applying this limiting factor to the facts in *Finch* – a case in which a governor challenged a state law that he believed violated the Equal Protection Clause – the Fifth Circuit reached the following conclusion:

> The Governor, as an elected official, is in no danger of expulsion from office as a result of any action that he alone believes may have violated his oath. He is certainly in no danger of expulsion at the hands of the defendant professional associations. Furthermore, there is no allegation that his office is in any danger of a loss of funds (and particularly a loss as a result of any action the defendants may take) if the Governor refuses to comply with the statute.

*Finch*, 585 F.2d at 774. Accordingly, the Governor did not possess standing.

In contrast, the *Finch* limiting factor does apply here. The ICE Agent Plaintiffs face the "danger of expulsion at the hands of the defendant[s]" Morton and Napolitano "if [they] refuse to comply with the [Directive]." Plaintiff Doebler has already been subjected to a proposed three-day suspension because he issued an NTA to an illegal alien and refused to exercise the "prosecutorial discretion" commanded by the Morton Memorandum. Doebler reasonably fears, based on his past experience, that if he follows the requirements of federal law, and disobeys the Mor-

ton Memorandum or the Directive by issuing an NTA again, he will be subjected to disciplinary action again, and that a second disciplinary action will result in expulsion from ICE. Doebler Aff. ¶ 10. The defendants have made it quite clear to all ICE officers that they will be punished if they disobey the Directive and/or the related provisions of the Morton Memorandum. Am. Compl. ¶ 49. The ICE Agent Plaintiffs have encountered many illegal aliens and have faced the choice between obeying federal law or obeying the Morton Memorandum and the Directive. *See* Doebler Aff. ¶¶ 2-8, Engle Aff. ¶¶ 9-15, Martin Aff. ¶¶ 5-17. The threat is real, it is imminent, and in Doebler's case, the disciplinary process has already been initiated. In short, the ICE Agent Plaintiffs are in the exact position envisioned by the Fifth Circuit in *Finch*.

More recently, in *Donelon*, the Fifth Circuit reiterated the same limiting factor governing oath cases. *Donelon* concerned a state insurance commissioner who believed that an administrative review process established by state law would violate federal law. *Donelon*, 522 F.3d 564, 565-66. Once again, the Court focused on *whether the plaintiff could lose his position at the hands of the defendant* if he refused to violate his oath of office. Because he did not face the threat of adverse employment consequences (or the loss of funding), he did not have standing:

> Here, Donelon has no 'personal stake' in this litigation. … There is no claim that he suffers any *personal* injury when an ALJ overturns one of his decisions regarding 18 U.S.C. § 1033 waivers. Nor is there any claim that he will be expelled from office or lose public funding if he complies with Louisiana law. As in *Finch*, he is merely suing to ensure Louisiana law conforms to his *opinion* of what federal law requires.

522 F.3d at 568 (emphasis in original). In contrast, the ICE Agent Plaintiffs face the direct threat of being suspended or terminated by Defendants Napolitano and Morton if they disobey the Directive or the Morton Memorandum. They therefore clearly satisfy the *Finch* limiting factor on violation-of-oath standing cases.

One additional comparison between this case and *Finch* and *Donelon* bears mentioning.

-10-

The Fifth Circuit noted that the plaintiffs in those cases possessed questionable injury-in-fact be-
cause their injury rested upon abstract opinions about whether the state law at issue might violate
the United States Constitution.  Consequently, if their personal opinions about the constitutional
issue changed, then their asserted injuries would vanish:

> The mental disposition of the Governor is all that gives him cause to complain;
> were he to change his mind tomorrow and decide, rightly or wrongly, that the
> state statute is valid, he would no longer have any interest in the case.  He has no
> personal stake in the outcome of the case; he will not be affected favorably by a
> decision that the statute is unconstitutional nor adversely by a decision that it is
> valid.

*Finch*, 585 F.2d at 774; *Donelon*, 522 F.3d at 567.  In contrast, this case involves federal statutes
that *unmistakably* order *the plaintiffs themselves* to act.  *See* Section II.A.1, *supra*.  There is no
question that these commands are addressed directly to the ICE Agent Plaintiffs and that they
require the ICE Agent Plaintiffs to issue NTAs to the illegal aliens concerned.  The plaintiffs
cannot "change their minds" and make these direct statutory commands go away.

The defendants make one final attempt to attack the plaintiffs' violation-of-oath standing.
Instead of relying on Fifth Circuit case law, which clearly supports standing, they attempt to
draw support from the Ninth Circuit decision in *Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011),
despite the fact that the Ninth Circuit views violation-of-oath standing more narrowly than the
Fifth Circuit (*see id.* at 780).[2]  Def. Memo. 14-15.  In *Drake*, the plaintiff military serviceman
claimed that he would violate his oath if he followed the orders of a president whom he believed
was not a natural-born citizen.  The Ninth Circuit held that the plaintiff lacked standing.

The defendants fail to acknowledge two decisive distinctions between this case and

---

[2]The Defendants concede that the circuits disagree on violation-of-oath standing, and that *Finch* represents the Fifth
Circuit's view.  Def. Memo. 15 n.16.

*Drake*.  First, the Drake plaintiff asserted, but could not substantiate, that to follow an order from an unqualified commander-in-chief somehow constituted unlawful behavior on his part.  In contrast, the ICE Agent Plaintiffs can point to *an affirmative violation of a specific law* that occurs when they follow the Directive or the Morton Memorandum.  Second, the *Drake* plaintiff "assert[ed] nothing more than an abstract constitutional grievance that, far from being particularized to him, is shared by all citizens generally." *Id.*  Here, *only* the ICE Agent Plaintiffs are commanded to act by 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A); no other citizen can raise such a claim.

Finally, the defendants suggest that, like the *Drake* plaintiff, the Plaintiff ICE Agents can violate their oaths without fear of adverse consequences.  Def. Memo. 16.  Here, too, the defendants ignore the fundamental difference between the two cases.  The *Drake* plaintiff's purported violation of his oath depended upon two abstract constitutional theories (whether President Obama was a natural-born citizen and the constitutional effect of an order from an unqualified President), and therefore it was a virtual impossibility that he might suffer adverse consequences from "violating" such abstract theories.  In contrast, the ICE Agent Plaintiffs clearly violate the *express terms* of 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A) when they follow the Directive or Morton Memorandum and decline to remove an illegal alien.  The illegality of such an action is plain on the face of federal law.[3]

### 3.    The Burden of Compliance Constitutes Injury-in-Fact.

The officers of ICE, along with USCIS personnel, are the individuals that the Directive

---

[3]A plaintiff need not prove that if he violates a law, enforcement action will immediately be taken against him.  *Am. Forest & Paper Ass'n v. United States EPA*, 137 F.3d 291, 296-97 (5th Cir. 1998).  As this Court has pointed out, a plaintiff does not have to prove that enforcing authorities will immediately punish his violation of the law.  "Plaintiffs' injuries are not rendered speculative or conjectural simply because a fine or license revocation can only occur following a series of intermediate steps."  *Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835, 848 (N.D. Tex. 2010), *aff'd on other grounds*, 675 F.3d 802 (5th Cir. 2012, vacated on grant of reh'g *en banc*).

commands to act.  And the officers of ICE are the only individuals that the Morton Memorandum commands to act.  The ICE Agent Plaintiffs in this case are therefore directly regulated by both.  It is well-established that where a regulation or government order commands a person to act, that person possesses standing because of the administrative burden of complying with that command.  *Am. Forest & Paper Ass'n*, 137 F.3d at 296-97 ("Permit holders' imminent need to comply, coupled with EPA's frank announcement of its intentions, belies the agency's claim that any injury is speculative").  As this Court recently held, where apartment tenants were compelled to comply with a city ordinance that regulated them directly, the mere burden of compliance was sufficient to constitute injury-in-fact, even if none of the tenants could establish that they would lose their tenancy or suffer any other injury.  *Farmers Branch*, 701 F. Supp. 2d at 848 (*citing Am. Forest & Paper Ass'n*, 137 F.3d at 296-97).

Standing is satisfied where "[the plaintiffs] fall within the ordinance provisions and must, as law-abiding citizens, *comply and conform their conduct according to its directives*."  *Gray v. Valley Park*, 567 F.3d 976, 985 (8th Cir. 2009) (emphasis added).  Here, the ICE Agent Plaintiffs are the target of the Directive, and they must "comply and conform their conduct according to its directives."  Where a plaintiff must alter his practices to conform to a directive that regulates his behavior, injury-in-fact has occurred: "Generally, [the plaintiffs] must inevitably alter current hiring practices to establish a procedure that assures compliance with ordinance 1722. … This, on its own, is injury-in-fact, traceable to ordinance 1722, that a favorable decision could redress, sufficient to confer jurisdiction."  *Id.* at 986.  Here, the ICE Agent Plaintiffs must spend a significant amount of time interviewing arrested illegal aliens to see if they qualify for deferred action under the Directive or Morton Memorandum, conducting background checks, and altering their practices to release aliens who otherwise would be placed into removal proceedings.  Crane Aff.

¶ 11; Martin Aff. ¶ 21; Engle Aff. ¶ 18.  They have had to radically alter their practices to con-
form their conduct to the Directive and the Morton Memorandum.  Consequently, they possess
the requisite injury-in-fact to challenge the legality of these regulatory commands.

### 4. The Amended Complaint Contains No Policy Argument Whatsoever.

The defendants repeatedly claim that the plaintiffs rest their case on a "policy" dispute
with DHS, declaring that the plaintiffs merely offer "policy objections," Def. Memo. 1, or "poli-
cy complaints," *id*. at 9.  They proclaim that "[t]he ICE officers' claim amounts to nothing more
than a disagreement with Department policy," Def. Memo. 10, and that "the State of Mississippi
… has similarly invoked this Court's jurisdiction purely based on a policy grievance."  *Id*. at 16.
Revealingly, the defendants do not once offer any citation to the Amended Complaint for these
claims.  That is because *there is no policy argument* to be found anywhere in the complaint; the
defendants' contentions on this point constitute a classic "straw man" argument.

The plaintiffs do not quarrel in this suit with the policy advanced by the Directive.  Had
the DREAM Act, embodying that policy, been enacted by Congress and signed by the President,
the plaintiffs would not be here.  The ICE Agent Plaintiffs would be dutifully complying with
that law.  And although the Plaintiff State of Mississippi would still be suffering a fiscal burden,
the State would have no legal cause of action to challenge an Act of Congress.

But that is not what we have here.  The Amended Complaint is based purely on the law,
and the law offers no refuge for the defendants in this case.  The Directive violates the express
terms of 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A).  It also violates the Administrative Procedure Act.
Even if it were consistent with these provisions of federal law, it would violate the constitutional
separation of powers.  If the defendants have violated the law as alleged, it is immaterial whether
they did so in pursuit of a good policy or a bad one.

-14-

**B.**     **The Plaintiffs Fall Within the Zone of Interest of 8 U.S.C.**
           **§§ 1225(a)(3) and (b)(2)(A).**

The defendants claim, without any supporting authority, that the ICE Agent Plaintiffs

lack prudential standing because they fall outside of the zone of interest of 8 U.S.C. § 1225(a)(3)

and (b)(2)(A).  The defendants suggest that the zone-of-interest test only concerns whether or not

a complainant is "protected" by the statute in question.[4]   But the zone of interest also extends to

entities *regulated by* the statute in question.  As the Supreme Court has explained, the zone-of-

interest test asks "the question whether the interest sought to be protected by the complainant is

arguably within the zone of interests to be protected *or regulated* by the statute or constitutional

guarantee in question."  *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153

(1970) (emphasis added).  There is no disputing the fact that the ICE Agent Plaintiffs are regu-

lated by 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A).  Indeed, those statutory provisions regulate no-

one else other than immigration enforcement agents.

**C.**     **The Procedures of the Civil Service Reform Act Are Irrelevant to the**
           **Case at Bar.**

In a footnote, the defendants make a passing reference to the Civil Service Reform Act,

suggesting without support that perhaps the plaintiffs should be taking their complaint through

the grievance procedures of that Act.  Def. Memo. 11 n.3 (referring to 5 U.S.C. § 7121).  But the

terms of the Civil Service Reform Act plainly do not apply to this case.  The Civil Service Re-

form Act provides a means for certain federal employees to obtain administrative and judicial

---

[4]In focusing on the "protected by" aspect of the zone of interest test, the defendants also make a strained attempt to compare this case to *Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 900 (D.C. Cir., 1996) (cited in Def. Memo. 23).  The comparison is absurd.  The plaintiff in that case was simply an interest group whose members disagreed with the 1994 immigration communiqué with Cuba.  The Court rejected the group's standing, based on the "near-universal character of the asserted interest of citizens qua citizens in ensuring that employment opportunities are not impaired and public services and facilities are not overburdened …."  *Id.* at 902.  In contrast, in the instant case, the ICE Agent Plaintiffs are the persons specifically regulated by the Morton Memorandum and the Directive.

review "of specified adverse employment actions" before the Merit Systems Protection Board. *Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126, 2130 (2012). The Act does not apply to the case at bar because the adverse employment actions that have occurred are not within the "specified adverse employment actions."

The most relevant provision of the Act does not apply because it only covers removals, suspensions of more than 14 days, reductions in grade or pay, or furloughs of 30 days or less. 5 U.S.C. § 7512. ICE Agent Doebler, who faced disciplinary action for failing to issue an NTA, was confronted with a three-day suspension. He therefore may not avail himself of the grievance procedures of the Act. The other ICE Agent Plaintiffs face the imminent threat of a suspension if they disobey the Directive or the Morton Memorandum. The Act does not apply to threatened suspensions; it only covers suspensions of more than 14 days that have already occurred. *Id*. Consequently, the ICE Agent Plaintiffs have no other avenue to seek relief.

## III.   THE STATE OF MISSISSIPPI POSSESSES STANDING.

### A.   The State's Fiscal Injury-in-Fact is Already Manifest.

The State of Mississippi has clearly alleged facts sufficient to establish injury-in-fact. Approximately 49,000 illegal aliens are costing the State more than $25 million a year in government expenditures, net – *after* any taxes paid by illegal aliens are taken into account. Those costs are measurable and calculable and reflected in the 2006 OSA Report by Governor Bryant in his prior capacity as State Auditor. OSA Report at ii-iv, Am. Compl. ¶¶ 62-63.

The State alleges that, because of the Directive and the Morton Memorandum, a significant portion of those aliens is being permitted to remain in the State, rather than being removed. Am. Compl. ¶¶ 64-66. Directive beneficiaries represent approximately 15% of the illegal aliens in the United States and are likely to represent a similar percentage of the 49,000 illegal aliens in Mississippi. *See id.* ¶¶ 35, 36, 63. There are therefore thousands of illegal aliens residing in

Mississippi who would otherwise be removed as they were encountered by ICE, but for the Directive and Morton Memorandum. Many have *already* been permitted to stay, pursuant to the Directive. Between August 15 and November 15, 2012, the Defendants approved 53,273 requests for Deferred Action for Childhood Arrivals.[5] Hundreds, if not thousands, of those illegal aliens likely reside in Mississippi. Because 71% of illegal alien households with children consume welfare benefits,[6] it is a certainty that the State has already suffered fiscal injury by virtue of the fact that those illegal aliens are being permitted to remain in the State.

The Fifth Circuit has made clear that "economic injury or other concrete injury" to a state is sufficient to establish injury-in-fact. *Texas v. United States*, 497 F.3d at 497. The Supreme Court too has stated that adverse effects on "the borrowing power, financial strength, and fiscal planning" of a city (or state) constitute sufficient injury-in-fact. *Clinton v. City of New York*, 524 U.S. 417, 431 (1998); *see also Sch. Dist. v. Sec'y of Dep't of Educ.*, 584 F.3d 253, 261-62 (6th Cir. 2009) (expenditure of state and local funds constituted injury-in-fact). The economic injury need not be a certainty; a plaintiff need only show that the challenged action "inflicted a sufficient likelihood of economic injury to establish standing…." *Clinton*, 542 U.S. at 432 (*citing Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971)). Nor must economic injury to a state be above a dollar threshold: "These injuries need not be large, an 'identifiable trifle' will suffice." *Public Interest Research Group v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 71 (3d Cir. 1990).[7]

---

[5]www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/2012-1116%20DACA%20Monthly%20Report.pdf.

[6]Stephen A. Camarota, *Welfare Use by Immigrant Households with Children: A Look at Cash, Medicaid, Housing, and Food Programs, Center for Immigration Studies Backgrounder*, at 1 (Apr, 2011) (available at www.cis.org/articles/2011/immigrant-welfare-use-4-11.pdf).

[7]*See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012); *Fleet Nat'l Bank v. Boyle*, 2005 U.S. Dist. LEXIS 44036, at *23 (E.D. Pa. 2005); *Independent Hous. Servs. v. Fillmore Ctr. Assocs.*, 840

(footnote continued on next page …)

Here the economic injury is already manifest.  The $25 million net annual fiscal burden imposed by illegal aliens on the state is based on empirical data regarding past expenditures, not on speculation.  Am. Compl. ¶ 62; OSA Report at iv.  The Directive's beneficiaries – those illegal aliens residing in Mississippi who gain deferred action through the Directive and are allowed to remain in the state – account for a portion of that $25 million annual burden.  The Directive specifically includes illegal aliens who are "currently in school" and are, therefore, consuming scarce public education resources.  Directive at 1.  Moreover, other tangible costs have already been observed by the ICE Agent Plaintiffs in this case.  Several criminal alien beneficiaries of the Directive have already imposed costs on the jail facilities that housed them.  *See* Martin Aff. ¶¶ 6-17.  There is nothing remotely speculative about the fiscal burden on the State.  The only uncertainty is the exact dollar amount of the fiscal burden.

In attempting to minimize the State's fiscal injury, defendants make a demonstrably false claim.  They argue that even if the Directive and Morton Memorandum are allowing illegal aliens to remain in Mississippi, those Directives simply result in other illegal aliens ("higher priority cases") being removed in their place.  Def. Memo. 21.  The sworn affidavits presented by the ICE Agent Plaintiffs make clear that that is not occurring.  Because of the Directive and the Morton Memorandum, illegal aliens who previously would have been removed are now being released in large numbers.  In the Dallas ICE office alone, more than 170 illegal aliens have been released.  Engle Aff. ¶ 9.  Yet *there has been no corresponding increase* in the removals of other "high priority" aliens as a result of the Directive and Morton Memorandum.  Crane Aff. ¶ 12; Engle Aff. ¶ 21, Martin Aff. ¶ 20.  The Directive has become, as Justice Scalia correctly de-

_____

(footnote continued from previous page …)

F. Supp. 1328,1336 (N.D. Cal. 1993).

scribed it, a "nonenforcement program." *Arizona v. United States*, 132 S. Ct. 2492, 2521 (2012) (Scalia, J., dissenting).

The State has accurately alleged that illegal aliens are not being removed from Mississippi and that it is costing the State money, Am. Compl. ¶¶ 65-66, and the affidavits of the ICE Agent Plaintiffs support that allegation.  If the defendants wish to dispute those allegations at trial, they may do so.  But their unsupported assertion cannot defeat the State's injury-in-fact at this stage.  At the motion to dismiss stage, a court must assume as true all factual allegations made by a plaintiff and all plausible inferences from those allegations.  *Warth*, 422 U.S. at 501.

**B.     The State's Injuries Are Redressable.**

Finally, in an attempt to attack the redressability of the State's fiscal injury, the defendants make a truly astonishing claim: that this Court lacks the power to "order the Executive Branch to remove those specific individuals."  Def. Memo. 21.  In support of this brazen assertion, they essentially shift to making an argument on the merits, claiming that "Mississippi does not, and of course, cannot challenge the Secretary's general authority to exercise prosecutorial discretion."  *Id*.  Actually, Mississippi *does* and *can* challenge the supposed authority to exercise prosecutorial discretion in the manner the defendants have done.  *See* Am. Compl. ¶¶ 67-91.

For the purposes of assessing standing, it must be assumed that plaintiffs are correct on the merits.  "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal ...."  *Warth v. Seldin*, 422 U.S. at 500 (*citing Flast v. Cohen*, 392 U.S. 83, 99 (1968)).  The plaintiffs have explained in great detail in their preliminary injunction brief why the defendants' actions violate federal law, and that any prosecutorial discretion the defendants possess has been strictly constrained by Congress.

The defendants appear to be declaring that this Court lacks the power to order them to cease implementation of the Directive and Morton Memorandum.  If so, the defendants have a

cramped and incorrect view of the power of an Article III court. "Is it to be contended that the heads of departments are not amenable to the laws of their country?" *Marbury v. Madison*, 5 U.S. 137, 164 (1803). "If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under [5 U.S.C.] § 701(a)(2), and courts may require that the agency follow that law." *Heckler v. Chaney*, 470 U.S. 821, 834-35 (1985). This Court clearly has the authority to grant the injunctive relief that the plaintiffs seek. If it is granted, the class of illegal aliens in Mississippi who qualify for the Directive or the Morton Memorandum will no longer be shielded from removal. And as the State alleges, their removal over time will certainly reduce the annual fiscal burden on the state. Am. Compl. ¶¶ 64-66.

## IV.   THE DEFENDANTS MISUNDERSTAND HOW EMPLOYMENT AUTHORIZATION AFFECTS THIS CASE.

The defendants declare that because USCIS employees, not ICE agents, grant the benefit of employment authorization to aliens, "Plaintiffs lack any connection to the employment authorization process, and their claims are therefore no different than those of any other citizen." Def. Memo. 6, 7, 9-10. Therefore, they say, the plaintiffs have failed to demonstrate "how the provision of employment authorization by USCIS (which does not directly involve the Plaintiff ICE Agents) results in injury to the Plaintiffs." *Id.* at 7. The defendants would have this Court believe that employment authorization occurs in a vacuum, devoid of any effect upon the plaintiffs in this case. But the Directive's command that employment authorization be granted to certain aliens affects the injury-in-fact of both the ICE Agent Plaintiffs and the State of Mississippi.

Consider first the ICE Agent Plaintiffs. The Directive specifies that illegal aliens who qualify for deferred action can be identified through three avenues: (1) ICE encounters such aliens during its law enforcement operations and must then grant them deferred action; (2) ICE

identifies Directive-eligible aliens who are already in removal proceedings and must then grant them deferred action; and (3) aliens present themselves to USCIS to request deferred action without ever interacting with ICE.  Directive at 2.  With respect to the first two avenues, ICE is directly involved in an alien's obtaining employment authorization because *employment authorization cannot occur unless and until ICE first defers action on the alien*.  As the Directive states: "For individuals *who are granted deferred action by either ICE or USCIS*, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action." *Id.* at 3 (emphasis added); *see* Crane Aff. ¶ 13.  Without the conferral of deferred action by ICE agents and the concomitant decision by ICE agents not to place the alien into removal proceedings, the alien cannot receive employment authorization.  Thus, for aliens identified through either of the first two avenues of the Directive, a decision by ICE to defer action is a prerequisite to the alien receiving employment authorization.  To claim that ICE has nothing to do with the granting of employment authorization is like arguing that depressing the clutch has nothing to do with switching the gears on a manual-transmission automobile.  It is a necessary first step that is part of a two-step process.

Even where deferred action is granted by USCIS through the third avenue of the Directive, it is undeniable that it constrains the ability of ICE officers to carry out their duties after-the-fact.  As Plaintiff Crane explained in his affidavit, "ICE cooperation and coordination with USCIS is required so that aliens who benefit from the Directive are identified and are not placed in removal proceedings if they are encountered by ICE at a later date.  Also, the Directive requires ICE to recognize the granting of employment authorization by USCIS and the deferral of action in every relevant alien's case." Crane Aff. ¶ 14.  Thus, when an ICE officer subsequently encounters Directive beneficiaries, he must decline to remove those beneficiaries who possess

employment authorization, and he must decline to take action against their employers, even though the aliens remain inadmissible and unlawfully present in the United States.  In sum, the ICE Agent Plaintiffs play a central role in permitting Directive beneficiaries to gain employment authorization; and the granting of employment authorization constrains the actions of the ICE Agent Plaintiffs after-the-fact.  They therefore possess standing to challenge both the employment authorization aspects and the deferred action aspects of the Directive.

For completely separate reasons, the State of Mississippi also possesses standing to challenge the granting of employment authorization to Directive beneficiaries.  The defendants declare that "Mississippi has failed to allege any injury that results from USCIS providing employment authorization."  Def. Memo. 10.  But the State of Mississippi specified multiple forms of fiscal injury to the State that stem from illegal aliens living and working in Mississippi, including, *inter alia*: the costs of educating illegal aliens in the State's K-12 school system; the costs of uncompensated healthcare provided by state agencies, hospitals, and clinics; the costs of arresting, prosecuting, and incarcerating illegal aliens in the State's criminal justice system; and lost tax revenues and economic losses due to the fact that illegal aliens send "remittances" to relatives in foreign countries.  Am. Compl. ¶ 66.  The granting of employment authorization to these illegal aliens makes it easier for them to remain employed in Mississippi and therefore makes it easier for them to remain unlawfully present in the State.  "In ordinary cases [aliens] cannot live where they cannot work."  *Truax v. Raich*, 239 U.S. 33, 42 (1915).

None of these burdens on the State disappears if an illegal alien is granted employment authorization.  The vast majority of illegal-alien-headed households are poor households.  Consequently, they consume far more in government services and costs than they contribute in taxes; the average illegal alien household consumes $19,588 *more* in government services and costs

-22-

than it contributes in taxes.[8]  The granting of employment authorization does not give an illegal

alien new skills or significantly reduce the fiscal burden that the alien places on the State.

The defendants assert, without any support whatsoever, that perhaps because of the Di-

rective a significant number of illegal aliens in Mississippi will stop working on a cash-only ba-

sis and start paying state income taxes.  Def. Memo. at 10-11.  That is improbable.[9]  Illegal aliens

and their employers who have successfully evaded state income tax laws are not likely to start

paying taxes just because they receive employment authorization.   Moreover, approximately

55% of illegal alien households already pay taxes using false or stolen Social Security Numbers,

but are not earning enough to make tax payments that suffice to pay for the services that they

consume.[10]  Consequently, illegal aliens create a massive net fiscal burden to the State, regard-

less of their work authorization, and regardless of whether they pay state income taxes.[11]  The

Directive and Morton Memorandum ensure that many illegal aliens in the State who would oth-

erwise be removed by ICE will not be removed.

---

[8]Robert Rector, "The Fiscal Cost of Low-Skill Immigrants to State and Local Taxpayers," Heritage Foundation Study, at 1 (testimony before Subcomm. on Immigration, House Comm. on the Judiciary, May 17, 2007) (available at judiciary.house.gov/hearings/May2007/Rector070501.pdf).  *See also* Robert E. Rector and Christine Kim, *The Fiscal Cost of Low-Skill Immigrants to the U.S. Taxpayer* (May 22, 2007), Heritage Foundation Special Report #14 (available at www.heritage.org/Research/Immigration/sr14.cfm).

[9]The defendants assert that the State concedes that Directive will result in more tax revenues coming to the State if beneficiaries are given employment authorization.  Def. Memo. 10, *citing* OSA Report at 13.  That is false.  The State simply said that revenue is lost when illegal aliens work off the books and do not pay taxes.  Therefore the OSA Report assumed a best-case scenario that all illegal aliens pay income taxes.  OSA Report at 13.  The State has never stated that the granting of employment authorization to illegal aliens will make such aliens net fiscal contributors.  On the contrary, ¶ 66 of the Amended Complaint alleges the opposite.

[10]*See* Rector and Kim, *The Fiscal Cost of Low-Skill Immigrants to U.S. Taxpayers*, *supra*.

[11]An additional fiscal burden on the State is created by the displacement of United States citizen workers from jobs occupied by illegal aliens.  Those citizens consequently avail themselves of unemployment benefits and other welfare services provided by the State.  A 2006 study found that a 10% increase in supply of immigrant labor resulted in a 3.6% increase in unemployment and nearly a 1% increase in incarceration among African-American United States citizens.  George J. Borjas, Jeffrey Grogger, & Gordon H. Hanson, *Immigration and African-American Employment Opportunities: The Response of Wages, Employment and Incarceration to Labor Market Shocks*, Working Paper #12518, National Bureau of Economic Research, www.nber.org/papers/w12518.

The plaintiffs will provide expert testimony and other factual evidence at trial in support of these allegations. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501. The defendants cannot defeat these allegations by simply asserting that they are not true.

## V.    IF THE PLAINTIFFS DO NOT HAVE STANDING, THEN NO ONE HAS STANDING.

The motion to dismiss begs the question: who else would have standing to challenge the Directive? An illegal alien beneficiary would not possess standing, because he or she is helped by the Directive, not injured by it. An illegal alien who seeks, but is denied, the benefits of the Directive would not possess standing, because another illegal alien's gain does not injure him. A United States citizen who might otherwise get a job that is given to a Directive beneficiary would lack standing, because his injury is dependent on the decision of a third-party employer who would not be before the court. And a member of Congress could not claim that he personally is injured by the loss of congressional power caused by the Directive. *See Raines v. Byrd*, 521 U.S. 811, 820-21 (1997). In short, if the plaintiffs in the case at bar are held to lack standing, then the unlawful acts of the defendants will never be reviewable in any Article III court.

## VI.    VENUE IS PROPER IN THIS DISTRICT.

The defendants conclude their motion, almost as an afterthought, with a nearly circular contention that because Plaintiff Engle allegedly lacks standing, venue is improper in this District. That contention is without merit. In an action against a federal officer acting in his official capacity or under color of legal authority, venue lies in the district of the plaintiff's residence if no real property is involved in the action. 28 U.S.C. § 1391(e)(1)(C). Courts have consistently construed this language to mean that venue is proper as to all plaintiffs if suit is brought in the

district of residence of any one or more of the plaintiffs.  *E.g.*, *Exxon Corp. v. FTC*, 588 F.2d 895, 898-99 (3rd Cir. 1978); *A. J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1301-02 (N.D. Ala. 2003) (canvassing cases); *Sidney Coal Co. v. Massanari*, 221 F. Supp. 2d 755, 766-67 (E.D. Ky. 2002) (canvassing cases), *app. dism'd*, 98 Fed. Appx. 378 (6th Cir. 2004).  Here, Engle is a resident of this District, and so venue is proper as to all plaintiffs.  Engle Aff. ¶ 1.

The defendants invoke a purported exception to this rule where the venue plaintiff's claim is frivolous or collusively joined; but they cannot substantiate those accusations.  Contrary to the defendants' statement that the plaintiffs have made no factual allegations as to Engle, the plaintiffs have alleged that Engle is an ICE Immigration Enforcement Agent with concomitant authority to apprehend illegal aliens (Am. Compl. ¶ 27); that the Directive and the Morton Memorandum instruct him to refrain from placing certain illegal aliens into removal proceedings (*id.* ¶¶ 2, 30); that federal law commands him to place such aliens into removal proceedings (*id.* ¶¶ 38-40); that he has been instructed by his supervisors that an alien need only claim coverage by the Directive to be entitled to release (*id.* ¶ 33); and that he believes that he will violate the law if he follows the Directive and the Morton Memorandum, and will suffer disciplinary action if he does not (*id.* ¶¶ 48-49).  Moreover, the plaintiffs are filing Engle's affidavit, wherein he describes several encounters with illegal aliens who he would have placed into removal proceedings, pursuant to federal law, but instead had to release.  Engle Aff. ¶¶ 10-13.  In total, Dallas ICE exercised "prosecutorial discretion" to release over 170 illegal aliens between June 15 and November 30, 2012.  *Id.* ¶ 9.  These allegations and factual proof establish Engle's standing and, simultaneously, establish that his claim is not frivolous and his joinder not collusive.

## CONCLUSION

The plaintiffs respectfully urge this Court to deny the defendants' Motion to Dismiss.

Respectfully submitted,

P. MICHAEL JUNG
Texas Bar No. 11054600

Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: 214-651-4300
Facsimile: 214-659-4022
michael.jung@strasburger.com

*/s Kris W. Kobach*
KRIS W. KOBACH
Kansas Bar No. 17280 (admitted *pro hac vice*)

Kobach Law, LLC
4701 N. 130th St.
Kansas City, Kansas 66109
Telephone: 913-638-5567
kkobach@gmail.com

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I hereby certify that this Plaintiffs' Response to Defendants' Motion to Dismiss has been served on the defendants by electronic service through the Court's ECF system to Adam Kirschner, Esq., Attorney for Defendants, at Adam.Kirschner@usdoj.gov, on this 4th day of December, 2012.


*/s Kris W. Kobach*
KRIS W. KOBACH