IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHRISTOPHER L. CRANE, DAVID A. ENGLE, ANASTASIA MARIE CARROLL, RICARDO DIAZ, LORENZO GARZA, FELIX LUCIANO, TRE REBSTOCK, FERNANDO SILVA, SAMUEL MARTIN, JAMES D. DOEBLER, and THE STATE OF MISSISSIPPI, by and through GOVERNOR PHIL BRYANT<br>　　Plaintiffs,<br><br>v.<br><br>JANET NAPOLITANO, in her official capacity as Secretary of Homeland Security, JOHN MORTON, in his official capacity as Director of Immigration and Customs Enforcement, and ALEJANDRO MAYORKAS, in his official capacity as Director of United States Citizenship and Immigration Services<br>　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 3:12-cv-03247-O<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' APPLICATION
FOR PRELIMINARY INJUNCTIVE RELIEF**

---

| | |
|---|---|
| P. MICHAEL JUNG<br>Texas Bar No. 11054600<br><br>Strasburger & Price, LLP<br>901 Main Street, Suite 4400<br>Dallas, Texas 75202<br>Telephone: 214-651-4300 | KRIS W. KOBACH<br>Kansas Bar No. 17280 (admitted *pro hac vice*)<br><br>Kobach Law, LLC<br>4701 N. 130th St.<br>Kansas City, Kansas 66109<br>Telephone: 913-638-5567 |

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

Table of Contents ............................................................................................................. i

Table of Authorities ....................................................................................................... iii

Introduction .................................................................................................................... 1

Argument and Authorities .............................................................................................. 1

    I.     THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............................................................................................................. 1

          A.    **The Directive Violates Federal Statutes Requiring the Initiation of Removals.** ............................................................. 1

               1.    The Defendants Misconstrue *Arizona v. United States*. .............. 1

               2.    The Defendants Misread 8 U.S.C. § 1225(b)(2)(A). ................... 2

               3.    The Defendants' Claim that "Shall" Means "May" is Meritless. ................................................................................ 3

               4.    The Defendants Misunderstand Where Executive Discretion Remains. ................................................................ 4

               5.    The Defendants Misstate the Holding of *Heckler v. Chaney*. ..................................................................................... 4

          B.    **Prosecutorial Discretion Cannot Be Used to Confer a Benefit and Cannot Be Exercised by a Non-Law-Enforcement Agency.** ........... 6

          C.    **The Directive Violates the Administrative Procedure Act.** ................. 7

          D.    **The Defendants' Jurisdictional Arguments are Baseless.** .................... 9

               1.    The ICE Plaintiffs Possess the Authority to Issue NTAs. ............ 9

               2.    The Defendants Stretch the CSRA Beyond Recognition. .......... 10

               3.    The Fiscal Injury to Mississippi is Sufficient to Confer Jurisdiction. ............................................................................. 11

    II.    THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY. ................... 11

-ii-

**III.    THE HARM ASSERTED BY DEFENDANTS IS DISPUTED BY THE ICE OFFICER AFFIDAVITS AND IS BASED ON MISLEADING DHS REPORTS.** ........................................................................ 12

Certificate of Service ................................................................................................ 14

# **TABLE OF AUTHORITIES**

**Cases**

*Adams v. Richardson*,
   480 F.2d 1159 (D.C. Cir. 1973) (*en banc*) ............................................................... 6

*Arizona v. United States*,
   132 S. Ct. 2492 (2012) ............................................................................................. 2

*Bachowski v. Brennan*,
   502 F.2d 79 (3d Cir. 1974) ....................................................................................... 5

*Catholic Health Initiatives v. Sebelius*,
   617 F.3d 490 (D.C. Cir. 2010) ................................................................................. 7

*Dunlop v. Bachowski*,
   421 U.S. 560 (1975) ................................................................................................. 5

*Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*,
   653 F.3d 1 (D.C. Cir. 2011) ..................................................................................... 7

*Elgin v. Department of the Treasury*,
   567 U.S. ___, 132 S. Ct. 2126 (2012) .................................................................... 10

*Fed. Express Corp. v. Holowecki*,
   552 U.S. 389 (2008) ................................................................................................. 5

*Gen. Elec. Co. v. EPA*,
   290 F.3d 377 (D.C. Cir. 2002) ................................................................................. 7

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ......................................................................................... 4, 5, 6

*Lopez v. Davis*,
   531 U.S. 230 (2001) ................................................................................................. 5

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................................... 11

*McLouth Steel Prods. Corp. v. Thomas*,
   838 F.2d 1317 (D.C. Cir. 1988) ............................................................................... 7

*Missouri v. Illinois*,
   180 U.S. 208 (1901) ............................................................................................... 11

*Reno v. AAADC*,
    525 U.S. 461 (1999) .................................................................................................. 4

*Texas v. United States*,
    497 F.3d 491 (5${}^{th}$ Cir. 2007) ............................................................................... 11

*United States v. Batchelder*,
    442 U.S. 114 (1979) .................................................................................................. 3

**Statutes**

28 U.S.C. § 1331 .................................................................................................................. 11

5 U.S.C. § 706 ...................................................................................................................... 11

6 U.S.C. § 271(b) ................................................................................................................... 7

8 U.S.C. § 1225 ..................................................................................................................... 5

8 U.S.C. § 1225(a)(1) .................................................................................................... 1, 2, 3

8 U.S.C. § 1225(a)(3) .................................................................................................... 1, 2, 3

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................................................... 3

8 U.S.C. § 1225(b)(2)(A) ............................................................................................. 1, 2, 3, 9

8 U.S.C. § 1226 ..................................................................................................................... 4

8 U.S.C. § 1227 ..................................................................................................................... 2

8 U.S.C. § 1229a ................................................................................................................ 1, 3

8 U.S.C. § 1229b ................................................................................................................... 4

8 U.S.C. § 1231(b)(3) ............................................................................................................ 4

**Administrative Materials**

5 C.F.R. § 1201.3(a)(1) ........................................................................................................ 10

70 Fed. Reg. 67087 (Nov. 4, 2005) ....................................................................................... 9

8 C.F.R. § 2.1 ........................................................................................................................ 9

8 C.F.R. § 239.1(a) .................................................................................................................. 9

8 C.F.R. § 274a.12(c)(14) ....................................................................................................... 6

Department of Homeland Security, *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives*, 77 Fed. Reg. 19,902 (Apr. 2, 2012) (proposed rule) ........................................................................................ 8

*In re E-R-M & L-R-M*,
25 I. & N. Dec. 520 (BIA 2011) ...................................................................................... 3

## **Secondary Sources**

Lamar Smith, *Obama Deportation Numbers a "Trick,"* POLITICO, Oct. 25, 2012 (available at www.politico.com/news/stories/1011/66805.html) ...................................... 13

Stephen Dinan, *Deportation Statistics Said to Be Inflated*, WASHINGTON TIMES, Aug. 23, 2012 (available at www.washingtontimes.com/news/2012/aug/23/deportation-statistics-said-to-be-inflated/) ............................................................................................................ 13

www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/2012-1116%20DACA%20Monthly%20Report.pdf ................................................................. 12

## INTRODUCTION

In attempting to find some support for the Directive and related provisions of the Morton Memorandum, the defendants misread federal statutes, misconstrue Supreme Court decisions, and misunderstand the operation of immigration enforcement in the field. The defendants also leave some of the plaintiffs' claims virtually unanswered.[1] This reply brief will focus only on the most glaring errors in the defendants' analysis.

## ARGUMENT AND AUTHORITIES

### I. THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A. The Directive Violates Federal Statutes Requiring the Initiation of Removals.

As explained at length in the plaintiffs' principal brief, Congress has acted to restrict any discretion that ICE officers might otherwise have in initiating removal proceedings. Pl. Br. 3-7. 8 U.S.C. § 1225(a)(1) deems a non-admitted alien to be an applicant for admission. Under 8 U.S.C. § 1225(a)(3), all applicants for admission "shall be inspected by immigration officers," and under 8 U.S.C. § 1225(b)(2)(A), "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." The defendants' attempts to escape these commands of federal law are transparently weak, as explained below.

##### 1. The Defendants Misconstrue *Arizona v. United States*.

The defendants' principal line of argument is that the Supreme Court in *Arizona v. United States* recognized vast and extraordinary powers of executive discretion in the enforcement of immigration laws – powers so expansive that they even trump the terms of federal statutes. De-

---

[1] In response to the plaintiffs' lengthy separation-of-powers analysis, the defendants offer only two sentences, essentially asserting that they have the same executive authority that a prosecutor has not to prosecute an individual. Def. Resp. 20. There are two problems with this analogy. First, a prosecutor exercises discretion with respect to one individual at a time, whereas the Directive establishes a pathway to benefits for some 1.7 million pre-defined illegal aliens who meet its criteria. Second, executive discretion cannot be used to confer a benefit. Pl. Br. 7-9.

-1-

fendants rest this bizarre argument on vague language in the introductory section of the *Arizona* opinion, in which the Court mentions in passing the "broad discretion exercised by immigration officials." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012); *see* Def. Resp. 2, 6, 14.

What the defendants fail to mention is that the Supreme Court in *Arizona* also recognized that any discretion not to remove an alien *can only be exercised where federal statute permits*: "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 132 U.S. at 2499 (*citing* 8 U.S.C. § 1227). "The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process." *Id*. at 2505. Thus, discretion in initiating removal proceedings is very narrowly constrained by the provisions of 8 U.S.C. §§ 1225(a)(1), (a)(3), and (b)(2)(A). Contrary to the defendants' mischaracterization, the *Arizona* Court never even remotely suggested that DHS has the power to override a statutory constraint on its discretion.

### 2. The Defendants Misread 8 U.S.C. § 1225(b)(2)(A).

The defendants' next effort to escape the plain meaning of 8 U.S.C. § 1225(a)(1), (a)(3), and (b)(2)(A) is transparently weak. They claim that there is a difference between the phrase "alien who is an applicant for admission" and "alien seeking admission" and that this difference somehow relieves ICE officers of their obligation to follow 8 U.S.C. § 1225(b)(2)(A). Def. Resp. 17-18. They contend that the latter phrase applies only to aliens at the port of entry. *Id*.

However, there is a fatal problem with the defendants' argument that they fail to even acknowledge: the two phrases are used *interchangeably* in the *same sentence*. "[I]n the case of *an alien who is an applicant for admission*, if the examining officer determines that *an alien seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). The statutory text speaks for itself, and it speaks plainly to defeat the defendants' claim.

### 3.     The Defendants' Claim that "Shall" Means "May" is Meritless.

The defendants then fall back on an even more absurd argument: that the term "shall" in 8 U.S.C. § 1225(a)(1), (a)(3), and (b)(2)(A) actually means "may." Def. Resp. 19-20.  In support of this assertion, they offer only an opinion by one of the Justice Department's own divisions – the Board of Immigration Appeals (BIA).  Def. Resp. 19-20.  In *In re E-R-M & L-R-M*, 25 I. & N. Dec. 520 (BIA 2011), the BIA considered a completely different situation, in which an alien was subject to expedited removal proceedings "without further hearing or review" under 8 U.S.C. § 1225(b)(1)(A)(i), and was also subject to normal removal proceedings under 8 U.S.C. § 1229a.  ICE personnel elected to pursue normal removal proceedings, which arguably violated the "shall" phrasing that required expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i).  The BIA reasoned that where there is a choice between two avenues of removal proceedings (both of which contain the word "shall"), the "shall" concerning expedited removals can be interpreted as "may." 25 I. & N. at 522-23.

There are three problems with applying this line of reasoning here.  First, it concerns a different section of federal law; the BIA did not offer any interpretation of the word "shall" in the provisions at issue here.  Second and more importantly, it involved a *choice between two mandatory enforcement actions*, whereas the defendants in this case seek to choose a course of complete non-enforcement.  Third, the basis of the BIA's opinion – an analogy to prosecutorial discretion to choose a criminal charge – does not remotely apply in the instant case.[2]

---

[2] The BIA reached its conclusion by looking at *United States v. Batchelder*, 442 U.S. 114, 118 (1979), which concerned a prosecutor's decision regarding which crime to charge a defendant who had committed two crimes "that are identical except for their penalty provisions." *Id*. at 117.  The Court reached the unremarkable holding that a prosecutor retains discretion concerning which charge to file "when an act violates more than one criminal statute." *Id*. at 123.  The *Batchelder* Court did not even consider the meaning of the word "shall" in the relevant statutes.  *See id*. at 118-26.  Nor could it have, because the word "shall" in the penalty section of a criminal statute is directed at the sentencing judge, not at the prosecutor's decision to charge in the first place.  In stark contrast, the statutes at issue here are specifically directed at the "immigration officer" who initiates the removal of an alien.

### 4. The Defendants Misunderstand Where Executive Discretion Remains.

The defendants fundamentally misunderstand what Congress did when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Congress restricted immigration officer discretion at the initial phase of the removal process, but preserved discretion later in the removal process through specific statutory channels. This understanding is perfectly consistent with *Reno v. AAADC*, 525 U.S. 461 (1999), which the defendants cite out of context. *See* Def. Resp. 14. The *AAADC* Court noted that deferred action was occurring without any statutory constraints *prior* to the enactment of IIRIRA. "[A]t the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') …." *Id*. at 483-84. The Court recognized that it was for this very reason that Congress imposed constraints on the practice. In addition, "Congress … focus[ed] special attention on, and ma[d]e special provision for, judicial review of the Attorney General's discrete acts of 'commenc[ing] proceedings, adjudicating cases, [and] executing removal orders.'" *Id*. at 483. Thus those previously unconstrained decisions were now circumscribed by statute and subject to judicial review.

Contrary to the defendants' suggestion, the plaintiffs are not arguing that immigration officers have *no* discretion in the removal process, but only that that discretion is circumscribed by statute. And such discretion exists principally *after* an NTA has been issued, as is the case with the cancellation or withholding of removal, 8 U.S.C. §§ 1229b, 1231(b)(3), and with the detention of aliens during removal proceedings, 8 U.S.C. § 1226.

### 5. The Defendants Misstate the Holding of *Heckler v. Chaney*.

In arguing that the Secretary's instructions not to issue NTAs are immune from judicial review, the defendants misstate the holding of *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). They ignore the important distinction between the statutory structure in *Heckler* and the statutory structure before this Court – Congress's decision to circumscribe agency power.

In *Heckler*, the Supreme Court was explicit that when a statute requires action by an agency, the agency may not ignore that requirement:

> [W]e emphasize that the decision [not to enforce a statute] is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers. Thus, in establishing this presumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.

*Heckler*, 470 U.S. at 832-33.

The difference between 8 U.S.C. § 1225 and the statute in *Heckler* is that in § 1225, Congress "circumscrib[ed]" DHS's power by requiring immigration officials to initiate removal proceedings in certain circumstances. *Id.* By using the term "shall," Congress explicitly denied immigration officers discretion as to whether to initiate removal proceedings. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 400 (2008) (*citing Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the term 'shall' indicates an intent to 'impose discretionless obligations'")).

*Heckler* went on to explain that Congress may remove discretion from an agency, citing *Dunlop v. Bachowski*, 421 U.S. 560 (1975). *Heckler*, 470 U.S. at 833-34. In *Dunlop*, the statute required that the Secretary of Labor "shall investigate such complaint" and "bring a civil action" upon "probable cause [of a] violation." *Heckler*, 470 U.S. at 834. Relying on the Court of Appeals' decision from *Dunlop*, *Heckler* explained that the "'principle of absolute prosecutorial discretion' [was] inapplicable, because the language of the [Act] indicated that the Secretary was *required* to file suit if certain 'clearly defined' factors were present. The decision therefore was not 'beyond the judicial capacity to supervise.'" *Id.* at 834 (*quoting Bachowski v. Brennan*, 502 F.2d 79, 87-88 (3d Cir. 1974) (emphasis supplied; citation omitted)).

The statutes at issue here employ similar statutory language to deny agency discretion.

Congress "quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." *Heckler*, 470 U.S. at 834. The Secretary is not "free to disregard legislative direction in the statutory scheme that [she] administers." *Id.* at 833. By issuing the Directive "the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *See id*. (*citing Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (*en banc*)).

### B. Prosecutorial Discretion Cannot Be Used to Confer a Benefit and Cannot Be Exercised by a Non-Law-Enforcement Agency.

The plaintiffs' second principal claim is that prosecutorial discretion, by definition, cannot be used to confer a benefit, and that prosecutorial discretion cannot be exercised by a non-law enforcement agency. Pl. Br. 7-9. In response, the defendants offer only three sentences. They claim the Directive "does not confer any … benefit," and only confirms that 8 C.F.R. § 274a.12(c)(14) allows deferred action aliens to seek employment authorization. Def. Resp. 22. But the Directive *does* offer employment authorization to aliens who receive deferred action. "For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization." Directive 3. The mere fact that the Directive does not guarantee an application's success does not mean that it does not entail the conferral of a benefit. Moreover, USCIS is *requiring* applicants for deferred action to *simultaneously* apply for employment authorization, in order even to be considered.[3]

The defendants offer *no answer at all* to the argument that a non-enforcement agency (USCIS) cannot exercise "prosecutorial" discretion. Never before has USCIS asserted the authority to exercise prosecutorial discretion. Yet, the Directive plainly orders USCIS to "establish a clear and efficient process for exercising prosecutorial discretion." Directive 2. Congress

---

[3] See USCIS document at http://www.uscis.gov/USCIS/Resources/daca.pdf.

-6-

plainly designated USCIS as a non-law-enforcement agency. 6 U.S.C. § 271(b). It therefore has no power to "prosecute," let alone exercise "prosecutorial discretion."

### C. The Directive Violates the Administrative Procedure Act.

The defendants argue that the APA may be swept aside by simply characterizing the intricate criteria and procedures of the Directive as "general statements of policy" that are not subject to the APA. Def. Resp. 21. This claim does not comport with the extensive case law defining the reach of the APA. The Directive is "a statement ... of present binding effect," and is therefore a "rule" subject to the requirements of the APA. *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988). An agency "pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, *or is applied by the agency in a way that indicates it is binding*." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted; emphasis added). It is enough for the agency's statement to "purport to bind" those subject to it, that is, to be cast in "mandatory language" so "the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences." *Id.* at 383-84 (internal quotation marks omitted). *See also Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011). As Plaintiff Doebler has already learned, those consequences will be swiftly imposed upon any ICE officer who disobeys.

The Directive attempts to cloak itself as "guidance" on the "exercise of discretion" but specifies "in or out" "criteria" such as age of unlawful entry ("under the age of sixteen"), age at application ("not above the age of thirty"), duration of continuous residence ("for a[t] least five years"). These criteria serve a "legislative function" of defining decisions that might be reasonable, but are by definition arbitrary; they are therefore rules subject to the APA. *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010). The defendants also neglect to mention the voluminous guidance memoranda that they have issued to the field in order to implement

-7-

the massive change in operations commanded by the Directive. The defendants have issued three documents, which amount to a total of 108 pages, explaining how Directive is to be implemented. Those documents are contained in the Appendix to this Reply Brief.[4]

No reasonable ICE officer could read the Directive language from the DHS Secretary and the extensive implementation memorandum to be less than a command to not remove individuals meeting the criteria. The massive response to the Directive by hundreds of thousands of illegal aliens and the 180-degree change of immigration enforcement practices belie the characterization of this sweeping program as merely a general policy statement. The rulemaking procedures under the APA were established by Congress for precisely the type of action that the Secretary took in promulgating the Directive.

Finally, it should be noted that the defendants' argument stands in stark contrast to their April 2, 2012, promulgation of a proposed rule allowing certain immediate relatives of U.S. citizens who are physically present in the United States to request provisional unlawful presence waivers prior to departing from the United States for consular processing of their immigrant visa applications.[5] The final rule is expected to be promulgated on January 3, 2013. Like the Directive, that rule provides relief to unlawfully present aliens meeting certain criteria. Like the Directive, that rule commands DHS personnel to take steps to accept and adjudicate applications from aliens seeking such relief. Unlike the Directive, that rule was promulgated in full compliance with the APA's rulemaking procedures.

---

[4] The three attached documents are all labeled as "draft" memoranda. The plaintiffs intend to obtain the final versions of all three documents from the defendants during discovery.

[5] Department of Homeland Security, *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives*, 77 Fed. Reg. 19,902 (Apr. 2, 2012) (proposed rule).

### D. The Defendants' Jurisdictional Arguments are Baseless.

#### 1. The ICE Plaintiffs Possess the Authority to Issue NTAs.

Strangely, the defendants argue that the ICE Plaintiffs are not injured by the Directive because, the defendants assert, neither Immigration Enforcement Agents (IEAs) nor Deportation Officers (DOs) are authorized to issue NTAs. Def. Resp. 10. This erroneous assertion conflicts with the sworn testimony of three ICE Plaintiffs that they do in fact issue NTAs. *See* Doebler Aff. ¶¶ 4-5, 11, 13; Engle Aff. ¶¶ 3, 11-15, 19; Martin Aff. ¶ 3. Indeed, the defendants contradict themselves on this point when they acknowledge (as they must) that Plaintiff Doebler was subjected to disciplinary actions when he referred an alien for removal – not because he lacked authority to do so, but because his supervisor ordered him to follow the Morton Memorandum and refrain from removing the alien when he previously would have done so. *See* Def. Resp. 9 n.6.

The defendants' misunderstanding evidently stems from their misreading of 8 C.F.R. § 239.1(a), which includes a list of officers that may issue NTAs. The defendants claim that because IEAs and DOs are not in the list, they must lack that authority. But the list was expanded in 2005 to include a "catch-all" category: "(41) Other officers or employees of the Department or of the United States who are delegated the authority as provided by 8 CFR 2.1 to issue notices to appear." 70 Fed. Reg. 67087 (Nov. 4, 2005). Alternatively, the defendants may be unfamiliar with the various stages of the process of initiating removals. The immigration officer (such as an IEA or DO) undertakes the arrest, determines the relevant immigration violations, drafts the NTA, signs the NTA, and serves the NTA on the alien. The NTA is also signed by a supervisory officer or agent – offices that are specifically included in the list of 8 C.F.R. § 239.1(a). However, neither the Directive nor the statutes that it violates are simply concerned with the signing of an NTA; the Directive generally prevents aliens "from being placed into removal proceedings," whereas 8 U.S.C. § 1225(b)(2)(A) requires the investigating immigration officer (*i.e.*, the

IEA or DO) to detain the alien for removal proceedings. The ICE Plaintiffs are unquestionably among the individuals constrained by the Directive.

### 2.  The Defendants Stretch the CSRA Beyond Recognition.

The defendants contend that the Civil Service Reform Act ("CSRA") somehow deprives this Court of jurisdiction to hear the statutory and constitutional claims in this case. They argue that the CSRA established the "exclusive administrative procedures for resolving grievances" for federal employment disputes, including matters covered by collective bargaining agreements. Def. Resp. 9. But the defendants do not address the fact that some disciplinary actions permitted by the CSRA fall below the threshold for invoking the procedures under the CSRA.

"Covered" actions to which the CSRA applies, and over which the MSPB has jurisdiction, are enumerated adverse actions: terminations of employment after completion of probationary period, reductions in grade or pay, suspension for more than 14 days, or furloughs for 30 days or less for cause that will promote the efficiency of the service; and an involuntary resignation or retirement. 5 C.F.R. § 1201.3(a)(1). Plaintiffs have been threatened with less than these actions – suspension for a non-appealable term, specifically three days. Thus, the CSRA is not all-inclusive within its scope. *Cf. Elgin v. Department of the Treasury*, 132 S. Ct. 2126, 2135-36 (2012) (facial claims of unconstitutionality of interrelated statute not reviewable in district court; recognizes CSRA thresholds for jurisdictional purposes). Unlike the plaintiff in *Elgin*, who was removed from federal service on the complex procedural framework under the CSRA for violating the Selective Service Act, *no* framework exists for judicial review of the plaintiffs' claims of adverse employment action for violating the employer's unlawful directive.

Nor is there any collective bargaining agreement between the ICE Plaintiffs and the defendants that provides for the resolution of a claim that the defendants are ordering ICE person-

nel to violate federal law.[6]  Jurisdiction accordingly lies in this Court under 28 U.S.C. § 1331, and review may occur pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706.

### 3. The Fiscal Injury to Mississippi is Sufficient to Confer Jurisdiction.

The defendants belittle the concrete and already-occurring fiscal injury to the State of Mississippi.  Def. Resp. 10-12.  But they disregard the abundant case law recognizing that the imposition of a fiscal burden creates standing.  *See* Pl. Resp. to Mtn. to Dismiss 16-19.  The Fifth Circuit has made clear that "economic injury or other concrete injury" to a state is sufficient to establish injury-in-fact.  *Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007).  And the defendants fail to acknowledge that because a state has a "stake in protecting it quasi-sovereign interests, [it] is entitled to special solicitude in standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  *See also Missouri v. Illinois*, 180 U.S. 208, 240-41 (1901) (federal jurisdiction appropriate "in cases directly affecting the property rights and interests of a State").

## II. THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY.

The defendants suggest that because the plaintiffs' application for a preliminary injunction came five months after the issuance of the Directive on June 15, 2012, the plaintiffs' injuries must not be imminent.  Def. Resp. 7.  But the defendants fail to mention that implementation of the Directive did not begin until August 15, 2012.  Rather than rushing to file their application before the full impact of the Directive was clear, the plaintiffs assessed, and amassed evidence of, their substantial injuries before asking this Court to grant injunctive relief.

After the defendants began implementing the Directive with extraordinary speed, issuing benefits to tens of thousands of illegal aliens *without denying benefits to a single applicant*, it be-

---

[6]The collective bargaining agreement allows grievances only for alleged violations of the agreement itself, or for alleged violations of a law, rule, or regulation affecting "conditions of employment."  Exhibit A to Attachment G to Def. Resp. at 90 (Art. 47(B)).  The present dispute is neither.

-11-

came clear that preliminary relief is necessary to restrict the growing fiscal burden upon Mississippi. By mid-November, 53,273 illegal aliens had been granted deferred action under the Directive.[7] Meanwhile, the ICE Plaintiffs learned that they would be prevented from even asking illegal aliens to prove their eligibility for the Directive. Crane Aff. ¶ 8; Engle Aff. ¶ 6. In the same period, several ICE Plaintiffs were forced to violate federal law by declining to issue NTAs. *See* Engle Aff. ¶¶ 10-13; Martin Aff. ¶¶ 12-15. These facts established that irreparable harm is already occurring and that the extent of the injury is increasing rapidly. If injunctive relief is not granted, it is likely that 100,000 additional illegal aliens will be granted deferred action over the next six months as discovery and briefing proceeds in this case. And the ICE Plaintiffs will continue to be ordered to break federal law.

Enjoining action under the Directive during the pendency of the litigation would effectively prevent irreparable harm to the Plaintiffs' careers, limit the damage from the Directive to Mississippi, and maintain the *status quo ante* until the legality of the defendants' actions is fully litigated. No remedy exists to correct the harm done, unless the defendants concede that they will, if necessary, cancel all of the deferred action and employment authorization benefits granted, refund all of the fees paid, and place all of the illegal aliens who applied under the Directive into removal proceedings. Only through such a remedy could the State of Mississippi and the ICE Plaintiffs be given assurance that the effects of the Directive upon them had ceased.

### III. THE HARM ASSERTED BY DEFENDANTS IS DISPUTED BY THE ICE OFFICER AFFIDAVITS AND IS BASED ON MISLEADING DHS REPORTS.

The defendants assert without support that the Directive has allowed ICE to "focus the government's limited resources" on "serious criminals" and other dangerous aliens. Def. Resp.

---

[7] www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Static_files/2012-1116%20DACA%20Monthly%20Report.pdf.

2, 23. Nothing could be further from the truth. As every ICE officer affidavit presented in this case declares, there has been *no* shift of resources toward the removal of criminal aliens, and there has been *no* increase in the number of removals of criminal aliens. Crane Aff. ¶ 12; Doebler Aff. ¶ 4; Engle Aff. ¶ 21; Martin Aff. ¶ 20. On the contrary, because the Directive focuses only on convicted aliens, rather than arrested aliens, it has resulted in the *release* of multiple, dangerous illegal aliens who pose a significant criminal threat to the public. Crane Aff. ¶¶ 9-10; Doebler Aff. ¶ 12; Engle Aff. ¶¶ 14-16; Martin Aff ¶¶ 6-17. The extent to which the Directive has *reduced* the removal of criminal aliens will be fully demonstrated at trial.

The defendants also misleadingly suggest that the Directive and Morton Memorandum have resulted in an overall increase in removals, citing a recent DHS publication. Def. Resp. 11. However, as was subsequently revealed through congressional inquiries to DHS, the agency had been "cooking the books" by counting as removals in 2011 and 2012 the interception of aliens at the border by the Border Patrol – encounters that were not counted as removals in previous years.[8] Once corrected accordingly, the numbers indicate that annual removal totals *decreased* by approximately 65,000. DHS did not deny that it had manipulated the numbers in this way.[9]

An injunction will not harm the defendants. Abeyance of the administrative process may adversely affect the illegal aliens who have applied under the Directive, but their interests are not ones that the defendants may assert. A preliminary injunction, narrowly tailored to bar the defendants from implementing the Directive and taking any action against the plaintiffs until this Court adjudicates the lawfulness of the Directive and renders a final judgment, is appropriate.

---

[8]Stephen Dinan, *Deportation Statistics Said to Be Inflated*, WASHINGTON TIMES, Aug. 23, 2012 (available at www.washingtontimes.com/news/2012/aug/23/deportation-statistics-said-to-be-inflated/); Lamar Smith, *Obama Deportation Numbers a "Trick,"* POLITICO, Oct. 25, 2012 (available at www.politico.com/news/stories/1011/-66805.html).

[9]*Id.*

           Respectfully submitted,

|  |  |
|---|---|
| P. MICHAEL JUNG<br>Texas Bar No. 11054600 | */s Kris W. Kobach*<br>KRIS W. KOBACH<br>Kansas Bar No. 17280 (admitted *pro hac vice*) |
| Strasburger & Price, LLP<br>901 Main Street, Suite 4400<br>Dallas, Texas 75202<br>Telephone: 214-651-4300 | Kobach Law, LLC<br>4701 N. 130th St.<br>Kansas City, Kansas 66109<br>Telephone:  913-638-5567 |

          ATTORNEYS FOR PLAINTIFFS

DATED:  January 2, 2013

## CERTIFICATE OF SERVICE

  I hereby certify that this Reply Brief in Support of Plaintiffs' Application for Preliminary Injunctive Relief has been served on the defendants by electronic service through the Court's ECF system to Adam Kirschner, Esq., and Bradley H. Cohen, Esq., Attorneys for Defendants, at Adam.Kirschner@usdoj.gov and Bradley.Cohen@usdoj.gov, on this 2nd day of January, 2013.

              */s Kris W. Kobach*
              KRIS W. KOBACH