IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHRISTOPHER L. CRANE, et al., § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | Civil Action No. 3:12-cv-03247-O |
| § | |
| JANET NAPOLITANO, *in her official* § | |
| *capacity as Secretary of Homeland Security*, § | |
| et al., § | |
| § | |
| Defendants. § | |
| § | |

MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion to Dismiss and Memorandum in Support (ECF No. 23), Plaintiffs' Response to Defendants' Motion to Dismiss (ECF No. 30), Appendix to Plaintiffs' Response to Defendants' Motion to Dismiss (ECF No. 31), and Defendants' Reply to Plaintiffs' Response to Defendants' Motion to Dismiss (ECF No. 33). Having considered the motion, the related briefing, the evidence presented by counsel, and the applicable law, the Court finds that Defendants' Motion to Dismiss (ECF No. 23) should be and is hereby **GRANTED in part** and **DENIED in part**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The United States Department of Homeland Security ("DHS") is a Cabinet-level department of the United States government created in 2002 for the purpose of coordinating and unifying national homeland security efforts. Creation of the Department of Homeland Security, http://www.dhs.gov/creation-department-homeland-security (last visited Jan. 23, 2013). Defendant

Janet Napolitano is the current Secretary of DHS. Pls.' Am. Compl. ¶ 22, ECF No. 15. DHS is charged with, among other things, protecting our nation's border security, cybersecurity, and economic security, preventing human trafficking and terrorism, and safeguarding civil rights and civil liberties. Topics, http://www.dhs.gov/topics (last visited Jan. 23, 2013). DHS is also responsible for overseeing citizenship and immigration in the United States. *Id.* The United States Citizenship and Immigration Services ("USCIS") oversees lawful immigration in the United States. Citizenship & Immigration Overview, http://www.dhs.gov/topic/citizenship-and-immigration-overview (last visited Jan. 23, 2013). Defendant Alejandro Mayorkas is the current Director of USCIS. Pls.' Am. Compl. ¶ 24, ECF No. 15. USCIS grants immigration and citizenship benefits, promotes an awareness and understanding of citizenship, and ensures the integrity of our immigration system. Citizenship & Immigration Overview, http://www.dhs.gov/topic/citizenship-and-immigration-overview (last visited Jan. 23, 2013). The United States Immigration and Customs Enforcement ("ICE") is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. Overview, http://www.ice.gov/about/overview (last visited Jan. 23, 2013). Defendant John Morton is the current Director of ICE. Pls.' Am. Compl. ¶ 23, ECF No. 15. ICE receives an annual appropriation from Congress to remove individuals who are unlawfully present in the United States. Immigration Enforcement Overview, http://www.dhs.gov/topic/immigration-enforcement-overview (last visited Jan. 23, 2013).

On June 17, 2011, Defendant Morton issued a Memorandum entitled "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency

for the Apprehension, Detention, and Removal of Aliens" (the "Morton Memorandum"). Pls.' Am. Compl. ¶ 28, ECF No. 15. The Morton Memorandum provides ICE personnel "guidance on the exercise of prosecutorial discretion to ensure that the agency's immigration enforcement resources are focused on the agency's enforcement priorities," which include "the promotion of national security, border security, public safety, and the integrity of the immigration system." Morton Mem. at 1, 2, *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf. The Morton Memorandum sets out several factors that ICE officers, agents, and attorneys should consider when determining whether an exercise of prosecutorial discretion may be warranted for a particular alien. *See* Morton Mem. at 4–5, *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

On June 15, 2012, Defendant Napolitano issued a Directive entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (the "Directive"). Pls.' Am. Compl. ¶¶ 2, 29, ECF No. 15; Pls.' Am. Compl. Ex. 1 (Directive), ECF No. 15-1. The Directive sets forth to what extent, in the exercise of prosecutorial discretion, DHS should enforce immigration laws "against certain young people who were brought to this country as children and know only this country as home." Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No. 15-1. The Directive instructs ICE officers to refrain from placing certain aliens who are unlawfully present in the United States into removal proceedings. It also directs ICE officers to facilitate granting deferred action to aliens who are unlawfully present in the United States and are already in removal proceedings but not yet subject to a final order of removal. Pls.' Am. Compl. ¶ 2, ECF No. 15; Pls.' Am. Compl. Ex. 1 (Directive), at 2, ECF No. 15-1. The Directive also instructs USCIS to accept applications to determine whether the individuals who receive deferred action are qualified

for work authorization during the period of deferred action. Pls.' Am. Compl. ¶ 2, ECF No. 15; Pls.' Am. Compl. Ex. 1 (Directive), at 3, ECF No. 15-1. To qualify for deferred action under the Directive, the alien must satisfy the following criteria:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of [the Directive] and is present in the United States on the date of [the Directive];
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No. 15-1.

In July 2012, DHS issued the "ERO Supplemental Guidance: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which directs DHS personnel to implement the terms of the Directive. Pls.' Am. Compl. ¶ 30, ECF No. 15. In early August 2012, DHS issued a document entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA) (Form I-821D and Form I-765)," which explains how DHS will process applications for deferred action under the Directive. Id. ¶ 31. On August 15, 2012, DHS began accepting requests for consideration of deferred action and applications for employment authorization pursuant to the Directive. Id. ¶ 32.

Several ICE Deportation Officers and Immigration Enforcement Agents (the "ICE Agent Plaintiffs")[1] and the state of Mississippi, by and through Governor Phil Bryant, filed this lawsuit on

---

[1] Plaintiff Christopher L. Crane is an ICE Deportation Officer in West Valley City, Utah. Pls.' Am. Compl. ¶ 9, ECF No. 15. Plaintiff David A. Engle is an ICE Immigration Enforcement Agent in Dallas,

August 23, 2012, to challenge the constitutional and statutory validity of the Directive and the Morton Memorandum. *See generally* Pls.' Compl., ECF No. 1; Pls.' Am. Compl., ECF No. 15. Plaintiffs assert that the Directive violates (1) federal statutes requiring the initiation of removals; (2) federal law by conferring a non-statutory form of benefit—deferred action—to more than 1.7 million aliens, rather than a form of relief or benefit that federal law permits on such a large scale; (3) federal law by conferring the legal benefit of employment authorization without any statutory basis and under the false pretense of "prosecutorial discretion"; (4) the constitutional allocation of legislative power to Congress; (5) the Article II, Section 3, constitutional obligation of the executive to take care that the laws are faithfully executed; and (6) the Administrative Procedure Act through conferral of a benefit without regulatory implementation. Pls.' Am. Compl. ¶¶ 67–116, ECF No. 15. Plaintiffs' causes of action 1, 2, 4, 5, and 6 challenge the portions of the Directive and Morton Memorandum that require ICE officers to exercise prosecutorial discretion and defer action against aliens who satisfy the Directive's criteria. Plaintiffs' third cause of action challenges the portion of the Directive that permits USCIS to issue employment authorization to Directive-eligible aliens during the period of deferred action. According to the Amended Complaint, the ICE Agent Plaintiffs' supervisors have instructed them that an alien only needs to claim he is covered by the

Texas. *Id.* ¶ 10. Plaintiff Anastasia Marie Carroll is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 11. Plaintiff Ricardo Diaz is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 12. Plaintiff Lorenzo Garza is an ICE Immigration Enforcement Agent in Los Fresnos, Texas. *Id.* ¶ 13. Plaintiff Felix Luciano is an ICE Immigration Enforcement Agent in San Diego, California. *Id.* ¶ 14. Plaintiff Tre Rebstock is an ICE Immigration Enforcement Agent in Huntsville, Texas. *Id.* ¶ 15. Plaintiff Fernando Silva is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 16. Plaintiff Samuel Martin is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 17. Plaintiff James D. Doebler is an ICE Deportation Officer in Dover, Delaware. *Id.* ¶ 18. In this Order, the Court collectively refers to these Plaintiffs as the "ICE Agent Plaintiffs."

Directive to be released and offered the benefits of the Directive. *Id.* ¶ 33. The ICE Agent Plaintiffs are prohibited from demanding proof that an alien meets the Directive's criteria. *Id.*

Plaintiffs contend that the Directive commands ICE officers to violate federal law and to violate their oaths to uphold and support federal law.[2] *Id.* ¶¶ 4, 37–46. As a result, the ICE Agent Plaintiffs have expressed their desire not to follow the Directive, but they believe they will be disciplined or suffer other adverse employment consequences if they arrest or issue a Notice to Appear in removal proceedings ("NTA")[3] to an alien who satisfies the factors for deferred action set out in the Directive. *Id.* ¶ 49. The state of Mississippi contends that the beneficiaries of the Directive who remain in the state will impose a net fiscal cost on the state, including increased costs of education, healthcare, arresting, prosecuting and incarcerating illegal aliens in the state's criminal justice system, and lost tax revenues from illegal aliens sending "remittances" to relatives in foreign countries. *Id.* ¶ 66. Plaintiffs seek a declaratory judgment from this Court finding the Directive unlawful and in violation of the Constitution. Pls.' Am. Compl. ¶¶ A–E, ECF No. 15. Plaintiffs correspondingly request the Court to vacate the Directive and relevant provisions of the Morton Memorandum. *Id.* Plaintiffs ultimately seek a permanent injunction preventing the implementation of the Directive and preventing DHS from taking any adverse action against Plaintiffs for failure to follow the Directive. *Id.* ¶ F.

Defendants filed their Motion to Dismiss on November 13, 2012, asserting that Plaintiffs lack standing to challenge the Directive and the Morton Memorandum. *See generally* Defs.' Mot.

---

[2] The specific provisions of federal law at issue will be discussed later in this Order. *See infra* Part III.A.1.a.iii.

[3] An NTA is a legal document that initiates removal proceedings against an alien. *See* 8 C.F.R. § 239.1.

Dismiss, ECF No. 23.  Plaintiffs filed a Response to Defendants' Motion to Dismiss on December 4, 2012.  *See generally* Pls.' Resp. Mot. Dismiss, ECF No. 30; App. Pls.' Resp. Mot. Dismiss, ECF No. 31.  Defendants filed their Reply on December 18, 2012.  *See generally* Defs.' Reply Mot. Dismiss, ECF No. 33.  Accordingly, the issues have been briefed by the parties and this matter is ripe for determination.

## II.  LEGAL STANDARD

Federal courts are courts of limited jurisdiction, and they possess "only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  Under Article III of the Constitution, federal courts are confined "to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984).  Of all the case-or-controversy doctrines—including standing, ripeness, political question, etc.—the requirement that a litigant have standing to invoke the power of a federal court is perhaps the most important.  *Id.*  Because the question of standing implicates the court's subject-matter jurisdiction, the court applies the standards for a motion to dismiss pursuant to Rule 12(b)(1).  *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 245 F.R.D. 551, 556 (N.D. Tex. 2007) (citing S*teel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Allen*, 468 U.S. at 751).

A Rule 12(b)(1) motion to dismiss challenges the subject-matter jurisdiction of a federal district court.  *See* Fed. R. Civ. P. 12(b)(1).  Plaintiffs, as the parties invoking jurisdiction, bear the burden of demonstrating that the requirements for standing are satisfied.  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  To prove standing, Plaintiffs must establish injury-in-fact, causation, and redressability.  *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," and "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560, 560 n.1 (internal quotation marks omitted).

A court can find that subject-matter jurisdiction is lacking based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161. When challenging subject-matter jurisdiction under Rule 12(b)(1), a party can make a "facial attack" or a "factual attack." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). If the party merely files a Rule 12(b)(1) motion, it is considered a facial attack, and the court looks only at the sufficiency of the allegations in the pleading and assumes them to be true. *Id.* If, however, a party submits evidence, such as affidavits or testimony, in support of its Rule 12(b)(1) motion, the moving party makes a factual attack on subject-matter jurisdiction, and the non-moving party must submit evidence and prove by a preponderance of the evidence that the court has jurisdiction. *Id.* While a district court is "empowered to consider matters of fact which may be in dispute," a motion to dismiss for lack of subject-matter jurisdiction "should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161. Here, Defendants filed their motion to dismiss without any supporting affidavits or testimony, and thus Defendants make a facial attack on the Court's subject-matter jurisdiction. Therefore, for purposes of ruling on Defendants' motion to dismiss for lack of standing, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

## III.    ANALYSIS

In their Motion to Dismiss, Defendants assert that the ICE Agent Plaintiffs have not alleged an adequate injury-in-fact to satisfy the constitutional requirements of standing, and that the state of Mississippi has failed to allege an adequate injury-in-fact that can be redressed by a favorable ruling from the Court. Defs.' Mot. Dismiss 8–22, ECF No. 23. Defendants argue that Plaintiffs also lack prudential standing to challenge the Directive and the Morton Memorandum because Plaintiffs are asserting generalized policy grievances and do not fall within the "zone of interests" of the provisions of the Immigration and Nationality Act at issue in this case. *Id.* at 22–24. Alternatively, Defendants assert that this Court lacks jurisdiction to resolve Plaintiffs' federal employment disputes pursuant to the Civil Service Reform Act ("CSRA"). *Id.* at 11 n.3; Defs.' Reply Mot. Dismiss 5, ECF No. 33. Finally, Defendants contend that Plaintiffs' claims must be dismissed for improper venue. Defs.' Mot. Dismiss 24–25, ECF No. 23.

Plaintiffs respond that they have suffered sufficient injuries-in-fact to satisfy the constitutional requirements for standing, and that Mississippi's alleged fiscal injury would be redressed by a favorable ruling and an injunction preventing the implementation of the Directive and Morton Memorandum. Pls.' Resp. Mot. Dismiss 2–14, 16–20, ECF No. 30. Plaintiffs argue that they have prudential standing because the ICE Agent Plaintiffs are directly regulated by the statutory provisions at issue, and their arguments are based on the law rather than general policy objections. *Id.* at 14–15. Finally, Plaintiffs assert that venue is proper in the Northern District of Texas because one of the ICE Agent Plaintiffs resides in this district. *Id.* at 24–25.

The Court will first address Defendants' contention that Plaintiffs lack standing to challenge the Directive and the Morton Memorandum.

## A. Standing

The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. First, Plaintiffs "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'" *Id.* (internal citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Second, Plaintiffs must demonstrate "a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (alteration in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon*, 426 U.S. at 38, 43). "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

Beyond the constitutional requirements for standing, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth*, 422 U.S. at 499). "In addition, even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III," federal courts refrain from "adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the

representative branches." *Id.* at 474–75 (quoting *Warth*, 422 U.S. at 499–500). Finally, Plaintiffs must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 475 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). A court analyzes prudential standing "only if the Article III standing requirements are met." *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1231 (10th Cir. 2012). "Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80–81 (1978). As the parties invoking jurisdiction, Plaintiffs bear the burden of demonstrating that all of the requirements for standing are satisfied. *See Ramming*, 281 F.3d at 161.

In their Amended Complaint, Plaintiffs challenge two distinct aspects of the Directive and Morton Memorandum: (1) the requirement that ICE Agents exercise prosecutorial discretion when they encounter an illegal alien who satisfies the criteria set out in the Directive, and (2) the requirement that USCIS accept applications to determine whether illegal aliens for whom action is deferred qualify for work authorization during the period of deferred action. The Court will address each of these challenges separately with respect to the ICE Agent Plaintiffs and the state of Mississippi.

### 1.  ICE Agent Plaintiffs

#### a.  *Challenge to the Exercise of Prosecutorial Discretion*

Plaintiffs' causes of action 1, 2, 4, 5, and 6 challenge the portions of the Directive and Morton Memorandum that require ICE officers to exercise prosecutorial discretion and defer action

against aliens who satisfy the Directive's criteria. Defendants assert that the ICE Agent Plaintiffs have not alleged a sufficient injury-in-fact to satisfy the constitutional requirements of standing to challenge those portions of the Directive and Morton Memorandum. *See generally* Defs.' Mot. Dismiss, ECF No. 23. Defendants do not challenge the causation and redressability requirements of constitutional standing. *See generally id.* Specifically, Defendants argue that the ICE Agent Plaintiffs' allegation that compliance with the Directive and the Morton Memorandum would require them to violate their oath is insufficient to establish standing because the violation of one's oath, on its own, is not a sufficient injury-in-fact. *Id.* at 11–16. In response, Plaintiffs assert that the ICE Agent Plaintiffs have suffered three distinct injuries-in-fact, any one of which would be sufficient to satisfy the requirements of standing: (1) "being compelled to violate their oaths of office, on pain of adverse employment action if they do not," (2) "the burden of compliance with the Directive," and (3) "being compelled to violate a federal statute directed specifically at them, on pain of adverse employment action if they do not." Pls.' Resp. Defs.' Mot. Dismiss 2, ECF No. 30. The Court will address the adequacy of each of these alleged injuries-in-fact in turn.

i.   <u>Violation of Oath</u>

First, the ICE Agent Plaintiffs assert that they have suffered an injury-in-fact because following the Directive and the Morton Memorandum would require them to violate their oaths to uphold the Constitution and laws of the United States of America. *See* Pls.' Resp. Mot. Dismiss 7–12, ECF No. 30. Defendants argue that the violation of one's oath is insufficient to establish standing in the Fifth Circuit because there must also be a separate, concrete, adverse consequence that flows from one's violation of his oath. Defs.' Mot. Dismiss 11, ECF No. 23. Because the ICE Agent Plaintiffs have not alleged that they will suffer any separate, concrete, adverse consequence

apart from the violation of their oath if they *comply* with the Directive, Defendants assert that the ICE Agent Plaintiffs have not alleged a sufficient injury-in-fact to satisfy the constitutional requirements of standing. *Id.* at 11–16. The Court finds that the ICE Agent Plaintiffs have not alleged a sufficient injury-in-fact under the Fifth Circuit's standard for violation-of-oath standing.

Violation-of-oath standing originated in the Supreme Court's decision of *Board of Education v. Allen*, 392 U.S. 236 (1968). In *Allen*, school boards in New York challenged a state law that required them to provide free textbooks to students attending private, parochial schools as well as public schools. *Id.* at 238–40. The school boards alleged that the state law violated both the State and Federal Constitutions; that if they failed to lend books to parochial school students, in reliance on their interpretation of the Constitutions, then the defendant would remove them from office; and to prevent their removal the school boards were complying with the law. *Id.* at 240. The case eventually made its way to the Supreme Court of the United States. Though the issue of standing was not raised before the Supreme Court, the Court stated in a footnote:

> Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation.

*Id.* at 241 n.5. Subsequent decisions have recognized standing on this theory, while some circuit courts—including the Fifth Circuit—have questioned *Allen*'s continued validity. *Compare Regents of Univ. of Minn. v. Nat'l Collegiate Athletic Ass'n*, 560 F.2d 352, 363–64 (8th Cir. 1977), *Akron Bd. of Educ. v. State Bd. of Educ. of Ohio*, 490 F.2d 1285, 1290–91 (6th Cir. 1974), *and Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247, 1260 n.14 (7th Cir. 1983), *with Drake v. Obama*, 664

13

F.3d 774, 779–81 (9th Cir. 2011), *City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 234–38 (9th Cir. 1980), *Donelon v. La. Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 566–68 (5th Cir. 2008), *and Finch v. Miss. State Med. Ass'n*, 585 F.2d 765, 773–75 (5th Cir. 1978).

The Fifth Circuit addressed violation-of-oath standing and the continued validity of the *Allen* rule in *Finch v. Mississippi State Medical Association*, 585 F.2d at 773–75. In *Finch*, the Governor of Mississippi, among others, challenged the constitutional validity of a state statute that provided for the appointment of members of the State Medical Association. *Id.* at 768–69. The Governor asserted that he had standing to challenge the state statute because:

> he must violate his oath of office to uphold the laws of Mississippi if he ignores the statute and he must violate his oath to uphold the Constitutions of Mississippi and the United States if he obeys it; in his opinion the statute violates both constitutions; and if he fails to act, he may be sued for damages.

*Id.* at 773. The Fifth Circuit held that the Governor lacked standing to challenge the statute. *Id.* at 775. The Fifth Circuit stated that subsequent Supreme Court decisions had narrowed the scope of standing based on the *Allen* rule. *Id.* at 773 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976); *Warth*, 422 U.S. 490). The Court found that "[t]he mental disposition of the Governor is all that gives him cause to complain; were he to change his mind tomorrow and decide . . . that the statute is valid, he would no longer have any interest in the case." *Id.* at 774. Because the Governor faced no negative consequences if he *followed* the challenged statute, the alleged violation of his oath was insufficient on its own to satisfy the constitutional requirements of standing. *Id.* ("The Governor, as an elected official, is in no danger of expulsion from office as a result of any action that he alone believes may

have violated his oath. . . . Furthermore, there is no allegation that his office is in any danger of a loss of funds . . . if the Governor refuses to comply with the statute.").

Similarly, in *Donelon* the Fifth Circuit found that the Louisiana State Commissioner of Insurance did not have standing to challenge the constitutionality of a Louisiana law that allowed judges in the Louisiana Division of Administrative Law to overturn his decisions. 522 F.3d at 565. The Commissioner lacked standing to sue primarily because he was seeking to protect the full extent of his official powers under federal and state law, and there was no claim that he suffered any personal injury when an administrative law judge overturned one of his decisions pursuant to the challenged law. *Id.* at 568. "As in *Finch*," the Commissioner was "merely suing to ensure Louisiana law conforms to his *opinion* of what federal law requires." *Id.* Furthermore, the Commissioner faced no negative consequences if he complied with the challenged law. *Id.* ("Nor is there a claim that he will be expelled from office or lose public funding if he complies with Louisiana law.").

Defendants assert that *Finch* and *Donelon* establish that, in the Fifth Circuit, if an alleged violation of one's oath "is the only consequence that flows from *upholding* a challenged law, a plaintiff cannot establish standing by suggesting that a *refusal* to uphold the law will result in injury." Defs.' Mot. Dismiss 14, ECF No. 23. The Court agrees. Here, the ICE Agent Plaintiffs are suing to ensure that the Directive and Morton Memorandum comply with their opinion of what federal law requires. *See Donelon*, 522 F.3d at 568; *see also Finch*, 585 F.2d at 774. The ICE Agent Plaintiffs have alleged that they will be disciplined if they refuse to comply with the Directive and the Morton Memorandum. However, they have not alleged that they will be disciplined if they comply with the Directive and Morton Memorandum. They allege, instead, that complying with the Directive and Morton Memorandum will cause them to violate their oaths to uphold the Constitution

and laws of the United States. Because the ICE Agent Plaintiffs have not alleged that any negative consequence apart from the violation of their oath will flow from *complying* with the challenged Directive and Morton Memorandum, they have failed to allege a sufficient injury-in-fact under the Fifth Circuit's interpretation of violation-of-oath standing. *See Donelon*, 522 F.3d at 568; *Finch*, 585 F.2d at 774.[4]

### ii.  Burden of Compliance

Next, the ICE Agent Plaintiffs assert that the burden of compliance with the Directive qualifies as a sufficient injury-in-fact to satisfy the requirements of constitutional standing.  Pls.' Resp. Mot. Dismiss 12–14, ECF No. 30.  Essentially, the ICE Agent Plaintiffs contend that because they have to alter their conduct to conform to the requirements of the Directive and the Morton Memorandum, they possess standing to challenge the constitutionality of the Directive and the Morton Memorandum.  *See id.*  Defendants argue that "a government employee responsible for carrying out an agency policy does not have standing to challenge that policy merely because of work responsibilities related to that policy."  Defs.' Reply Mot. Dismiss 5, ECF No. 33.  The Court finds that the burden of compliance with the Directive and the Morton Memorandum is insufficient to satisfy the injury-in-fact requirement of constitutional standing.

---

[4] The Ninth Circuit uses this same standard for violation-of-oath standing.  *See Drake*, 664 F.3d at 780.  In *Drake*, plaintiff on active military duty asserted that President Obama was ineligible for the presidency and, as a result, following President Obama's orders would force plaintiff to violate his oath to uphold the Constitution.  *Id.*  The Ninth Circuit held that plaintiff did not allege a sufficient injury-in-fact because it was purely speculative that he would be disciplined for obeying President Obama's orders.  *Id.* "He might be disciplined for *disobeying* those orders, but he has an 'available course of action which subjects [him] to no concrete adverse consequences'—he can obey the orders of the Commander-in-Chief."  *Id.* (quoting *City of S. Lake Tahoe*, 625 F.2d at 237 (alteration in original)).

The ICE Agent Plaintiffs allege that they must inevitably alter their current procedures to ensure that they comply with the Directive and the Morton Memorandum and defer action with respect to Directive-eligible aliens. App. Pls.' Resp. Mot. Dismiss Ex. 1 (Crane Aff.), ¶ 11, ECF No. 31 (stating that the ICE Agent Plaintiffs must spend time "conducting criminal and immigration background checks as well as conducting interviews of aliens who claim to be eligible for deferred action"); *id.* Ex. 2 (Engle Aff.), ¶ 18 (same); *id.* Ex. 3 (Doebler Aff.), ¶ 14 (same); *id.* Ex. 4 (Martin Aff.), ¶ 21 (same). The ICE Agent Plaintiffs assert that this alone may be a sufficient injury-in-fact traceable to the Directive and the Morton Memorandum that a favorable decision could redress. Pls.' Resp. Mot. Dismiss 13, ECF No. 30 (quoting *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 979–80 (8th Cir. 2009)). However, merely having to alter one's conduct is not a sufficient injury-in-fact to have standing to challenge a statute, regulation, or rule. The cases on which the ICE Agent Plaintiffs rely all involved entities that would inevitably incur financial costs or harm to property interests as a result of complying with the challenged statutes. *See Gray*, 567 F.3d at 986 (owners of rental properties had to incur costs in altering their hiring procedures to ensure that they complied with the challenged ordinance); *Am. Forest & Paper Ass'n v. U.S. E.P.A.*, 137 F.3d 291, 296 (5th Cir. 1998) (the costs of complying with the EPA's challenged regulation, "including delays in permitting and the added risk that an application will be denied," qualified as an injury-in-fact sufficient to satisfy the constitutional requirements of standing); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 848 (N.D. Tex. 2012) (apartment tenants had to modify their rental agreements to comply with the challenged city ordinance); *see also 520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 963 (7th Cir. 2006) (explaining that in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), drug manufacturers had standing to challenge a regulation because

of the costs "the manufacturers would incur in preparing to comply (or the legal risks they would incur in not doing so)"). Here, the ICE Agent Plaintiffs do not suffer any financial burden or harm to their personal property interests by complying with the Directive and the Morton Memorandum and deferring action against Directive-eligible aliens. They simply must change the way they conduct their duties while performing their jobs as ICE agents. Accordingly, the Court finds that the burden of compliance with the Directive and the Morton Memorandum, standing alone, is not a sufficient injury-in-fact that satisfies the constitutional requirements of standing.

> iii.   Being Compelled to Violate a Federal Statute upon Pain of Adverse Employment Action

Next, the ICE Agent Plaintiffs assert that they have suffered an injury-in-fact by virtue of being compelled to violate a federal statute upon pain of adverse employment action. Pls.' Resp. Mot. Dismiss 2–7, ECF No. 30. Plaintiffs allege that the Directive and the Morton Memorandum require them to choose between (1) complying with the Directive and the Morton Memorandum and consequently violating their statutory duties under federal law and (2) violating the Directive and the Morton Memorandum and being disciplined as a result. *Id.* Defendants' response to this basis of standing is essentially the same as their response to the issue of violation-of-oath standing: Defendants contend that the ICE Agent Plaintiffs have not alleged a sufficient injury-in-fact because they have not alleged that they will "personally suffer any adverse consequence as a result of implementing the challenged memoranda." Defs.' Reply Mot. Dismiss 1, ECF No. 33. For the reasons set forth below, the Court finds that the ICE Agent Plaintiffs have alleged a sufficient injury-in-fact to satisfy the constitutional requirements of standing.

The ICE Agent Plaintiffs allege that compliance with the Directive and Morton Memorandum would require them to violate their statutory obligations under the Immigration and Nationality Act ("INA"). Pls.' Am. Compl. ¶¶ 37–40, ECF No. 15; *see generally* 8 U.S.C. §§ 1101–1537. The INA provides that "[a]n alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). All applicants for admission "shall be inspected by immigration officers." *Id.* § 1225(a)(3). "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [of the INA]." *Id.* § 1225(b)(2)(A). The ICE Agent Plaintiffs assert that these statutory provisions require them to arrest or issue an NTA to illegal aliens whenever those aliens "are not clearly and beyond a doubt entitled to be admitted" to the United States. Pls.' Am. Compl. ¶¶ 37–40, ECF No. 15; Pls.' Resp. Mot. Dismiss 2–3, ECF No. 30. Because Directive-eligible aliens may not be "clearly and beyond a doubt entitled to be admitted," Plaintiffs allege that federal law requires them to arrest those aliens or issue an NTA. Pls.' Am. Compl. ¶¶ 37–40, ECF No. 15; Pls.' Resp. Mot. Dismiss 2–3, ECF No. 30. The Directive and the Morton Memorandum, in contrast, require the ICE Agent Plaintiffs to defer action against Directive-eligible aliens. Pls.' Resp. Mot. Dismiss 3, ECF No. 30. The ICE Agent Plaintiffs "fear, based upon official communications to them, . . . that if they follow the requirements of federal law, contrary to the Directive, and arrest an alien or issue an alien a Notice to Appear (NTA) in removal proceedings, they will be disciplined or suffer other adverse employment consequences." Pls.' Am. Compl. ¶ 49, ECF No. 15.

Several cases have made it clear that where a plaintiff states an intention to engage in a course of conduct prohibited by rule, the plaintiff has standing to challenge the rule, even absent a

specific threat of enforcement. For example, in *Doe v. Bolton* the Supreme Court found that several physicians had standing to challenge a Georgia abortion statute because they risked criminal prosecution if they disobeyed the requirements of the statute, even though no prosecution had been threatened. 410 U.S. 179, 188 (1973). Similarly, in *United Food & Commercial Workers International Union v. IPB, Inc.*, the Eighth Circuit found that unions and union officials had standing to challenge two anti-picketing statutes because they risked criminal prosecution if they disobeyed the requirements of the statutes, even though no picketers had been arrested or prosecuted. 857 F.2d 422, 424, 427–28 (8th Cir. 1988). In *Gray v. City of Valley Park, Missouri*, the Eighth Circuit found that owners of rental properties in Valley Park, Missouri had standing to challenge an ordinance that prohibited business entities in the city from knowingly employing unauthorized aliens. 567 F.3d 976, 979–80 (8th Cir. 2009). The court stated: "Where a plaintiff alleges an intention to engage in a course of conduct that is clearly proscribed by statute, courts have found standing to challenge the statute, even absent a specific threat of enforcement." *Id.* at 985 (citing *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 507 (1972)). Additionally, in *KVUE, Inc. v. Moore*, the Fifth Circuit found that a television broadcaster had standing to challenge a Texas statute prescribing the rates radio and television stations could charge political advertisers even though the broadcaster had not been threatened with prosecution. 709 F.2d 922, 926 (5th Cir. 1983). The broadcaster had stated its desire to violate the statute by charging higher rates, and the county attorney had "not rule[d] out prosecution." *Id.* at 930. The Fifth Circuit found that the broadcaster had demonstrated "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," even though the state had not yet enforced the statute against the broadcaster. *Id.* at 928, 930 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Here, the Directive and the Morton Memorandum require Plaintiffs to defer action against illegal aliens who satisfy the criteria set out in the Directive. Pls.' Am. Compl. Ex. 1 (Directive), at 2, ECF No. 15-1. Plaintiffs have made it clear that they do not intend to comply with the Directive and the Morton Memorandum by deferring action for Directive-eligible aliens. Pls.' Am. Compl. ¶¶ 50–58, ECF No. 15. Rather, Plaintiffs intend to comply with what they believe to be their statutory obligations by arresting or issuing an NTA to any illegal aliens who are not "clearly and beyond a doubt entitled to be admitted" to the United States, which may include some Directive-eligible aliens. *See* 8. U.S.C. § 1225(b)(2)(A). Plaintiffs face the threat of disciplinary action if they engage in this intended course of conduct and violate the commands of the Directive by arresting or issuing an NTA to a Directive-eligible alien. *See* Pls.' Am. Compl. ¶ 49, ECF No. 15. There is "no question" that the ICE Agent Plaintiffs have sufficient standing as plaintiffs under these circumstances: the Directive and the Morton Memorandum are specifically directed at the ICE Agent Plaintiffs; the Directive and the Morton Memorandum require them to make significant changes in the way they carry out their duties; and if they fail to comply with the Directive and the Morton Memorandum they will be exposed to adverse employment consequences. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967). An adverse employment action, or the threat thereof, constitutes an injury-in-fact. *See United States v. City of Miami, Fla.*, 664 F.2d 435, 446 (Former 5th Cir. Dec. 1981) (en banc) (per curiam) (finding that plaintiffs suffered the requisite injury-in-fact to satisfy the requirements of Article III where decree allowed plaintiffs who passed a civil service test to be passed over for promotions); *see also Shanahan v. City of Chi.*, 82 F.3d 776, 780 (7th Cir. 1996) (finding that plaintiff suffered an adequate injury-in-fact when he was demoted to his former position). The Court finds that the potential disciplinary action that results from failing to comply

with the Directive and the Morton Memorandum constitutes a sufficient injury-in-fact to satisfy the constitutional requirements of standing.[5]

Accordingly, the Court finds that the ICE Agent Plaintiffs have alleged a sufficient injury-in-fact to satisfy the constitutional requirements of standing. Furthermore, the alleged injury is directly traceable to the Defendants' conduct in issuing and enforcing the Directive and Morton Memorandum, and a favorable decision by this Court would likely redress the injury. Accordingly, the Court finds that the ICE Agent Plaintiffs have met their burden of establishing the constitutional requirements of standing to challenge the portions of the Directive and the Morton Memorandum related to the exercise of prosecutorial discretion.

iv. Prudential Standing

A court analyzes prudential standing "only if the Article III standing requirements are met." *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1231 (10th Cir. 2012). Because the Court has found that the ICE Agent Plaintiffs have alleged a sufficient injury-in-fact to satisfy the constitutional requirements of standing to challenge the portions of the Directive and the Morton Memorandum related to deferred action, the Court must now address whether the prudential principles of standing require the Court to dismiss the case.

Defendants argue that Plaintiffs do not have prudential standing because they are asserting "generalized grievances" shared by the public at large and because Plaintiffs are not in the "zone of

---

[5] The Court finds the threat of disciplinary action sufficiently concrete to qualify as an injury-in-fact. Plaintiff James D. Doebler has already been disciplined for issuing an NTA to a Directive-eligible alien. Pls.' Am. Compl. ¶ 50, ECF No. 15; App. Pls.' Resp. Mot. Dismiss Ex. 3 (Doebler Aff.), ¶¶ 2–9, ECF No. 31. Plaintiff David A. Engle has been specifically threatened with disciplinary action if he issues an NTA to a Directive-eligible alien. App. Pls.' Resp. Mot. Dismiss Ex. 2 (Engle Aff.), ¶¶ 8, 20, ECF No. 15-1. The Court finds the remaining ICE Agent Plaintiffs' fear of disciplinary action reasonable in light of what their colleagues have experienced.

interests" protected or regulated by the provisions of the INA at issue in the present case. Defs.'

Mot. Dismiss 2, 3–4, 22–24, ECF No. 23. Defendants assert that Plaintiffs are not within the zone

of interests protected or regulated by 8 U.S.C. § 1225(b)(2)(A) because that statute establishes a

procedure for aliens to be subject to removal, and Congress provided a framework for aliens to

contest such removals in 8 U.S.C. § 1252(a). *Id.* at 23–24. Plaintiffs respond that they are not

asserting generalized policy objections; rather, their complaint is based on the allegation that the

Directive and Morton Memorandum violate the Administrative Procedure Act and the express terms

of 8 U.S.C. §§ 1225(a)(3) and (b)(2)(A). Pls.' Resp. Mot. Dismiss 14, ECF No. 30. Plaintiffs also

argue that they satisfy the "zone of interests" test because the statutes in question—8 U.S.C.

§§ 1225(a)(3) and (b)(2)(A)—directly regulate their conduct as immigration enforcement agents.

*Id.* at 15.

To have prudential standing, a plaintiff "generally must assert his own legal rights and

interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley*

*Forge Christian Coll.*, 454 U.S. at 474 (quoting *Warth*, 422 U.S. at 499). "In addition, even when

the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III," federal

courts refrain from "adjudicating 'abstract questions of wide public significance' which amount to

'generalized grievances,' pervasively shared and most appropriately addressed in the representative

branches." *Id.* at 474–75 (quoting *Warth*, 422 U.S. at 499–500). Finally, Plaintiffs must fall within

"the zone of interests to be protected or regulated by the statute or constitutional guarantee in

question." *Id.* at 475 (quoting *Camp*, 397 U.S. at 153). "Where a party champions his own rights,

and where the injury alleged is a concrete and particularized one which will be prevented or

redressed by the relief requested, the basic practical and prudential concerns underlying the standing

doctrine are generally satisfied when the constitutional requisites are met." *Duke Power Co.*, 438 U.S. at 80–81.

Here, because the ICE Agent Plaintiffs are asserting their own rights to be free from adverse employment consequences, because the alleged injury is sufficiently concrete, and because the injury will be prevented or redressed by the relief requested, the Court is satisfied that the ICE Agent Plaintiffs are not asserting "generalized policy grievances" that would be more appropriately resolved by the representative branches of government. *See supra* Part III.A.1.a.iii. Additionally, the statutory provisions at issue in this case—8 U.S.C. §§ 1225(a)(3) and (b)(2)(A)—govern the conduct of the ICE Agent Plaintiffs while conducting their investigations and initiating removal proceedings. The Court therefore finds that the ICE Agent Plaintiffs are within the "zone of interests . . . regulated by the statute" in question. *See Valley Forge Christian Coll.*, 454 U.S. at 475. Accordingly, the Court is satisfied that the ICE Agent Plaintiffs have met their burden of proving that they have prudential standing to challenge the portions of the Directive and the Morton Memorandum related to the exercise of prosecutorial discretion.

### b. Challenge to Employment Authorization

Plaintiffs' third cause of action challenges the portion of the Directive that permits USCIS to issue employment authorization to Directive-eligible aliens during the period of deferred action. *See* Pls.' Am. Compl. ¶¶ 81–91, ECF No. 15. Defendants assert that the ICE Agent Plaintiffs "have claimed no injury that results from USCIS providing employment authorization to those with deferred action." Defs.' Mot. Dismiss 10, ECF No. 23. Defendants argue that the ICE Agent Plaintiffs' challenge to the portion of the Directive instructing USCIS to provide employment authorization is a generalized grievance that does not satisfy the constitutional requirements of

standing because the ICE Agent Plaintiffs have no connection to the employment-authorization process. *Id.* at 9–10.

Plaintiffs respond that Defendants have misconstrued the ICE Agent Plaintiffs' role in the employment-authorization process. Pls.' Resp. Mot. Dismiss 20, ECF No. 30. Plaintiffs explain that the Directive specifies three avenues by which illegal aliens who qualify for deferred action may obtain employment authorization:

> (1) ICE encounters such aliens during its law enforcement operations and must then grant them deferred action; (2) ICE identifies Directive-eligible aliens who are already in removal proceedings and must then grant them deferred action; and (3) aliens present themselves to USCIS to request deferred action without ever interacting with ICE.

*Id.* at 20–21 (citing Pls.' Am. Compl. Ex. 1 (Directive), at 2, ECF No. 15-1). The ICE Agent Plaintiffs assert that they are directly involved in the employment-authorization process because an ICE agent's decision to defer action under the Directive "is a prerequisite to the alien receiving employment authorization" in two out of the three possible avenues for obtaining employment authorization. *Id.* at 21. In the third avenue, where aliens present themselves to USCIS to request deferred action and employment authorization without ever interacting with ICE, the ICE Agent Plaintiffs argue that the granting of employment authorization constrains their ability "to carry out their duties after-the-fact." *Id.* Plaintiffs allege that when an ICE officer encounters aliens who have been issued employment authorization under the Directive, he must decline to remove those aliens and decline to take action against their employers. *Id.* at 21–22. According to Plaintiffs, the restriction in the way the ICE Agent Plaintiffs must carry out their duties is sufficient to confer standing to challenge the issuance of employment authorizations.

The Court finds that the ICE Agent Plaintiffs have not alleged a sufficient injury to satisfy the requirements of standing to challenge the portion of the Directive related to the issuance of employment authorization. First, the ICE Agent Plaintiffs are not involved in the employment-authorization process. Contrary to their allegation, the ICE Agent Plaintiffs are not a "necessary first step that is part of a two-step process" for Directive-eligible aliens to obtain employment authorization. *See id.* at 21. The avenues described above are not three separate avenues by which Directive-eligible aliens may obtain employment authorization. Rather, they are three separate avenues by which an alien may obtain deferred action. The Directive only provides one avenue for aliens to obtain work authorization: filing an application with USCIS. *See* Pls.' Am. Compl. Ex. 1 (Directive), at 3, ECF No. 15-1 ("For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during the period of deferred action."). While a decision to defer action is a prerequisite to an alien obtaining employment authorization, under the Directive many aliens may be granted deferred action and employment authorization without ICE ever being involved. An alien may request deferred action and apply for employment authorization directly with USCIS, which is an agency of DHS that is completely separate from ICE. *See generally* "Deferred Action for Childhood Arrivals," http://www.dhs.gov/deferred-action-childhood-arrivals (last visited Jan. 23, 2013) (explaining the process for requesting consideration of deferred action and applying for employment authorization with USCIS). The ICE Agent Plaintiffs are never involved in the decision to issue employment authorization under the Directive. That is a decision left solely to USCIS.

Second, the ICE Agent Plaintiffs have failed to articulate how the issuance of employment authorization harms them personally. With respect to the decision to defer action, the ICE Agent

Plaintiffs have alleged a sufficient personal stake in the outcome of the litigation because they face adverse employment consequences if they fail to comply with the Directive. Unlike the decision to defer action, however, the ICE Agent Plaintiffs have not alleged that they will be disciplined if USCIS fails to issue employment authorization to Directive-eligible aliens, or that they will be harmed in any other way. The Supreme Court has "'consistently held that a plaintiff . . . claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (quoting *Lujan*, 504 U.S. at 573–74). Plaintiffs' third cause of action alleges simply that "the Directive violates federal law by conferring the legal benefit of employment authorization without any statutory basis and under the false pretense of 'prosecutorial discretion.'" Pls.' Am. Compl. 17, ECF No. 15. Because this cause of action avers generally that the issuance of employment authorization is inconsistent with the Constitution and laws of the United States, and because a favorable ruling from this Court vacating the portion of the Directive that relates to employment authorization would "no more directly and tangibly benefit[]" the ICE Agent Plaintiffs than it would the public at large, the Court finds that the ICE Agent Plaintiffs lack standing to challenge this portion of the Directive. *See Lance*, 549 U.S. at 439. Accordingly, Plaintiffs' third cause of action challenging the issuance of employment authorization to Directive-eligible aliens is hereby **DISMISSED** without prejudice to refiling.[6]

---

[6] While the ICE Agent Plaintiffs do not have standing to challenge the issuance of work authorization, as discussed above they do have standing to challenge the portions of the Directive and the Morton Memorandum that relate to deferred action. The ICE Agent Plaintiffs' standing to challenge the granting of deferred action is based on the fact that they may be disciplined for arresting or issuing an NTA to a Directive-eligible alien; however, the ICE Agent Plaintiffs face no similar threat of disciplinary action

## 2. Mississippi

Defendants assert that Mississippi's claims should be dismissed for lack of standing because Mississippi's alleged fiscal injury is purely speculative. *See* Defs.' Mot. Dismiss 16–21, ECF No. 23. Mississippi's alleged injury is the purported "fiscal costs of the illegal aliens residing in Mississippi" who are permitted to remain in the state pursuant to the Directive and the Morton Memorandum. Pls.' Am. Compl. ¶ 60, ECF No. 15. Defendants do not dispute that the expenditure of state funds may qualify as an invasion of a legally protected interest sufficient to establish standing under the proper circumstances. *See, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) (school districts and education associations had standing "based on their allegation that they must spend state and local funds" to comply with the challenged law); *Clinton v. City of N.Y.*, 524 U.S. 417, 430–31 (1998) (adverse effects on the "borrowing power, financial strength, and fiscal planning" of a governmental entity can constitute a sufficient injury-in-fact to establish constitutional standing). Rather, Defendants assert that Mississippi's alleged injury is purely conjectural and based on speculation, thus making it insufficiently concrete to confer standing. Defs.' Mot. Dismiss 16–21, ECF No. 23. Plaintiffs rely on reports and statistics outlining the costs illegal aliens impose on the nation as a whole and the state of Mississippi specifically to support their assertion that Mississippi's economic injury resulting from the implementation of the Directive and the Morton Memorandum is "already manifest." *See* Pls.' Resp. Mot. Dismiss 16–19, ECF No. 30. Based on the evidence presented, the Court concludes

---

if USCIS fails to issue work authorization under the Directive. The Court recognizes that should the ICE Agent Plaintiffs ultimately prevail on their challenge to the granting of deferred action, such a decision will necessarily affect USCIS's ability to issue work authorization under the Directive. However, the Court finds that the ICE Agent Plaintiffs do not have standing to challenge the issuance of work authorization directly because they are not personally harmed by the work authorization process.

that Mississippi's alleged injury of increased fiscal costs resulting from the Directive and the Morton Memorandum is insufficiently concrete to satisfy the constitutional requirements of standing because it is conjectural and based on speculation.

Mississippi, as the party invoking federal jurisdiction, bears the burden of establishing that the constitutional requirements of standing are satisfied. *See Lujan*, 504 U.S. at 561. The first element of constitutional standing is that "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560. To qualify as an injury in fact sufficient to confer constitutional standing, a state's alleged fiscal burden must not be "purely speculative" or "remote and indirect." *See Florida v. Mellon*, 273 U.S. 12, 17–18 (1927) ("The claim of immediate injury to the state rests upon the allegation that the act will have the result of inducing potential taxpayers to withdraw property from the state, thereby diminishing the subjects upon which the state power of taxation may operate. The averment to that effect, however, affords no basis for relief, because . . . the anticipated result is purely speculative, and, at most, only remote and indirect.").

Plaintiffs primarily rely on a 2006 Audit Report compiled by then Mississippi State Auditor Phil Bryant entitled "The Impact of Illegal Immigration on Mississippi: Costs and Population Trends" to support their assertion that the Directive and Morton Memorandum result in fiscal injury to the state of Mississippi. *See* Pls.' Resp. Mot. Dismiss 16, ECF No. 30; *see generally* Pls.' Am. Compl. Ex. 2 (2006 Audit Report), ECF No. 15-2. The economic data in the 2006 Audit Report, however, does not support Mississippi's alleged injury. The report admits that Mississippi cannot "accurately quantify the costs of illegal immigrants," the report's conclusions are "estimates" because there is a "lack of data" or only "anecdotal evidence," and local and state law enforcement

have "no accurate picture of the costs associated with illegal immigrants." Pls.' Am. Compl. Ex. 2 (2006 Audit Report), 18–19, ECF No. 15-2. While it is not necessary for Plaintiffs to quantify the exact extent of any alleged fiscal injury, it is necessary for Plaintiffs to establish that the Directive and Morton Memorandum result in an increased financial burden on the state of Mississippi. The 2006 Audit Report provides "a snapshot of the estimated impact of illegal immigrants residing in Mississippi," including illegal immigrants' estimated annual contribution to sales tax, estimated annual contribution to income tax, estimated annual education costs, estimated annual healthcare costs, estimated annual remittances to relatives in foreign countries, and known annual public safety costs. *Id.* at preface, iv. However, because it was written six years prior to the issuance of the Morton Memorandum and the Directive, the report cannot provide any support for Mississippi's contention that the Directive and the Morton Memorandum result in an *increased* fiscal burden on the state. *See Wyoming*, 674 F.3d at 1232 (citation to a study from 1995 did not establish that plaintiffs were suffering a loss as a result of the challenged 2009 rule).

Plaintiffs also rely on statistical data to support their allegation that the Directive and the Morton Memorandum result in an increased fiscal burden on the state of Mississippi. Plaintiffs state that "Directive beneficiaries represent approximately 15% of the illegal aliens in the United States and are likely to represent a similar percentage of the 49,000 illegal aliens in Mississippi." Pls.' Resp. Mot. Dismiss 16, ECF No. 30. Between August 15, 2012, and January 17, 2013, the government approved 154,404 requests for Deferred Action for Childhood Arrivals. U.S. Citizen & Immigration Services, "Deferred Action for Childhood Arrivals Process (January 2013)," http://www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20

Data/All%20Form%20Types/DACA/DACA%20Monthly%20Report%20A Ver%20II%20PDF.pdf.[7]

Plaintiffs assert that "[h]undreds, if not thousands, of those illegal aliens likely reside in Mississippi," and "the State has already suffered fiscal injury by virtue of the fact that those illegal aliens are being permitted to remain in the State." Pls.' Resp. Mot. Dismiss 17, ECF No. 30. Even if it is true that many illegal immigrants are permitted to remain in the state of Mississippi pursuant to the Directive and the Morton Memorandum, Plaintiffs have offered only conclusory allegations that those illegal aliens who are permitted to remain would otherwise have been removed, or that there has been a decrease in the total number of removals as a result of the Directive and Morton Memorandum, resulting in an increased fiscal burden on the state of Mississippi.

In support of their allegation that the Directive and Morton Memorandum result in a decreased total number of removals, Plaintiffs have included affidavits from several of the ICE Agent Plaintiffs with their Response to Defendants' Motion to Dismiss. *See generally* App. Pls.' Resp. Mot. Dismiss Exs. 1–4 (Crane, Engle, Doebler, & Martin Affs.), ECF No. 31. In their affidavits, the ICE Agents state that they "have not observed any increase in the removal of dangerous criminal aliens as a result of the Directive or the Morton Memorandum." *Id.* Ex. 2 (Engle Aff.), ¶ 21; *id.* Ex. 3 (Doebler Aff.), ¶ 15; *see id.* Ex. 1 (Crane Aff.), ¶ 12; *see id.* Ex. 4 (Martin Aff.), ¶ 20. The inference that Plaintiffs wish the Court to draw from these statements is that there has not been an increased removal of high-priority illegal aliens to correspond with the decreased removal of Directive-eligible illegal aliens, thereby resulting in a net decrease in overall removals and an increased fiscal burden on the state of Mississippi. These statements, however, do not support such

---

[7] http://www.uscis.gov (follow "Resources" tab, select "Reports and Studies" in left menu, select "Immigration Forms Data" in left menu, follow link to "Individual Applications and Petitions," and select "Deferred Action for Childhood Arrivals Process (January 2013)").

an inference. The affidavits refer to isolated ICE offices in Delaware, Texas, and Utah, and there is no indication that similar observations have been made in Mississippi. *See id.* Ex. 1 (Crane Aff.), ¶ 2 (West Valley City, Utah); *id.* Ex. 2 (Engle Aff.), ¶ 2 (Dallas, Texas); *id.* Ex. 3 (Doebler Aff.), ¶ 1 (Dover, Delaware); *id.* Ex. 4 (Martin Aff.), ¶ 2 (El Paso, Texas).

In sum, the Court finds that Mississippi's asserted fiscal injury is purely speculative because there is no concrete evidence that the costs associated with the presence of illegal aliens in the state of Mississippi have increased or will increase as a result of the Directive or the Morton Memorandum. *See Wyoming*, 674 F.3d at 1231–35 (Wyoming's alleged loss of tax revenue from a reduced number of snowmobiles in parks was conclusory and based on "speculative economic data," and therefore insufficient to confer standing. Wyoming did not present any "concrete evidence" that "revenues have decreased or will decrease" with the challenged rule in place.). Accordingly, the Court finds that Mississippi has failed to allege an injury-in-fact sufficient to satisfy the constitutional requirements of standing. The state of Mississippi's claims are therefore **DISMISSED** without prejudice to refiling.

### B. Civil Service Reform Act

Defendants assert in a footnote that this Court lacks jurisdiction because Plaintiffs' claims are federal employment disputes subject to the Civil Service Reform Act ("CSRA"). *See* Defs.' Mot. Dismiss 11 n.3, ECF No. 23 (citing 5 U.S.C. § 7121); Defs.' Reply Mot. Dismiss 5, ECF No. 33. Defendants assert that Plaintiffs' challenges to a purported proposed suspension or a purported violation of a collective bargaining requirement to provide proper notice are not properly before the Court because Plaintiffs have not submitted their grievances through the appropriate administrative process as established by the collective bargaining agreement. Defs.' Mot. Dismiss 11 n.3, ECF No.

23 (citing 5 U.S.C. § 7121).  Plaintiffs respond that the CSRA does not apply to this case because the adverse employment actions that have occurred are not within the "specified adverse employment actions" defined by the CSRA.  Pls.' Resp. Mot. Dismiss 15–16, ECF No. 30 (citing *Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126, 2130 (2012)).  Because Defendants' claim that the CSRA precludes federal-court jurisdiction over Plaintiffs' claims has been inadequately briefed, the Court defers ruling on it until trial.

### C.  Venue

Alternatively, Defendants assert that the case should be dismissed for improper venue.  Defs.' Mot. Dismiss 24–25, ECF No. 23.  Defendants argue that Plaintiff David A. Engle—the only plaintiff who resides in the Northern District of Texas—has filed a frivolous claim or is improperly or collusively joined for the purpose of creating venue in the district.  *Id.* at 24.  Defendants contend that Plaintiff Engle cannot establish standing and he should, therefore, be dismissed.  *Id.* at 25.  Consequently, because none of the other plaintiffs reside in the Northern District of Texas, Defendants assert that the remaining plaintiffs should be dismissed for improper venue.  *Id.*  Plaintiffs respond that Plaintiff Engle's claim is not frivolous or collusively joined because the Amended Complaint contains sufficient factual allegations to establish Plaintiff Engle's standing; therefore, venue is proper in the Northern District of Texas because Plaintiff Engle resides in the district.  Pls.' Resp. Mot. Dismiss 24–25, ECF No. 30.  The Court concludes that venue is appropriate in the Northern District of Texas.

In civil actions against "an officer or employee of the United States or an agency thereof acting in his official capacity or under color of legal authority," venue is appropriate in the district where "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 2391(e)(1)(C).

Courts have held that venue is proper as to all plaintiffs if suit is brought in a district where any one or more of the plaintiffs resides. *See, e.g.*, *Exxon Corp. v. FTC*, 588 F.2d 895, 898–99 (3d Cir. 1978); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 1290, 1301–02 (N.D. Ala. 2003) (canvassing cases); *Sidney Coal Co. v. Massanari*, F. Supp. 2d 755, 766–67, 766 n.9 (E.D. Ky. 2002) (canvassing cases), *appeal dismissed*, 98 F. App'x 378 (6th Cir. 2004). Because Plaintiff Engle resides in the Northern District of Texas, venue is proper in this district as to all plaintiffs. *See* App. Pls.' Resp. Mot. Dismiss Ex. 2 (Engle Aff.), ¶ 1, ECF No. 31.

The Court finds unavailing Defendants' argument that venue is improper in the Northern District of Texas because Plaintiff Engle's claims are frivolous or because he was improperly or collusively joined. Defendants essentially argue that because Plaintiff Engle lacks standing, his claims should be dismissed, and the claims of the remaining plaintiffs should be dismissed for improper venue. *See* Defs.' Mot. Dismiss 24–25, ECF No. 23. However, as the Court discussed previously, Plaintiffs have pleaded sufficient facts to support Plaintiff Engle's standing to assert his claims. Therefore, Plaintiff Engle was not improperly or collusively joined, and venue is appropriate in the Northern District of Texas. The portion of Defendants' Motion to Dismiss based on improper venue is therefore **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss (ECF No. 23).

Accordingly, it is **ORDERED** that the State of Mississippi's claims, by and through Governor Phil Bryant, are **DISMISSED** without prejudice to refiling.

It is further **ORDERED** that Plaintiffs' third cause of action challenging the issuance of employment authorization is **DISMISSED** without prejudice to refiling.

**SO ORDERED** on this **24th** day of **January, 2013**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**