## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER L. CRANE et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-cv-03247-O** |
| | § | |
| **JANET NAPOLITANO,** *in her official* | § | |
| *capacity as Secretary of Homeland Security,* | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs' Application for Preliminary Injunctive Relief (ECF No. 24),

Brief in Support of Plaintiffs' Application for Preliminary Injunctive Relief (ECF No. 26),

Defendants' Opposition to Plaintiffs' Application for Preliminary Injunctive Relief (ECF No. 34),

Plaintiffs' Reply Brief in Support of Plaintiffs' Application for Preliminary Injunctive Relief (ECF

No. 36), and Appendix to Plaintiffs' Reply in Support of Application for Preliminary Injunction

(ECF No. 37). The Court held a hearing on this matter on April 8, 2013. *See* Electronic Minute

Entry, Apr. 8, 2013, ECF No. 53. For the reasons set forth below, the Court concludes that Plaintiffs

are likely to succeed on the merits of their claim that the Directive and related provisions of the

Morton Memorandum violate 8 U.S.C. § 1225(b)(2)(A), but the Court defers ruling on Plaintiffs'

Application for Preliminary Injunction (ECF No. 24) until the parties have provided the Court with

additional briefing**.**

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The United States Department of Homeland Security ("DHS") is a Cabinet-level department of the United States government created in 2002 for the purpose of coordinating and unifying national homeland security efforts.   Creation of the Department of Homeland Security, http://www.dhs.gov/creation-department-homeland-security (last visited Apr. 23, 2013).   Defendant Janet Napolitano is the current Secretary of DHS.   Pls.' Am. Compl. ¶ 22, ECF No. 15.   DHS is charged with, among other things, protecting our nation's border security, cybersecurity, and economic security, preventing human trafficking and terrorism, and safeguarding civil rights and civil liberties.   Topics, http://www.dhs.gov/topics (last visited Apr. 23, 2013).   DHS is also responsible for overseeing citizenship and immigration in the United States. *Id.*   The United States Citizenship and Immigration Services ("USCIS") oversees lawful immigration in the United States. Citizenship & Immigration Overview, http://www.dhs.gov/topic/citizenship-and-immigration-overview (last visited Apr. 23, 2013).   Defendant Alejandro Mayorkas is the current Director of USCIS. Pls.' Am. Compl. ¶ 24, ECF No. 15.   USCIS grants immigration and citizenship benefits, promotes an awareness and understanding of citizenship, and ensures the integrity of our immigration system.   Citizenship & Immigration Overview, http://www.dhs.gov/topic/citizenship-and-immigration-overview (last visited Apr. 23, 2013).   The United States Immigration and Customs Enforcement ("ICE") is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration.   Overview, http://www.ice.gov/about/overview (last visited Apr. 23, 2013).   Defendant John Morton is the current Director of ICE.   Pls.' Am. Compl. ¶ 23, ECF No. 15.   ICE receives an annual appropriation

2

from Congress to remove individuals who are unlawfully present in the United States.  Immigration

Enforcement Overview, http://www.dhs.gov/topic/immigration-enforcement-overview (last visited

Apr. 23, 2013).

On June 17, 2011, Defendant Morton issued a Memorandum entitled "Exercising

Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency

for the Apprehension, Detention, and Removal of Aliens" (the "Morton Memorandum").  Pls.' Am.

Compl. ¶ 28, ECF No. 15.  The Morton Memorandum provides ICE personnel "guidance on the

exercise of prosecutorial discretion to ensure that the agency's immigration enforcement resources

are focused on the agency's enforcement priorities," which include "the promotion of national

security, border security, public safety, and the integrity of the immigration system."  Morton Mem.

at 1, 2, *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-

memo.pdf.  The Morton Memorandum sets out several factors that ICE officers, agents, and

attorneys should consider when determining whether an exercise of prosecutorial discretion may be

warranted for a particular alien.  *See* Morton Mem. at 4–5, *available at*

http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

On June 15, 2012, Defendant Napolitano issued a Directive entitled "Exercising

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"

(the "Directive").  Pls.' Am. Compl. ¶¶ 2, 29, ECF No. 15; Pls.' Am. Compl. Ex. 1 (Directive), ECF

No. 15-1.  The Directive sets forth to what extent, in the exercise of prosecutorial discretion, DHS

should enforce immigration laws "against certain young people who were brought to this country

as children and know only this country as home."  Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No.

15-1.  The Directive instructs ICE officers to refrain from placing certain aliens who are unlawfully

3

present in the United States into removal proceedings.  It also directs ICE officers to facilitate

granting deferred action to aliens who are unlawfully present in the United States and are already in

removal proceedings but not yet subject to a final order of removal.  Pls.' Am. Compl. ¶ 2, ECF No.

15; Pls.' Am. Compl. Ex. 1 (Directive), at 2, ECF No. 15-1.  The Directive also instructs USCIS to

accept applications to determine whether the individuals who receive deferred action are qualified

for work authorization during the period of deferred action.    Pls.' Am. Compl. ¶ 2, ECF No. 15;

Pls.' Am. Compl. Ex. 1 (Directive), at 3, ECF No. 15-1.  To qualify for deferred action under the

Directive, the alien must satisfy the following criteria:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of [the Directive] and is present in the United States on the date of [the Directive];
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No. 15-1.

In July 2012, DHS issued the "ERO Supplemental Guidance: Exercising Prosecutorial

Discretion with Respect to Individuals Who Came to the United States as Children," which directs

DHS personnel to implement the terms of the Directive. Pls.' Am. Compl. ¶ 30, ECF No. 15.  In

early August 2012, DHS issued a document entitled "National Standard Operating Procedures

(SOP): Deferred Action for Childhood Arrivals (DACA) (Form I-821D and Form I-765)," which

explains how DHS will process applications for deferred action under the Directive. *Id.* ¶ 31.  On

August 15, 2012, DHS began accepting requests for consideration of deferred action and applications for employment authorization pursuant to the Directive. *Id.* ¶ 32.

Several ICE Deportation Officers and Immigration Enforcement Agents[1] filed this lawsuit on August 23, 2012, to challenge the constitutional and statutory validity of the Directive and the Morton Memorandum. *See generally* Pls.' Compl., ECF No. 1; Pls.' Am. Compl., ECF No. 15. Plaintiffs assert that the Directive violates (1) federal statutes requiring the initiation of removals; (2) federal law by conferring a non-statutory form of benefit—deferred action—to more than 1.7 million aliens, rather than a form of relief or benefit that federal law permits on such a large scale; (3) the constitutional allocation of legislative power to Congress; (4) the Article II, Section 3, constitutional obligation of the Executive to take care that the laws are faithfully executed; and (5) the Administrative Procedure Act through conferral of a benefit without regulatory

---

[1] Plaintiff Christopher L. Crane is an ICE Deportation Officer in West Valley City, Utah. Pls.' Am. Compl. ¶ 9, ECF No. 15. Plaintiff David A. Engle is an ICE Immigration Enforcement Agent in Dallas, Texas. *Id.* ¶ 10. Plaintiff Anastasia Marie Carroll is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 11. Plaintiff Ricardo Diaz is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 12. Plaintiff Lorenzo Garza is an ICE Immigration Enforcement Agent in Los Fresnos, Texas. *Id.* ¶ 13. Plaintiff Felix Luciano is an ICE Immigration Enforcement Agent in San Diego, California. *Id.* ¶ 14. Plaintiff Tre Rebstock is an ICE Immigration Enforcement Agent in Huntsville, Texas. *Id.* ¶ 15. Plaintiff Fernando Silva is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 16. Plaintiff Samuel Martin is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 17. Plaintiff James D. Doebler is an ICE Deportation Officer in Dover, Delaware. *Id.* ¶ 18. The State of Mississippi, by and through Governor Phil Bryant, was originally an additional plaintiff in this lawsuit, but the Court dismissed its claims for lack of standing. *See* Order, Jan. 24, 2013, ECF No. 41. The Court found that the State of Mississippi lacked standing because its asserted fiscal injury was conclusory and based on purely speculative economic data. *Id.* at 32. In contrast, the Court found that the individual plaintiffs satisfied the constitutional requirements of standing with respect to the Directive and related provisions of the Morton Memorandum that instruct them to violate what they believe to be their statutory obligations, and they face a sufficiently concrete threat of disciplinary action if they violate the commands of the Directive by arresting or issuing a Notice to Appear in removal proceedings to a Directive-eligible alien. *Id.* at 21–22. Accordingly, this Order will address Plaintiffs' Application for Preliminary Injunction only as it pertains to the ICE Deportation Officers and ICE Immigration Enforcement Agents (collectively, "Plaintiffs").

implementation.[2]  Pls.' Am. Compl. ¶¶ 67–80, 92–116, ECF No. 15.  Plaintiffs challenge the portions of the Directive and Morton Memorandum that require ICE officers to exercise prosecutorial discretion and defer action against aliens who satisfy the Directive's criteria.

Plaintiffs contend that the Directive commands ICE officers to violate federal law and to violate their oaths to uphold and support federal law.[3]  *Id.* ¶¶ 4, 37–46.  As a result, Plaintiffs have expressed their desire not to follow the Directive, but they believe they will be disciplined or suffer other adverse employment consequences if they arrest or issue a Notice to Appear in removal proceedings ("NTA")[4] to an alien who satisfies the factors for deferred action set out in the Directive.  *Id.* ¶ 49.  Plaintiffs seek a declaratory judgment from this Court finding the Directive unlawful and in violation of the Constitution.  Pls.' Am. Compl. ¶¶ A–E, ECF No. 15.  Plaintiffs correspondingly request the Court to vacate the Directive and relevant provisions of the Morton Memorandum.  *Id.* Plaintiffs ultimately seek a permanent injunction preventing the implementation of the Directive and preventing DHS from taking any adverse action against Plaintiffs for failure to follow the Directive. *Id.* ¶ F.

Plaintiffs filed their Application for Preliminary Injunction on November 28, 2012, asking the Court to preliminarily enjoin Defendants from implementing and enforcing the Directive and

---

[2]  In their Amended Complaint, Plaintiffs additionally allege that the Directive violates federal law by conferring the legal benefit of employment authorization without any statutory basis and under the false pretense of "prosecutorial discretion."  Pls.' Am. Compl. ¶ 81–91, ECF No. 15.  However, the Court dismissed this cause of action for lack of standing.  *See* Order, Jan. 24, 2013, ECF No. 41.  Accordingly, this Order will address Plaintiffs' Application for Preliminary Injunction only as it pertains to the remaining causes of action.

[3]  The specific provisions of federal law at issue will be discussed later in this Order.  *See infra* Part III.A.1.

[4]  An NTA is a legal document that initiates removal proceedings against an alien.  *See* 8 U.S.C. § 1229; 8 C.F.R. § 239.1.

related provisions of the Morton Memorandum. *See generally* Pls.' Appl. Prelim. Inj., ECF No. 24.

Defendants filed their Opposition on December 19, 2012, and Plaintiffs filed their Reply on January

2, 2013. *See generally* Defs.' Opp'n Appl. Prelim. Inj., ECF No. 34; Pls.' Reply Appl. Prelim. Inj.,

ECF No. 36.  The Court held an evidentiary hearing on April 8, 2013.[5]  *See* Electronic Minute Entry,

Apr. 8, 2013, ECF No. 53.  Accordingly, the issues have been briefed by the parties and this matter

is ripe for determination.

## II.   LEGAL STANDARD

To obtain preliminary injunctive relief, a movant "must establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.*

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Nichols v. Alcatel USA, Inc.*, 532

F.3d 364, 372 (5th Cir. 2008); *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but

only when the movant, by a clear showing, carries the burden of persuasion."  *White v. Carlucci*, 862

F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992,

997 (5th Cir. 1985)); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas*

*Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).  If the movant fails to carry its burden on any one

of the four elements, the court must deny the request for preliminary injunctive relief.  *See*

*Gonannies, Inc. v. Goaupair.com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006).  Even when the

---

[5]   The Court delayed consideration of Plaintiffs' Application for Preliminary Injunction while it examined the complicated issue of standing. *See generally* Order, Jan. 24, 2013, ECF No. 41. Additionally, counsel for Defendants sought a delay based on personal obligations. *See* Unopposed Mot. Reschedule Date Pls.' Prelim. Inj. Hr'g, ECF No. 48; Order Setting Hr'g, Feb. 11, 2013, ECF No. 49.

movant carries its burden of persuasion on all of the four factors for obtaining a preliminary injunction, the decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal*, 489 F.2d at 572). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Id.* A movant who obtains a preliminary injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction. Fed. R. Civ. P. 65(c).

## III.   ANALYSIS

Plaintiffs filed their Application for Preliminary Injunction on November 28, 2012. Plaintiffs seek an injunction preventing Defendants from implementing and enforcing the Directive and related provisions of the Morton Memorandum until the Court fully decides the lawfulness of those documents. Pls.' Appl. Prelim. Inj. 1–2, ECF No. 24. The Court will address each element required to obtain a preliminary injunction in turn.

### A.  Likelihood of Success on the Merits

To secure a preliminary injunction, Plaintiffs must establish that there is a substantial likelihood that they will succeed on the merits of their claims. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). "It is not necessary for Plaintiffs to prove to an absolute certainty that they will prevail on the merits." *Placid Oil Co. v. U.S. Dep't of Interior*, 491 F. Supp. 895, 905 (N.D. Tex. 1980). Rather, Plaintiffs must raise "questions going to the merits so serious, substantial, and difficult and doubtful, as to make them a fair ground for litigation." *Id.* (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). They must present a prima facie case, but need not show they are certain to win. *See Janvey*, 647 F.3d at 595–96 (citing 11A Charles Alan

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (2d ed. 1995)).

A "more than negligible chance of success" is sufficient to obtain a preliminary injunction. *Compact Van Equip. Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978). The Court will begin with an analysis of what Section 1225 of the Immigration and Nationality Act ("INA")[6] requires, because that statute is central to all of Plaintiffs' causes of action.

### 1.   8 U.S.C. § 1225

Plaintiffs assert that the Directive and related provisions of the Morton Memorandum expressly violate federal statutes requiring the initiation of removal proceedings. Br. Supp. Pls.' Appl. Prelim. Inj. 3–7, ECF No. 26. Specifically, Plaintiffs assert that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") requires immigration officers to initiate removal proceedings when they encounter illegal immigrants who are not "clearly and beyond a doubt entitled to be admitted," and that any "prosecutorial discretion" can only be exercised *after* removal proceedings have been initiated. *See* 8 U.S.C. § 1225; Br. Supp. Pls.' Appl. Prelim. Inj. 4, 5, ECF No. 26. Plaintiffs assert that Defendant Napolitano's authority under 8 U.S.C. § 1103(a)(5) as Secretary of Homeland Security to enforce the immigration laws cannot be construed to authorize her to order her employees to violate the requirements of federal law in 8 U.S.C. § 1225. *Id.* at 5. Defendants respond that 8 U.S.C. § 1225(b)(2)(A) only applies to aliens arriving in the United States at a port of entry, rather than to any illegal alien that immigration officers encounter

---

[6] The statutory provision at issue in the present case is Section 1225 of Title 8 of the United States Code. Title 8 of the United States Code contains the provisions of the INA. This particular statutory provision corresponds to Section 235 of the INA, and it is often referred to as Section 235 in opinions from the Board of Immigration Appeals and in the immigration regulations located in Title 8 of the Code of Federal Regulations. The United States Supreme Court, in contrast, provides citations to the United States Code when it addresses immigration law. *See, e.g., Arizona v. United States*, 132 S. Ct. 2492, 2502 (2012). For simplicity and clarity, the Court will refer to this provision of the INA as "Section 1225."

who has not been lawfully admitted to the United States.  Defs.' Opp'n Appl. Prelim. Inj. 17–19, ECF No. 34.  Defendants further argue that the INA grants broad discretion to the Executive Branch, including the decision whether to initiate removal proceedings, so even if 8 U.S.C. § 1225(b)(2)(A) applies at places other than a port of entry, it still does not mandate the initiation of removal proceedings.  *Id.* at 14.  The Court finds that 8 U.S.C. § 1225(b)(2)(A) is not limited to aliens arriving in the United States at a port of entry, and it mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not "clearly and beyond a doubt entitled to be admitted."

<u>a.  The Scope of 8 U.S.C. § 1225(b)(2)(A)</u>

Section 1225 states: "An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C. § 1225(a)(1).  In the INA, the terms "admission" and "admitted" mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  *Id.* § 1101(a)(13)(A).  An alien "who has not been admitted," therefore, is an alien who has not lawfully entered into the United States "after inspection and authorization by an immigration officer."  *See id.*  By the Directive's terms, any Directive-eligible alien would be one "who has not been admitted" and is therefore deemed an "applicant for admission" for purposes of Section 1225.  *See generally* Pls.' Am. Compl. Ex. 1 (Directive), ECF No. 15-1.  Section 1225 further provides that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3).  Subject to certain exceptions not relevant to the present case, when an immigration officer encounters "an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt

entitled to be admitted, the alien *shall* be detained for a proceeding under [S]ection 1229a of this title." *Id.* § 1225(b)(2)(A) (emphasis added). The proceedings under Section 1229a are removal proceedings in the United States Immigration Courts.[7] *Id.* § 1229a.

Defendants contend that Section 1225(b)(2)(A)'s statement that the "alien shall be detained" applies only to applicants for admission who are "seeking admission" to the United States, as distinguished from aliens who are already present and merely encounter an immigration officer in the course of the officer carrying out his regular duties. Defs.' Opp'n Appl. Prelim. Inj. 17, ECF No. 34 (quoting 8 U.S.C. § 1225(b)(2)(A)). They assert that, while "aliens who are present in the United States and have not been admitted are deemed 'applicants for admission' pursuant to 8 U.S.C. § 1225(a)(1), they are not necessarily 'seeking admission' for purposes of [S]ection 1225(b)(2)." *Id.* at 17–18. Defendants contend that the phrase "alien seeking admission" means only those aliens coming or attempting to come into the United States at a port of entry. *Id.* at 18. The Court finds that the phrase "alien seeking admission" in Section 1225(b)(2)(A) is not limited to aliens arriving in the United States at a port of entry.

When construing a statute, the starting point should be the language of the statute itself, "for 'if the intent of Congress is clear, that is the end of the matter.'" *Arif v. Mukasey*, 509 F.3d 677, 681 (5th Cir. 2007) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409–10 (1993)). Because the meaning of certain words or phrases "may only become evident when placed in context . . . , the words of a statute must be read in their context and with a view to their place in the overall statutory

---

[7] Service of an NTA initiates removal proceedings against an alien. *See* 8 U.S.C. § 1229; 8 C.F.R. § 239.1. Once an NTA is issued, the government determines whether to detain the alien or release him on bond or his own recognizance. The issues presented in this case concern only the issuance of an NTA and do not involve the decision to detain an alien or release him on bond or his own recognizance.

11

scheme." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)). With respect to the INA, the Secretary of Homeland Security has the power to administer the statutory scheme, which includes the power to pass regulations elucidating specific provisions of the INA. *See* 8 U.S.C. § 1103(a)(1), (3); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue," the court must determine if the agency has provided an interpretation or clarification of the statute. *See Chevron*, 467 U.S. at 843–44. If the agency has provided such an interpretation, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Defendants ask the Court to construe Section 1225(b)(2)(A) as only applying to aliens who are coming or attempting to come into the United States at a port of entry. *See* Defs.' Opp'n Appl. Prelim. Inj. 18, ECF No. 34. Defendants have not provided the Court with the statutory construction analysis that would lead to such a conclusion.[8] *See id.* at 17–19. Accordingly, the Court will proceed with its own statutory construction analysis.

---

[8] Given their cursory analysis of the issue, the Court questions whether Defendants have sufficiently presented the statutory construction issue to the Court for determination. For example, Defendants mention in a footnote that Section 1225 typically applies to aliens encountered at a port of entry or near the border, while Section 1226 applies to aliens encountered in the interior of the United States, but they do not provide citations to any sources that would lead the Court to that conclusion. *See* Defs.' Opp'n Appl. Prelim. Inj. 17 n.14. Defendants also state that the phrase "alien seeking admission" has been interpreted to mean "only those aliens coming or attempting to come into the United States at a port of entry," but they again fail to cite any sources that would lead the Court to that conclusion. *See id.* at 18 (inviting the Court to compare Section 1225(b)(1)(A)(i) with Section 1225(b)(1)(A)(iii), but providing no analysis). In the Fifth Circuit, a party waives any issues that are inadequately briefed. *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001); *Regmi v. Gonzales*, 157 F. App'x 675, 676 (5th Cir. 2005) (per curiam). The parties must provide citations to relevant authority in support of their propositions. *See Castro v. McCord*, 259 F. App'x 664, 666 (5th Cir. 2007). Given the importance of the issue, the Court will address Defendants' arguments in spite of their minimal analysis and citations in support of their proposed construction of Section 1225(b)(2)(A).

The Court finds that the language of the statute itself does not limit the application of Section 1225(b)(2)(A) to aliens coming or attempting to come into the United States at a port of entry. Section 1225(b) applies generally to "applicants for admission," which includes aliens "present in the United States who [have] not been admitted." 8 U.S.C. § 1225(a)(1), (b). Section 1225(b)(1) applies to two categories of aliens: First, "aliens arriving in the United States," and second, aliens who have not been admitted or paroled into the United States and who have not affirmatively shown that they have been physically present in the United States continuously for two years prior to the date that an immigration officer determines they are inadmissible. *Id.* § 1225(b)(1)(A)(i), (iii). Section 1225(b)(2) applies to a separate category of aliens, described simply as "other aliens." *Id.* § 1225(b)(2). Section 1225(b)(2)(A) states that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained." *Id.* § 1225(b)(2)(A). Nothing in the language of Section 1225 limits the application of Section 1225(b)(2)(A) to aliens who are coming or attempting to come into the United States at a port of entry, and the Court has been unable to locate a statute providing a definition of the phrase "alien seeking admission." Because the language of the statute itself does not shed light on the meaning of "alien seeking admission," the Court will turn to relevant regulations that the Secretary of Homeland Security has promulgated in an effort to interpret Section 1225.

Regulations located at 8 C.F.R. §§ 235.1–235.12 relate to Section 1225 of the INA. Defendants rely specifically on 8 C.F.R. § 235.3(c) to support their proposition that Section 1225(b)(2)(A) applies only to aliens coming or attempting to come into the United States at a port of entry. *See* Defs.' Opp'n Appl. Prelim. Inj. 18–19, ECF No. 34. That regulation states that "any

arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to [8 U.S.C. § 1229a] shall be detained in accordance with [8 U.S.C. § 1225(b)]." 8 C.F.R. § 235.3(c). An "arriving alien" is defined as "an applicant for admission coming or attempting to come into the United States at a port of entry." 8 C.F.R. § 1.2. While this regulation *applies* Section 1225(b) to "arriving aliens," it does not *limit* the application of Section 1225(b)(2)(A) to "arriving aliens."[9] Notably, throughout the INA and related regulations, the terms "arriving alien" and "alien arriving in the United States" are used to refer to aliens coming or attempting to come into the United States at a port of entry. If Congress intended to limit the application of Section 1225(b)(2)(A) to aliens coming or attempting to come into the United States at a port of entry, it would have used the term "arriving alien" or "alien arriving in the United States" instead of the term "seeking admission." Because Congress has not done so, the Court rejects Defendants' proposed interpretation of Section 1225(b)(2)(A) and finds that Section 1225(b)(2)(A) applies to "applicants for admission"—that is, aliens who have not lawfully entered the United States after inspection and authorization by an immigration officer—whether they are arriving in the United States at a port of entry or are encountered by immigration officers elsewhere in the United States.

Next, the Court must determine whether Section 1225(b)(2)(A) requires immigration officers to initiate removal proceedings (i.e., issue an NTA) against aliens who are not "clearly and beyond

---

[9] The Court has also found several cases in which the government relied on Section 1225(b)(2)(A) to justify the detention of aliens who were encountered while coming or attempting to come into the United States at a port of entry. *See, e.g.*, *Bautista v. Sabol*, 862 F. Supp. 2d 375, 377, 379 (M.D. Pa. 2012); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1073, 1076 (9th Cir. 2006); *Mejia v. Ashcroft*, 360 F. Supp. 2d 647, 649–50 (D.N.J. 2005); *Tineo v. Ashcroft*, 350 F.3d 382, 387–88 (3d Cir. 2003); *Ferreras v. Ashcroft*, 160 F. Supp. 2d 617, 622–23 (S.D.N.Y. 2001). However, the Court has been unable to locate any statutory provisions, regulations, or cases limiting the application of Section 1225(b)(2)(A) to aliens coming or attempting to come into the United States at a port of entry, and the Court finds it inappropriate to impose such a limitation. Again, Defendants have not provided the Court with citations to or substantive analysis of relevant statutes, regulations, and case law that would support such a limitation.

a doubt entitled to be admitted," or whether the statute leaves room at that level for the exercise of prosecutorial discretion.

### b.  Whether 8 U.S.C. § 1225(b)(2)(A) is Mandatory

Plaintiffs contend that Section 1225(b)(2)(A) creates a mandatory duty for immigration officers to initiate removal proceedings against aliens who are not "clearly and beyond a doubt entitled to be admitted."  Br. Supp. Pls.' Appl. Prelim. Inj. 5, ECF No. 26. Plaintiffs assert that the INA eliminates ICE's discretion to enforce the immigration laws because Section 1225 "requires the agency to enforce the Act [and] also sets forth specific enforcement procedures."  *Id.* at 6 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)).  Defendants contend that the Executive Branch has long exercised prosecutorial discretion in the immigration context, often in the form of deferred action.  Defs.' Opp'n Appl. Prelim. Inj. 5–6, 14, ECF No. 34 (citing *Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC")*, 525 U.S. 471, 483–84 (1999), *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012), and *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997)). Defendants also assert that the word "shall" does not impose a mandatory duty on immigration officers to initiate removal proceedings.  *Id.* at 19, 19 n.17 (citing *In re E-R-M & L-R-M*, 25 I. & N. Dec. 520, 522 (B.I.A. 2011), *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760–62 (2005), and *City of Chi. v. Morales*, 527 U.S. 41, 62 n.32 (1999)).  The Court finds that Congress's use of the word "shall" in Section 1225(b)(2)(A) imposes a mandatory obligation on immigration officers to initiate removal proceedings against aliens they encounter who are not "clearly and beyond a doubt entitled to be admitted."

The Supreme Court has noted that Congress's use of the word "shall" in a statute imposes a mandatory duty on an agency to act.  *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008)

15

(citing 29 U.S.C. § 629(d) and noting that "[t]he [EEOC's] duty to initiate formal dispute resolution processes upon receipt of a charge is mandatory in the ADEA context"); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting that Congress's use of the word "shall" indicates an intent to "impose discretionless obligations"). In contrast, Congress's use of the word "may" in a statute merely imposes a permissive duty, and it leaves the agency with discretion to determine when to act. *See Lopez*, 531 U.S. at 421. Application of these basic rules leads the Court to conclude that Section 1225(b)(2)(A)'s use of the word "shall" imposes a mandatory duty on immigration officers to initiate removal proceedings whenever they encounter "applicants for admission" who are not "clearly and beyond a doubt entitled to be admitted." *See* 8 U.S.C. § 1225(b)(2)(A). Nevertheless, Defendants cite several cases in support of their proposition that the term "shall" in Section 1225(b)(2)(A) does not impose a mandatory obligation on immigration officers, but instead leaves the decision to initiate removal proceedings subject to an immigration officer's prosecutorial discretion. Defs.' Opp'n Appl. Prelim. Inj. 13, 19, 19 n.17, ECF No. 34 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 (1985); *In re E-R-M & L-R-M*, 25 I. & N. Dec. at 522; *Gonzales*, 545 U.S. at 760–62; *Morales*, 527 U.S. at 62 n.32).

The Court acknowledges that immigration law is an area of law where DHS and ICE have traditionally had discretion to prioritize their enforcement efforts to promote the efficient use of their limited financial resources and further their goal of ensuring public safety in the United States. As recently as last year, the Supreme Court acknowledged that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499. "Discretion in the enforcement of immigration law embraces immediate human concerns," including the desire to be near one's family, an alien's ties to the community, an alien's military service, and

international relations. *Id.* Concerns that justify executive discretion in the criminal law context apply in the immigration law context as well. *Reno*, 525 U.S. at 489–91. Generally, the Executive must consider "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Id.* at 490. Judicial review of executive decisions to enforce criminal or immigration laws could result in unnecessary delays of proceedings, "chill[ing] law enforcement by subjecting the prosecutor's [or immigration official's] motives and decisionmaking to outside inquiry," and "undermin[ing] prosecutorial effectiveness." *Id.* The Supreme Court, speaking generally with regard to immigration law, has noted that "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all," and ICE "may decline to institute proceedings, terminate proceedings, or decline to execute a final order of removal" "to ameliorate a harsh and unjust outcome." *Arizona*, 132 S. Ct. at 2499; *Reno*, 525 U.S. at 484. The Supreme Court has also approved of ICE's utilization of "deferred action," which may occur "at any stage of the administrative process." *Reno*, 525 U.S. at 484. While DHS and ICE generally have the discretion to determine when to initiate removal proceedings, the Supreme Court has noted that "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 833. The Court finds that Congress, by using the mandatory term "shall" in Section 1225(b)(2)(A), has circumscribed ICE's power to exercise discretion when determining against which "applicants for admission" it will initiate removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(A).

The Court does not find Defendants' cited cases where the word "shall" left room for discretion controlling. First, in *In re E-R-M & L-R-M*, the Board of Immigration Appeals found that the use of the term "shall" in Section 1225(b)(1)(A)(i) did not limit the prosecutorial discretion of DHS to place arriving aliens in removal proceedings under Section 1229a, rather than expedited removal proceedings. 52 I. & N. Dec. at 520. In that case, the government initiated removal proceedings against the respondents under Section 1229a when they arrived in the United States from Cuba. *Id.* at 520–21. The respondents were subject to expedited removal proceedings under Section 1225(b)(1)(A)(i), but they were also entitled to Section 1229a removal proceedings under Section 1225(b)(2)(A). *Compare* 8 U.S.C. § 1225(b)(1)(A)(i) ("If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States . . . is inadmissible under [S]ection 1182(a)(6)(C) or 1182 (a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [S]ection 1158 of this title or a fear of persecution."), *with id.* § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under [S]ection 1229a of this title."). The Immigration Judge found that it lacked jurisdiction over the Section 1229a removal proceedings because the respondents were subject to mandatory expedited removal proceedings under Section 1225(b)(1)(A)(i). *In re E-R-M & L-R-M*, 25 I. & N. Dec. at 521.

Presented with mutually exclusive mandatory provisions, the Board of Immigration Appeals vacated the Immigration Judge's decision and determined that, when there is a choice between two avenues of removal proceedings, both of which contain the word "shall," the "shall" in Section

1225(b)(1)(A)(i) concerning expedited removal proceedings can be interpreted as "may."  *Id.* at 522–24.

In the present case, Directive-eligible aliens would fall under Section 1225(b)(2)(A)'s instruction that immigration officers "shall" initiate removal proceedings under Section 1229a. Even if Directive-eligible aliens were encountered upon arrival in the United States (perhaps after a brief departure from the country) so that Section 1225(b)(1)(A)(i)'s expedited removal proceedings would also apply, the Government's discretion could only be exercised to determine whether to proceed under Section 1225(b)(1)(A)(i)'s expedited removal proceedings or the removal proceedings under Section 1229a.  Nothing in *In re E-R-M & L-R-M* suggests that DHS and ICE have discretion to refrain from initiating removal proceedings at all.

In *Heckler v. Chaney*, the Supreme Court found that the Federal Food, Drug, and Cosmetic Act's ("FDCA") section on criminal sanctions did not impose a mandatory duty on the Food and Drug Administration ("FDA") to prosecute every violation of the Act, even though the statute provided that "any person who violates the Act's substantive prohibitions 'shall be imprisoned . . . or fined.'" 470 U.S. at 835 (quoting 21 U.S.C. § 333).  The Supreme Court found that this seemingly mandatory language did not require prosecution of every violation of the Act, "particularly since the Act charges the Secretary only with recommending prosecution," and "any criminal prosecutions must be initiated by the Attorney General."  *Id.*  The Supreme Court found that the Act's enforcement provisions, on the whole, committed "complete discretion to the Secretary to decide how and when they should be exercised."  *Id.*  The INA, in contrast, is not structured in such a way that DHS and ICE have complete discretion to decide when to initiate removal proceedings.  Instead, Section 1225(b)(2)(A) of the INA requires immigration officers to initiate removal proceedings

whenever they encounter applicants for admission who are not "clearly and beyond a doubt entitled to be admitted," and nothing in the INA or related regulations suggests that Congress's use of the term "shall" imposes anything other than a mandatory duty.

In *City of Chicago v. Morales*, the Supreme Court addressed the constitutionality of an Illinois city ordinance that stated: "Whenever a police officer observes a person whom he reasonably believes to be a criminal street gang member loitering in any public place with one or more other persons, he shall order all such persons to disperse and remove themselves from the area." 527 U.S. at 47 n.2. The Supreme Court found that the ordinance was unconstitutionally vague because it did not "provide sufficiently specific limits on the enforcement discretion of the police 'to meet constitutional standards for definiteness and clarity.'" *Id.* at 64. The Supreme Court also noted that the word "shall" was not mandatory, because the City—the legislative body that drafted the ordinance—conceded that "police officers must use some discretion in deciding when and where to enforce city ordinances." *Id.* at 62 n.32. Similarly, in *Town of Castle Rock, Colorado v. Gonzales*, the respondent filed suit under 42 U.S.C. § 1983 alleging that the Town of Castle Rock, Colorado violated her due process rights when its police officers failed to respond to her reports that her estranged husband had taken their children in violation of her restraining order against him. 545 U.S. at 751, 754. Colorado law provided in relevant part:

> (a) . . . A peace officer shall use every reasonable means to enforce a restraining order.
> (b) A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable cause that:
> (I) The restrained person has violated or attempted to violate any provision of a restraining order; and

> (II) The restrained person has been properly served with a copy of the restraining order or the restrained person has received actual notice of the existence and substance of such order.
>
> (c) . . . A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry.

*Id.* at 752 (quoting Colo. Rev. Stat. § 18-6-803.5(3) (Lexis 1999)). The Supreme Court found that this statute did not create a mandatory duty for police officers to enforce restraining orders. *Id.* at 760. The Supreme Court stated that "[a] well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." *Id.* at 760. However, the Supreme Court noted that the legislature may override normal police discretion by providing "a true mandate[, which] would require some stronger indication . . . than 'shall use every reasonable means to enforce a restraining order' (or even 'shall arrest . . . or . . . seek a warrant')." *Id.* at 760–61.

The Supreme Court in *City of Chicago v. Morales* was examining the city ordinance to determine whether it provided sufficient notice of what constituted prohibited conduct. *Morales*, 527 U.S. at 59–60. The Supreme Court in *Town of Castle Rock, Colorado v. Gonzales* was examining the statute to determine whether it conferred a property right for purposes of the Due Process Clause of the Fourteenth Amendment. *Gonzales*, 545 U.S. at 766. Here, the Court must determine what Section 1225 requires and whether the Directive and related provisions of the Morton Memorandum directly conflict with those statutory requirements. Accordingly, the Court's analysis in the present case is different from the Supreme Court's analysis in *Morales* and *Gonzales*. Considering Section 1225 as a whole, the Court finds that Congress has used language indicating an intent to impose a mandatory duty on immigration officers in Section 1225(b)(2)(A). Specifically, the statute sets out a detailed scheme for the initiation of removal proceedings. For example, Section 1225(b)(1) applies expedited removal proceedings to particular aliens, while Section 1225(b)(2)

applies traditional removal proceedings to another class of aliens.  *Compare* 8 U.S.C. § 1225(b)(1), *with id.* § 1225(b)(2).  Sections 1225(b)(2)(B) and (C) also provide specific exceptions to the initiation of removal proceedings required by Section 1225(b)(2)(A).  Given the use of the mandatory term "shall," the structure of Section 1225(b) as a whole, and the defined exceptions to the initiation of removal proceedings located in Sections 1225(b)(2)(B) and (C), the Court finds that Section 1225(b)(2)(A) imposes a mandatory duty on immigration officers to initiate removal proceedings whenever they encounter an "applicant for admission" who "is not clearly and beyond a doubt entitled to be admitted."

### c.  Whether the Court Can Still Uphold DHS's Discretion

When the Executive "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," and "[c]ourts can sustain exclusive [executive] control in such a case" only if that particular subject matter "is within [the Executive's] domain and beyond control by Congress."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–40 (1952) (Jackson, J., concurring).  Because Section 1225(b)(2)(A) expressly requires immigration officers to initiate removal proceedings against applicants for admission who are not "clearly and beyond a doubt entitled to be admitted," the Court can uphold DHS's discretion to refrain from initiating removal proceedings under those circumstances only if Congress does not have power to legislate in the area of immigration law with regard to the removal of aliens.

Congress's power over immigration is rooted in the Constitution, is inherent in the powers of sovereign nations, and is an incident of international law.  U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have power . . . [t]o establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States."); *Chae Chan Ping v. United States*,

130 U.S. 581, 603–07 (1889) ("That the government of the United States, through the action of the legislative department, can exclude aliens from its territory is a proposition which we do not think open to controversy."); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."); *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) ("The right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97 (1952) (Frankfurter, J., concurring) ("The conditions for entry of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress . . . ."); *Arizona*, 132 S. Ct. at 2498 ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). Congress unquestionably has the ability to legislate in the area of immigration law with regard to the removal of aliens. Because immigration law is not "within [the Executive's] domain and beyond control by Congress," Congress has the ability to eliminate DHS's discretion with respect to when to initiate removal proceedings against an alien, and DHS cannot implement measures that are incompatible with Congressional intent.[10]  *See Heckler*, 470 U.S. at 833

---

[10]  At the April 8, 2013 hearing, Defendants asserted that "as a statutory matter" Congress has the ability to require every immigration officer that encounters an alien who is not "clearly and beyond a doubt entitled to be admitted" to issue an NTA to such alien, but Congress may not have the ability to do so "as

("Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.").

Because Congress has the power to legislate in the area of immigration law and has expressed its intent to require the initiation of removal proceedings against aliens when the requirements of Section 1225(b)(2)(A) are satisfied, the Court finds that DHS does not have discretion to refuse to initiate removal proceedings when the requirements of Section 1225(b)(2)(A) are satisfied. However, DHS's ability to exercise its discretion at later stages in the removal process by, for example, cancelling the Notice to Appear or moving to dismiss the removal proceedings, is not at issue in the present case, and nothing in this Order limits DHS's discretion at later stages of the removal process. *See* 8 C.F.R. § 239.2(a) (providing for cancellation of a Notice to Appear prior to jurisdiction vesting with an immigration judge); *id.* § 239.2(c) (providing for a motion to dismiss removal proceedings after jurisdiction vests with an immigration judge); *In re G-N-C*, 22 I. & N. Dec. 281, 283–84 (B.I.A. 1998) (noting that, pursuant to 8 C.F.R. § 239.2(a), an immigration officer "authorized to issue a Notice to Appear has complete power to cancel such notice prior to jurisdiction vesting with the Immigration Judge"). Through the exercise of discretion at these later stages in the removal proceedings, DHS appears capable of prioritizing its removal objectives and conserving its limited resources.

---

a constitutional matter." *See* Hr'g Tr. Defendants argued that Congress might not have the ability to impose such a mandatory duty "as a constitutional matter" because Congress's implementation of a mandatory duty might infringe on the Executive's ability to use its discretion in the immigration law context to "take Care that the Laws be faithfully executed." *Id.*; *see* U.S. Const. art. II, § 3. The Court finds this argument unavailing given the Supreme Court's recognition of Congress's broad power in the area of immigration law. *See supra* Part III.A.1.c. (discussing congressional power in the area of immigration law).

Having determined that 8 U.S.C. § 1225(b)(2)(A) requires the initiation of removal proceedings whenever an immigration officer encounters an "applicant for admission" who is not "clearly and beyond a doubt entitled to be admitted," the Court now turns to the issue of whether relief is available under the Declaratory Judgment Act.

### 2. Declaratory Judgment Act

Plaintiffs ultimately seek a declaratory judgment to the effect that the Directive and related provisions of the Morton Memorandum are unlawful and in violation of various statutes and the Constitution of the United States, along with an injunction preventing Defendants from implementing or enforcing the Directive or taking any adverse action against Plaintiffs for not following the Directive. Pls.' Am. Compl. ¶¶ A–F, ECF No. 15. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Declaratory Judgment Act is not an independent source of subject matter jurisdiction, but merely provides additional remedies. *See Earnest v. Lowentritt*, 690 F.2d 1198, 1203 (5th Cir. 1982). It permits an award of declaratory relief only when there is another basis for jurisdiction present. *TTEA v. Ysleta del Sur Pueblo*, 181 F.3d 676, 681 (5th Cir. 1999). The existence of an "actual controversy" in a constitutional sense is necessary to sustain jurisdiction under the Declaratory Judgment Act. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). The district court must determine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

25

warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The plaintiff must have suffered "an invasion of a legally protected interest," which is "traditionally thought to be capable of resolution through the judicial process," and is currently fit for judicial review. *Magaw*, 132 F.3d at 280 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and *Flast v. Cohen*, 392 U.S. 83, 97 (1968)).

The Court previously determined that Plaintiffs have suffered an invasion of a legally protected interest that is capable of resolution through the judicial process, because they face the threat of disciplinary action if they issue an NTA to a Directive-eligible alien.[11] *See* Order 18–24, 22 n.5, Jan. 24, 2013, ECF No. 41; *see also* Pls.' Am. Compl. ¶ 50, ECF No. 15; App. Pls.' Resp.

---

[11] The Code of Federal Regulations provides that "[a]ny immigration officer, or supervisor thereof, performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such alien." 8 C.F.R. § 239.1(a). In addition, a specific list of "officers, or officers acting in such capacity, may issue a notice to appear" at locations other than a port-of-entry. *Id.* Immigration enforcement agents and deportation officers are not specifically listed as having authority to issue NTAs. *See generally id.* However, subsection 41 states that "[o]ther officers or employees of the Department or of the United States who are delegated the authority as provided by 8 C.F.R. 1.2 to issue notices to appear" may issue NTAs. *Id.* § 239(a)(41). In 8 C.F.R. § 235.6, the Secretary of DHS has specifically delegated "immigration officers" the authority to issue a Form I-862, which is an NTA, "[i]f, in accordance with the provisions of [8 U.S.C. § 1225(b)(2)(A)], the examining immigration officer detains an alien for a proceeding before an immigration judge under [8 U.S.C. § 1229a]." 8 C.F.R. § 235.6(a)(1)(i). This regulation specifically gives immigration enforcement agents and deportation officers the authority to issue NTAs in the circumstances described in Section 1225(b)(2)(A). *See* 8 C.F.R. § 1.2 (defining the term "immigration officer" to include immigration enforcement agents and deportation officers).

Defendants assert that Plaintiffs are not harmed by the Directive and related provisions of the Morton Memorandum because immigration enforcement agents and deportation officers are not authorized to issue NTAs. Defs.' Opp'n Appl. Prelim. Inj. 10, ECF No. 34. At the hearing on Plaintiffs' Application for Preliminary Injunction, Defendants presented a December 5, 2011 Memorandum by Gary Mead discussing the delegation of authority to issue NTAs. *See* Gov't Ex. 4 (Mead Memorandum). However, this memorandum relates to Section 287(g) agreements with state governments and is inapplicable to the issues presented in the present case. *See generally id.*; *see also* 8 U.S.C. § 1357(g). In their opposition to Plaintiffs' Application for Preliminary Injunction and at the April 8, 2013 hearing, Defendants provided no authority indicating that immigration enforcement agents and deportation officers do not have authority to issue NTAs pursuant to Section 1225(b)(2)(A). *See generally* Defs.' Opp'n Appl. Prelim. Inj., ECF No. 34; Hr'g Tr. (At the April 8, 2013 hearing, the Court gave the parties as much time as they thought they needed to present their arguments and supporting authority.).

Mot. Dismiss Ex. 3 (Doebler Aff.) ¶¶ 2–9, ECF No. 31; *id.* Ex. 2 (Engle Aff.) ¶¶ 8, 20; Defs.' Opp'n

Appl. Prelim. Inj. Attachment G (Ellis Decl.), Ex. B (Doebler Notice of Proposed Suspension), ECF

No. 34-7; *id.* Attachment G (Ellis Decl.), Ex. C (Doebler Decision on Proposed Suspension).

Accordingly, the only thing left to determine is whether the issues are currently fit for judicial

review.

In *Abbott Laboratories v. Gardner*, the Supreme Court permitted the petitioner drug

companies and their association to challenge regulations promulgated by the Commissioner of Food

and Drugs designed to implement labeling provisions of the Federal Food, Drug, and Cosmetic Act.

387 U.S. 136, 152 (1967).  The Supreme Court held that the issues presented were "appropriate for

judicial resolution at this time" because "the issue tendered was a purely legal one," and "the impact

of the regulations upon the petitioners [was] sufficiently direct and immediate." *Id.* at 148, 152.  The

Supreme Court allowed the petitioners to pursue relief under the Declaratory Judgment Act even

though none of them had been prosecuted for failure to comply with the challenged regulations.  *Id.*

at 152–54; *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1965) (finding

claims sufficiently ripe for judicial review where the issues involved purely legal questions and the

threat of harm was "certainly impending").

The Court finds the present situation analogous to that presented in *Gardner*.  Plaintiffs'

causes of action require an analysis of whether the Directive and related portions of the Morton

Memorandum are consistent with (1) federal law, (2) the separation-of-powers doctrine, (3) the

Executive's duty under the Constitution to take care that the laws are faithfully executed, and (4) the

Administrative Procedure Act.  *See* Pls.' Am. Compl. ¶¶ 67–80, 92–116, ECF No. 15.  These causes

of action present primarily legal issues that are the appropriate subject matter of a declaratory

judgment action.   Additionally, the impact of the Directive and related portions of the Morton

Memorandum is "sufficiently direct and immediate," because Plaintiffs face the threat of disciplinary

action if they issue an NTA to a Directive-eligible alien.   *See* Order 18–24, 22 n.5, Jan. 24, 2013,

ECF No. 41; *see also* Pls.' Am. Compl. ¶ 50, ECF No. 15; App. Pls.' Resp. Mot. Dismiss Ex. 3

(Doebler Aff.) ¶¶ 2–9, ECF No. 31; *id.* Ex. 2 (Engle Aff.) ¶¶ 8, 20; Defs.' Opp'n Appl. Prelim. Inj.

Attachment G (Ellis Decl.), Ex. B (Doebler Notice of Proposed Suspension), ECF No. 34-7; *id.*

Attachment G (Ellis Decl.), Ex. C (Doebler Decision on Proposed Suspension).   Accordingly, the

Court finds that the issues presented are "fit for judicial review," and relief pursuant to the

Declaratory Judgment Act is available to Plaintiffs.[12]   The Court will now turn to the issue of this

Court's jurisdiction under the Administrative Procedure Act to review the Directive and the Morton

Memorandum.

### 3.   Administrative Procedure Act

Plaintiffs argue that the Directive and related provisions of the Morton Memorandum violate

the Administrative Procedure Act ("APA") by conferring a benefit without appropriate regulatory

implementation.   Br. Supp. Pls.' Appl. Prelim. Inj. 15–22, ECF No. 26.   Specifically, Plaintiffs

contend that the Directive's establishment of criteria for exception from removal and definition of

a class with affirmative eligibility for benefits is essentially a "rule" under the APA that must be

promulgated through the formal rulemaking procedure.   *Id.* at 16.   Plaintiffs argue that because the

---

[12]   While the Court has found that relief pursuant to the Declaratory Judgment Act is available to Plaintiffs on all their remaining causes of action, this Order only addresses the issuance of a preliminary injunction based on Plaintiffs' likelihood of success on the merits of their first and sixth causes of action. *See* Pls.' Am. Compl. ¶¶ 67–73, ECF No. 15 (asserting that the Directive and related provisions of the Morton Memorandum violate federal statutes requiring the initiation of removal proceedings); *id.* ¶¶ 110–16 (asserting that the Directive and related provisions of the Morton Memorandum violate the Administrative Procedure Act).

Secretary of Homeland Security has not complied with the APA's rulemaking procedure, the Directive and Morton Memorandum violate the APA. Defendants argue that this Court lacks jurisdiction to review Plaintiffs' APA claims because the decision whether to initiate removal proceedings is a matter committed to agency discretion. Defs.' Opp'n Appl. Prelim. Inj. 12–16, ECF No. 34. Defendants also contend that the Directive and Morton Memorandum reflect general statements of policy by the agency, which are not subject to notice and comment and the requirements of the rulemaking process. *Id.* at 21. Defendants additionally argue that the Directive and Morton Memorandum do not confer any benefits, but simply provide guidance on situations where deferred action would be appropriate.

### a.  Whether the Court Has Jurisdiction Under the APA

The Court must first address its jurisdiction to review the Directive and the Morton Memorandum under the APA. Defendants argue that this Court lacks jurisdiction because the INA grants broad discretion to the Executive Branch, including the decision to initiate removal proceedings. Defs.' Opp'n Appl. Prelim. Inj. 14, ECF No. 34. Plaintiffs recognize that the Executive Branch has discretion to determine its immigration law enforcement priorities, but they contend judicial review is available in the present case because Congress has explicitly removed the Executive's discretion to initiate removal proceedings in 8 U.S.C. § 1225. Pls.' Reply Appl. Prelim. Inj. 4–6, ECF No. 36. The Court finds that jurisdiction exists to review the Directive and related provisions of the Morton Memorandum.

The Supreme Court addressed "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review" under the APA in *Heckler*, 470 U.S. at 823. The APA's provisions for judicial review of agency

actions are contained in 5 U.S.C. §§ 701–706.  *See id.* at 828.  "Any person 'adversely affected or aggrieved' by agency action . . . , 'including a failure to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court.'"  *Id.* (quoting 5 U.S.C. §§ 702, 704).  Section 706 governs the standards a court is to apply when reviewing agency actions.  *See* 5 U.S.C. § 706.  "But before any review at all may be had, a party must first clear the hurdle of § 701(a)."  *Heckler*, 470 U.S. at 828.  Section 701 states that the chapter on judicial review "applies, according to the provisions thereof, except to the extent that-- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).  When the statute at issue does not expressly preclude judicial review of agency actions, the court must analyze whether judicial review is available under Section 701(a)(2).  "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler*, 470 U.S. at 830.  An agency's decision not to take enforcement action is "presumed immune from judicial review under § 701(a)(2)."  *Id.* at 832.  However, this presumption may be rebutted "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  *Id.* at 832–33.  If Congress has "indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2), and courts may require that the agency follow that law."  *Id.* at 834–35.  If Congress has not done so, "then an agency refusal to institute proceedings is a decision 'committed to agency discretion by law' within the meaning of" Section 701(a)(2), and judicial review is unavailable.  *Id.* at 835.

In *Dunlop v. Bachowski*, a union employee brought suit under the Labor Management Reporting and Disclosure Act ("LMRDA") asking the Secretary of Labor to investigate and file suit to set aside a union election.   421 U.S. 560, 563–64 (1975).  The LMRDA provided that, upon filing of a complaint by a union member, "[t]he Secretary shall investgate such complaint and, if he finds probable cause to believe that a violation . . . has occurred . . . he shall . . . bring a civil action . . . ." 29 U.S.C. § 482.   The Supreme Court held that judicial review of the Secretary's decision not to bring a civil action was available, because "the language of the LMRDA indicated that the Secretary was required to file suit if certain 'clearly defined' factors were present."  *Heckler*, 470 U.S. at 834 (quoting *Bachowski v. Brennan*, 502 F.2d 79, 87–88 (3d Cir. 1974)); *see Dunlop*, 421 U.S. at 567–68.   The statute at issue in *Dunlop* "quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power."  *Heckler*, 470 U.S. at 834.   Therefore, judicial review was available.  *Id.*

In *Heckler v. Chaney*, the Supreme Court addressed the extent to which determinations by the Food and Drug Administration ("FDA") not to exercise its enforcement authority over the use of drugs in interstate commerce may be judicially reviewed.  *Id.* at 828.   The Federal Food, Drug, and Cosmetic Act ("FDCA") contained a general enforcement provision providing that "'[t]he Secretary is *authorized* to conduct examinations and investigations . . . .'"  *Id.* at 835 (quoting 21 U.S.C. § 372).   The provision addressing injunctions provided "no indication of when an injunction should be sought," and the provision providing for seizures of offending food, drug, or cosmetic articles stated that the offending items "'shall be liable to be proceeded against.'"  *Id.* (quoting 21 U.S.C. §§ 332, 334).   The provision providing for criminal sanctions provided that "any person who violates the Act's substantive prohibitions 'shall be imprisoned . . . or fined.'"  *Id.* (quoting 21 U.S.C.

§ 333).  The Supreme Court held that this language did not mandate criminal prosecution of every person who violated the FDCA, "particularly since the Act charge[d] the Secretary only with recommending prosecution," and any criminal prosecutions had to be initiated by the Attorney General.  *Id.* Unlike the statute at issue in *Dunlop*, the statute in *Heckler* did not "clearly [withdraw] discretion from the agency and provide[] guidelines for exercise of its enforcement power."  *Id.* at 834–37.

In the present case, Plaintiffs are challenging DHS and ICE's decision not to issue NTAs and initiate removal proceedings against aliens who satisfy the criteria set out in the Directive and the Morton Memorandum. Because the INA does not expressly preclude judicial review over the agency's decision not to initiate removal proceedings, the Court must determine whether there is "law to apply" under Section 701(a)(2) so that the Court has jurisdiction "to require that the agency follow that law." *See Heckler*, 470 U.S. at 834–35.  The Court finds the statute at issue in the present case akin to the one at issue in *Dunlop*.

As discussed previously, the Court finds that Section 1225(b)(2)(A) clearly defines when inspecting immigration officers are required to initiate removal proceedings against an alien.  *See supra* Part III.A.1.b.  Congress has used the mandatory term "shall" to describe immigration officers' duty to initiate removal proceedings, and the statute sets out a detailed scheme for when initiation of removal proceedings is required.[13]  *Compare* 8 U.S.C. § 1225(b)(1) *with id.* § 1225(b)(2).  The specific exceptions to the initiation of removal proceedings required by Section 1225(b)(2)(A)

---

[13] At the hearing on Plaintiffs' Application for Preliminary Injunction, Defendants did not dispute that the use of the term "shall" is typically used to impose a mandatory duty.  *See* Hr'g Tr.  However, Defendants argued that Section 1225(b)(2)(A) did not provide specific enough standards to remove DHS's discretion with regard to when to initiate removal proceedings.  *See id.*

further define when immigration officers must initiate removal proceedings. *See id.* § 1225(b)(2)(B), (C). Given the use of the mandatory term "shall," the structure of Section 1225(b) as a whole, and the defined exceptions to the initiation of removal proceedings located in Sections 1225(b)(2)(B) and (C), the Court finds that Section 1225(b)(2)(A) provides clearly defined factors for when inspecting immigration officers are required to initiate removal proceedings against an alien, just as the statute at issue in *Dunlop* provided certain clearly defined factors for when the Secretary of Labor was required to file a civil action. *See Heckler*, 470 U.S. at 834 (quoting *Bachowski*, 502 F.2d at 87–88); *Dunlop*, 421 U.S. at 567–68. Accordingly, the Court finds that there is "law to apply" so that judicial review is available to ensure that DHS complies with the law pursuant to 5 U.S.C. § 701(a)(2). *See Heckler*, 470 U.S. at 834–35.

### b. Whether Plaintiffs Are Entitled to Relief Under the APA

Having found that Plaintiffs have cleared the jurisdictional hurdle of Section 701(a), the Court must now determine if Plaintiffs are entitled to relief pursuant to the APA. As stated previously, "[a]ny person 'adversely affected or aggrieved' by agency action . . . , 'including a failure to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court.'" *Heckler*, 470 U.S. at 828 (quoting 5 U.S.C. §§ 702, 704). Once those statutory requirements are satisfied, the court reviewing the agency's action shall:

> hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;

> (E) unsupported by substantial evidence in a case subject to [S]ections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

The Court has already determined that Plaintiffs are adversely affected or aggrieved by the Directive and Morton Memorandum. *See* Order 21–22, Jan. 24, 2013, ECF No. 41. For agency action to be "final," two conditions must be satisfied. *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78 (internal citation omitted). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The Court finds that the Directive and related provisions of the Morton Memorandum are sufficiently final to warrant judicial review. First, DHS has already begun implementing the Directive and related provisions of the Morton Memorandum by granting deferred action to individuals who satisfy the criteria set forth in the Directive. *See* Pls.' Ex. 10 (Deferred Action for Childhood Arrivals Process); Pls.' Ex. 14 (Nat'l Standard Operating Procedures (SOP) Deferred Action for Childhood Arrivals (DACA)). This indicates that the Directive and related provisions of the Morton Memorandum are not "merely tentative or interlocutory" in nature. *See Bennett*, 520 U.S. at 177–78. Second, the Directive sets forth specific criteria that must be satisfied before an individual is considered for an exercise of prosecutorial discretion. *See* Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No. 15-1. If the criteria of the Directive are satisfied, ICE agents are instructed to defer action against the alien "for a period

of two years, subject to renewal." *Id.* at 2.  Legal consequences flow from a grant of deferred action,

because "an individual whose case has been deferred is not considered to be unlawfully present

during the period in which deferred action is in effect."  Mot. Supplement R. on Appl. Prelim. Inj.

Attach. 1 (Jung Decl.), Ex. A (USCIS Frequently Asked Questions), at 2, ECF No. 39-1.  Additional

legal consequences flow from the Directive and related provisions of the Morton Memorandum,

because if Plaintiffs comply with Section 1225 and issue an NTA to a Directive-eligible alien, they

face the threat of disciplinary action.  *See* Order 18–24, 22 n.5, Jan. 24, 2013, ECF No. 41; *see also*

Pls.' Am. Compl. ¶ 50, ECF No. 15; App. Pls.' Resp. Mot. Dismiss Ex. 3 (Doebler Aff.) ¶¶ 2–9,

ECF No. 31; *id.* Ex. 2 (Engle Aff.) ¶¶ 8, 20; Defs.' Opp'n Appl. Prelim. Inj. Attachment G (Ellis

Decl.), Ex. B (Doebler Notice of Proposed Suspension), ECF No. 34-7; *id.* Attachment G (Ellis

Decl.), Ex. C (Doebler Decision on Proposed Suspension).  Accordingly, the Court finds that the

Directive and related provisions of the Morton Memorandum constitute "final agency action" for

which judicial review is available.  *See* 5 U.S.C. § 704.

As explained below, the Court cannot determine the threshold issue of whether "there is no

other adequate remedy in a court" at this time.  The Court will complete its analysis of the merits of

Plaintiffs' APA claims after the parties have addressed the remaining jurisdictional issues before the

Court.

### B.  Threat of Irreparable Harm in the Absence of Preliminary Relief

To obtain a preliminary injunction, Plaintiffs must demonstrate a "likelihood of substantial

and immediate irreparable injury."  *See O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).  They must

demonstrate that irreparable injury is *likely* in the absence of an injunction, rather than a mere

possibility.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  There must be a

showing of a real or immediate threat that the plaintiffs will be wronged in the future. *See City of*

*Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Defendants contend that this Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs

have essentially alleged federal employment disputes that may proceed only under the Civil Service

Reform Act ("CSRA").   Defs.' Opp'n Appl. Prelim. Inj. 16, ECF No. 34 (citing 5 U.S.C.

§ 7103(a)(9)(C)(ii)).  Defendants previously raised this issue in a footnote in their Motion to Dismiss

and addressed the argument further in their reply brief.  *See* Defs.' Mot. Dismiss 11 n.3, ECF No.

23; Defs.' Reply Mot. Dismiss 5, ECF No. 33.  They again addressed this issue in their opposition

to Plaintiff's Application for Preliminary Injunctive Relief, but in no greater detail than at the motion

to dismiss stage.  *See* Defs.' Opp'n Appl. Prelim. Inj. 16, ECF No. 34.   At the hearing on Plaintiffs'

Application for Preliminary Injunction, the parties presented new facts that bear on the application

of the CSRA, including details about Plaintiff Crane issuing a demand to bargain under Collective

Bargaining Agreement 2000, to which Plaintiffs are parties.  *See* Hr'g Tr.; *see also* Defs.' Opp'n

Appl. Prelim. Inj. Attach. G (Ellis Decl.), Ex. A (Agreement 2000 Between U.S. Immigration and

Naturalization Service and National Immigration and Naturalization Service Council), ECF No.

34-7.

This is an inadequate way to address the Court's jurisdiction.  The Court previously criticized

Defendants' failure to adequately raise the issue of whether the CSRA precludes this Court's

jurisdiction in its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss.  *See*

Order 32–33, Jan. 24, 2013, ECF No. 41.  Presenting piecemeal arguments in a footnote in their

motion to dismiss, in their reply brief, in their opposition to Plaintiffs' Application for Preliminary

Injunction, and then entirely new arguments at an evidentiary hearing is an inappropriate way to

challenge jurisdiction.  In the Fifth Circuit, a party waives any issues that are inadequately briefed. *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001); *Regmi v. Gonzales*, 157 F. App'x 675, 676 (5th Cir. 2005) (per curiam).  However, the issue of a federal court's subject matter jurisdiction cannot be waived.  *See* Fed. R. Civ. P. 12(h)(3); *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996) (citing *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76 (1941)).  The CSRA issue could affect the Court's determination of whether "there is no other adequate remedy in a court" so that relief is available under the APA, whether there is a threat of irreparable harm in the absence of preliminary relief, thus making a preliminary injunction appropriate, and whether the Court has jurisdiction to hear this case at all. While ordinarily the issue would be waived, because the CSRA could potentially affect jurisdiction the Court finds it necessary to address the issue and require additional briefing from the parties.[14]

## IV.    CONCLUSION

Accordingly, the Court hereby defers ruling on Plaintiffs' Application for Preliminary Injunction until the parties have submitted additional briefing.

It is hereby **ORDERED** that the parties must submit supplemental briefs, not to exceed 15 pages in length, addressing the effect of the Collective Bargaining Agreement and the CSRA on the Court's jurisdiction to hear the case.  The parties must provide citations to relevant authority in support of their propositions, including citations to the relevant provisions of the Collective Bargaining Agreement.  *See Castro v. McCord*, 259 F. App'x 664, 666 (5th Cir. 2007) (requiring citations to relevant authority). The parties shall file their respective briefs on or before **May 6, 2013**.

---

[14]    The Court will address the third and fourth factors required to obtain a preliminary injunction—whether the balance of equities tips in Plaintiffs' favor and whether an injunction is in the public interest—after the Court addresses the CSRA's effect on jurisdiction.

**SO ORDERED** on this **23rd day** of **April, 2013**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**